UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:20-CR-00167-M-3

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORDAN DUNCAN | MOTION TO REVOKE MAGISTRATE'S ORDER OF DETENTION AND SUPPORTING MEMORANDUM OF LAW |

The undersigned counsel, on behalf of Defendant Jordan Duncan, respectfully moves this Court for an order revoking the magistrate judge's order of detention. DE 55, under 18 U.S.C. § 3145(b). Mr. Duncan seeks an order for his pre-trial release, consistent with the recommendations of the U.S. Probation Office. DE 34.

A balancing of the factors, and his rights, under the Bail Reform Act of 1984 (the Act)—18 U.S.C. § 3142 *et. seq*., and the United States Constitution, including the Fifth, Sixth, Eighth, and Fourteenth Amendments favors pre-trial release and belies the Government's suggestion that the awesome and narrow power of pre-trial detention without bond is warranted. This is not a presumption of detention case under the Bail Reform Act. If one strips away the toxic and reprehensible ideologies and viewpoints that the Government attributed to Mr. Duncan (and his co-defendants) during the detention hearing, there is a clear basis for fashioning pre-trial release conditions for him, especially as the maximum statutory punishment for Mr. Duncan (with no prior criminal convictions) is 5 years imprisonment. The ideologies and viewpoints attributed to him were the driving force of the detention order, but advocacy for the use of force or even violence is protected by long-standing Supreme Court precedent in a line of First Amendment cases, absent an imminent likelihood of violence or lawless action occurring. No evidence of imminence was presented.

## BACKGROUND

Mr. Duncan is 26 years old. He was honorably discharged from the United States Marine Corps. Prior to his arrest in this case, he has never been charged with or convicted of a crime. He does not have a substance abuse history. He was working in Idaho at a government contractor prior to his arrest. He can live with his parents in Pennsylvania, be under electronic monitoring overseen by the U.S. Probation office in Pennsylvania, and he has employment waiting for him there if released. He has not saved a lot of money through his prior employment. His car is modest, and he owes money on it. He does not have any meaningful assets. His passport has been seized. His father testified that even as an adult, he is the kind of person willing to obey his parents' house rules when he stays there. His parents (as his father testified at the detention hearing) will enforce the rules relating to any conditions of release that this Court may fashion. Put simply, he lacks the means to flee U.S. jurisdiction, and there is a lack of meaningful evidence from which this Court can infer an intent to flee U.S. jurisdiction. All these facts were established at the detention hearing. The Government has failed to demonstrate by either clear and convincing evidence (or assuming arguendo a preponderance of the evidence standard) that there are no conditions or combination of conditions that will reasonably assure Mr. Duncan's appearance in this Court when hearings occur.

Furthermore, he is charged with a conspiracy offense, 18 U.S.C. § 371 to commit a regulatory firearm violation, 18 U.S.C. § 922(a)(1)(A) (prohibiting engaging in the business of manufacturing or dealing in firearms without a license), and the Civil Disorders Act, 18 U.S.C. 231(a)(2), despite no evidence of an imminent likelihood of violence or injury to anyone. The statutory punishment is a maximum of 5 years in prison. 18 U.S.C. § 371. The accusation does

not carry a presumption of detention under the Act. He is, of course, presumed to be innocent. On balance, the totality of the allegations against Mr. Duncan fails to show that the Government has met its burden by clear and convincing evidence to prove that pre-trial detention is the only remedy that can reasonably assure the safety of the community.

## DISCUSSION

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987) (upholding constitutionality of the Bail Reform Act). That exception is to be invoked "only for the strongest of reasons." *Sellers v. United States*, 89 S. Ct. 36, 38, 21 L. Ed. 2d 64 (1969) (Black, J., in chambers). The Act instructs trial courts to first consider "pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond." 18 U.S.C. § 3142(b); *see Betterman v. Montana*, 136 S. Ct. 1609, 1614 (2016) (noting statutory presumption that bail is available for the accused awaiting trial). This statutory presumption gives effect to the Fifth Amendment's command that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V; *see also Salerno*, 481 U.S. at 755. This "traditional right to freedom before conviction permits the unhampered preparation of a defense and serves to prevent the infliction of punishment prior to conviction." *Stack v. Boyle*, 342 U.S. 1, 3 (1951).

The Act "favor[s] release over pretrial detention," *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985), by creating two statutory presumptions against pretrial detention. The first is a presumption in favor of pretrial release on personal recognizance or unsecured appearance bond. *See* 18 U.S.C. § 3142(c). The second is a presumption in favor of release in conjunction

3

with the imposition of reasonable conditions when the judicial officer determines that release pursuant to the first presumption will not reasonably ensure the person's appearance as required or would endanger the safety of others. *Id*.

These presumptions must be given meaning. As the Supreme Court explained in *Boyle*:

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 156 U.S. 277, 285 (1895). ***Unless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.*** *Stack v. Boyle*, 342 U.S. 1, 4 (1951) (emphasis in original).

342 U.S. at 4 (emphasis in original).

When a personal recognizance bond is insufficient, the court must choose "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(c)(1)(B); *see, e.g, United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991) (holding that under § 3142(e) defendants on racketeering charges were entitled to further consideration of electronic ankle bracelets, rather than continued detention, as a lesser restrictive condition); *see also United States v. O'Brien*, 895 F.2d 810, 816 (1st Cir. 1990) (use of an electronic bracelet, standing alone, may even rebut the presumption of detention in the narrow class of cases where the presumption applies).

The Act goes on to list thirteen specific possible conditions as well as a catchall: "[A]ny other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." 18 U.S.C. § 3142(c)(B). It is only as a *last resort*, only if none of those conditions—and no combination of those, or any other conditions—would reasonably assure the appearance of the person or the safety of any other person and the community, that the judicial officer may order the person detained pending trial. *Id.* § 3142(e). This "wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." *Orta*, 760 F.2d at 891.

Title 18 U.S.C.§ 3145(b) allows the accused to seek by motion review or revocation of a magistrate's detention order. It does not require that new evidence or information be available before a detention order can be reconsidered and revoked, id., and "[t]he standard of review for the district court's review of a magistrate judge's detention order…is de novo." *United States v. Cisneros*, 328 F.3d 610, 616 n. 1 (10th Cir. 2003). "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Rueben*, 974 F.2d 580, 585-86 (5th Cir. 1992); *see also United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985).

*Danger to the Community*:

With respect to reasonably assuring the safety of any other person and the community, the Government bears the burden of proving its allegations by clear and convincing evidence. 18 U.S.C. § 3142(f); *Salerno*, 481 U.S. at 739. Clear and convincing evidence is more than

preponderance of the evidence but less than beyond a reasonable doubt. *Addington v. Texas*, 441 U.S. 418, 431-33 (1979).

The specific factors to be considered in a detention ruling are set forth in 18 U.S.C. § 3142(g):

> Factors to be considered.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
>> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>>
>> (2) the weight of the evidence against the person;
>>
>> (3) the history and characteristics of the person, including—
>>
>>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>>
>>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>>
>> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Here, Mr. Duncan is accused of conspiring with others to sell unregistered weapons. More specifically, as to just Mr. Duncan's alleged conduct, he is principally accused of purchasing what the Government believes to have been, based on circumstantial evidence, a silencer for a firearm from a co-defendant and allegedly having it shipped to his brother's house

in Texas. It is noteworthy that this package was never actually inspected. Mr. Duncan also shared an apartment in Idaho with another co-defendant, Mr. Collins, where evidence related to unregistered firearms were seized. Additionally, Mr. Duncan was not present when undercover purchases of unregistered firearms (or silencers) were conducted in this case involving the co-defendants. The magistrate judge noted at the hearing that the evidence did not support concluding that Mr. Duncan occupied an organizer, leader, or even management or supervisor role in any alleged conspiracy.

Mr. Duncan is also accused of being in a conspiracy to violate the civil disorders act, based on the weapons attributed to Mr. Duncan, firearm training and target practice (consistent with Second Amendment protected conduct), and countless allegations of being involved in electronic messages and other forms of media where the Government contends Mr. Duncan and others were advocating for violence at an unknown date in the future if our society falls into a state of de-facto anarchy (in the context of observations about the social and political protests and riots that occurred this year throughout our country in the aftermath of George Floyd being killed by a police officer in Minnesota).

Moreover, the Government, at the detention hearing (and in the indictment) focused on a viewpoint and characterized it as white supremacist/neo-Nazi/alt-right. Based on what most of our society would conclude are hateful, toxic, and reprehensible ideologies and views, the Government attributed those ideologies and views to Mr. Duncan, argued that those views and ideas, in conjunction with the regulatory firearm offenses and advocacy of behavior that would constitute a civil disorder without any imminent likelihood of an actual civil disorder, justified an order depriving Mr. Duncan of his liberty pre-trial on the theory that he posed a danger to the

7

community. If one strips away the ideologies and viewpoints attributed to Mr. Duncan at the detention hearing, the totality of the factors does not come close to establishing a case where there are no conditions of release that can reasonably assure the safety of the community, what you have is a young man with a good job and a history of honorable military service who allegedly engaged in a regulatory firearm offense(s).

The Government's allegation that the co-defendants did a small-militia style field training target practice also fails to justify a detention order since that allegation involves conduct and expressive conduct squarely protected by the Second Amendment. The ideologies and viewpoints attributed to Mr. Duncan eclipsed the others factors at the detention hearing and were the driving force of the magistrate's conclusion that Mr. Jordan posed a danger. That conclusion was flawed and ran afoul of the First Amendment. *See United States v. D-1 David Brian Stone*, No. 10-20123, 2010 U.S. Dist. LEXIS 42834, at *5 (E.D. Mich. May 3, 2010) (weighting countervailing First Amendment principles and reversing detention order and ordering release on conditions for alleged members of an anti-government extremist group charged with seditious conspiracy to overthrow the government and firearm offenses, including with allegations of live-fire training in furtherance of an allegedly seditious plot).

Despite the visceral reaction most have to the toxic, hateful, and reprehensible ideologies presented by the Government in its allegations at the detention hearing, this Court is well aware of the first principles of speech, assembly, and the right to bear arms as enshrined in the First and Second Amendments.

"It is easy to champion free speech when it advocates a viewpoint with which we agree. It is much harder when the speech promotes ideas we find abhorrent. But an essential function of

free speech is to invite dispute." *United States v. Rundo et. al.*, No. 2:18-cr-759-CJC, DE 145 at 2 (C.D. Ca. June 3, 2019) (Carney, J.) (holding that the federal Anti-Riot Act is unconstitutional on First Amendment overbreadth grounds and dismissing indictments against alleged alt-right violent white supremacists). "The vitality of our democratic and public institutions depends on free and vigorous discussion." *Id*. Speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). This is the robust market place of ideas our First Amendment laws seek to protect from the encroachment of government censorship, and censorship is greater evil compared to the perceived evil flowing from the content or viewpoint of reviled speech. These principles led the Supreme Court to its line of decisions on when there is a narrow exception to conclude that certain advocacy to violence or force falls outside of First Amendment protection. Under this narrow exception, the government may prohibit advocacy of the use of force or violence only "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or product such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (the advocacy of violence is protected speech). Yet the magistrate's detention order concluding danger from the evidence of ideology and viewpoints placed its imprimatur on the Government's theory of danger, which was tantamount to unconstitutional censorship, because there was no evidence at the detention hearing that violence or lawless action was imminent. The magistrate's conclusion that there was such a danger that Mr. Duncan's liberty had to be revoked pre-trial (and while presumed innocent) eviscerated *Brandenburg's* protections of speech. Just as civil liability cannot be imposed for advocacy of force or violence (lacking an imminent likelihood of such force or violence occurring), *see N.A.A.C.P. v. Claiborne Hardware Co.*, 458

9

U.S. 886 (1982), neither can a determination of dangerousness be made on that basis to deprive one of their liberty pre-trial under the Bail Reform Act.

*Flight Risk :*

The fact that Mr. Duncan would live in Pennsylvania with his parents if released as well as having previously traveled overseas as part of his military service, and developed foreign language skills as part of that service, does not provide an adequate basis for detaining him. A detention order may not be based on the "[m]ere opportunity for flight." *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986). In *Himler*, the Government urged the Third Circuit to adopt the magistrate's finding that the defendant posed a serious risk of flight based on his "considerable experience in adopting a false identity," as demonstrated by the pending charges for production of a false identification document and his prior convictions for larceny and possession of false identification. *Id.* at 158. The Third Circuit reversed the detention order based on the lack of "direct evidence to suggest that [the defendant] would flee from prosecution in the future." *Id.* at 162; *see also United States v. Hanson*, 613 F. Supp. 2d 85, 89-90 (D.D.C. 2009) (ordering defendant released subject to conditions despite Government's arguments regarding her "closer ties and greater affinity with China" and ability to obtain a new Chinese passport and to "relocate with ease"); *see also Government of Virgin Islands v. Leycock*, 678 F.2d 467, 469 (3d Cir. 1982) ("If the opportunity for flight were a reason to deny bail, virtually any defendant living in an area served by interstate public transportation could be denied bail for that reason.").

Here, the magistrate made no finding regarding any direct evidence of Mr. Duncan's likelihood to use his supposed mobility to flee the jurisdiction. The magistrate failed to appreciate the practical facts demonstrating Mr. Duncan's inability to travel. The magistrate

demonstrated a lack of appreciation of the fact that travelling internationally without a passport, without which, Mr. Duncan cannot board a flight or a ship bound internationally in the United States or Canada; nor, in most cases, Mexico, is utterly impractical. Further, GPS monitoring, a third party custodian who is regularly present (his father and even mother), required reporting via land line to Pretrial Services, and even monitoring by U.S. Probation create an interlocking system of checks and balances to ensure any effort to start to flee will be identified immediately. Mr. Duncan's lack of meaningful assets to support international travel only compounds the impracticality of fleeing without detection. The magistrate's failure to evaluate the practicalities of these limitations of the accused, here Mr. Duncan, justifies revoking the detention order.

The magistrate ignored the strong countervailing evidence confirming that Mr. Duncan would not be willing or able to undertake the risks associated with fleeing U.S. jurisdiction. He would be severing ties with his parents and siblings and friends in the United States and risk never seeing them again. Yet he is charged with one count, that even if he were given the maximum punishment, 5 years imprisonment, he may not even be 30 years old when released. He also has substantive defenses to whether he was actually in a conspiracy to sell any unregistered weapon or was running afoul of the civil disorders act. Even more serious charges would not necessarily warrant detention on the basis of flight risk. *See United States v. Giordana*, 370 F.Supp.2d 1256 (S.D. Fla. 2005) (serious charges not enough by themselves to justifying detention on the basis of flight risk); moreover, even "evidence of the commission of a serious crime and the fact of a potentially long sentence" alone is insufficient to "support a finding of risk of flight." *United States v. Friedman*, 837 F.3d 48, 50 (2d Cir. 1988). Additionally, Mr. Duncan has significant First Amendment and Second Amendment defenses to

11

the Government's allegations against him. Here, flight risk is purely speculative and cannot be a valid basis to deprive him of liberty at this critical stage where he is presumed innocent.

Finally, even under a preponderance of the evidence standard, the Government failed to make out its case for detention based on flight risk. However, this Court should analyze flight risk under a higher standard, clear and convincing evidence, on both constitutional and statutory grounds.

The Fourth Circuit has recognized that the trial court may only detain the accused pending trial if it finds, "by clear and convincing evidence 'that no condition or combination of conditions will *reasonably assure the appearance* of the person as required and the safety of any other person and the community.'" *United States v. Clark*, 865 F.2d 1433, 1435-37 (4th Cir. 1989) (en banc) (quoting 18 U.S.C. §§ 3142(e),(f)) (emphasis added); *United States v. Williams*, 753 F.2d , 332-33 (4th Cir. 1985). Thus, these published Fourth Circuit decisions establish that the Government has a high burden—the second highest burden under the law and higher than a preponderance of the evidence—in order to prove that the last resort of pre-trial detention without bond is authorized.

The Fourth Circuit's approach and conclusion is the correct standard as to addressing a claim of one being a risk of flight and reasonably assuring their appearance in court. Judge Boochever's dissent *in United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985), provides compelling analysis explaining why. *Id*. at 1409-14. He began by noting in the absence of clearly expressed legislative intent to the contrary, a statute should be construed to avoid serious constitutional issues. *Id*. at 1409. Because application of a preponderance standard would place

12

in issue "substantial" Fifth and Eighth Amendment questions and would, in his view, render the statute unconstitutional, he would apply a clear and convincing burden of proof. *Id*.

Evaluating what standard due process requires, Judge Boochever weighed significant liberty interest held by the accused in not being confined pending trial, noting that detention is obviously a fundamental loss of freedom, but may also imperil a defendant's job, source of income, and family relationships. *Id*. at 1414 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). And it may "hamper the preparation of a defense by limiting the defendant's access to his attorney and to potential witnesses for the defense." *Id.* (citing *Boyle*, 342 U.S. at 4). These injuries are not compensable. *Id.*

He compared that interest against society's interest in ensuring the defendant's appearance, noting that society has "no interest in confining a defendant who is not a flight risk." *Id.* at 1415. What is more, pretrial detention of someone who does not pose a flight risk is actually detrimental to society because it is so costly. *Id.* He concluded that the consequences to the defendant are "certain and grave," while those to society are "speculative," concluding that the proper balance is struck by imposition of a clear and convincing burden of proof.

Even in the absence of those constitutional considerations, Judge Boochever viewed the statute as requiring such a burden. *Id.* at 1409. First, he noted that the dangerousness determination is, by express statutory mandate, subject to a clear and convincing burden of proof. *Id.* Both the dangerousness determination and the risk of flight determination require a weighing of factors and, in Judge Boochever's view, the factors to be considered for flight risk are no less "specific and quantifiable" than those to be considered for dangerousness. *Id.* at 1410. Judge Boochever emphasized that several Supreme Court Justices had explained that bail should

be denied "only for the strongest of reasons." *Id.* (citing *Sellers v. United States*, 89 S. Ct. 36, 38 (1968) (Black, J., in chambers); *Truong Dinh Hung v. United States*, 439 U.S. 1326, 1329 (1978) (Brennan, J., in chambers); *Harris v. United States*, 404 U.S. 1232, 1232 (1971) (Douglas, J., in chambers). And, in close cases, "[d]oubts whether [bail] should be granted or denied should always be resolved in favor of the defendant." *Id.* (citing *Herzog v. United States*, 75 S. Ct. 349, 351 (1955) (Douglas, J., in chambers)).

Judge Boochever reasoned that the correct way to read Congress's silence on the burden applicable to risk of flight is to read from the legislative history that Congress believed the preexisting clear and convincing evidence standard from prior law would carry over to this new statute. *Id.* at 1411. He noted that Senate reports state that section 3142 "places the consideration of defendant dangerousness on an equal footing with the consideration of appearance," S. Rep. No. 225, 98th Cong., 2d Sess. 3-25, *reprinted in* 1984 U.S. Code Cong. & Ad. News 3182, 3195; S. Rep. No. 98-147, 98th Cong., 1st Sess. 18-52 (1983) (report on S. 215, an earlier and substantially similar version of 1984 Act). *Id.* And he concluded that Congress believed that its provision of the burden of proof applicable to dangerousness should be the same as the "current (and continued)" standard for proof of flight risk. *Id.* He also reasoned that application of a lower standard of proof on risk of flight would suggest that Congress considered flight risk to be more important than dangerousness, "a conclusion unsupported by the Act and contradicted by the legislative history's emphasis on the gravity of the dangerousness problem." *Id*.

Even if the "risk of flight" analysis could be subject only to a preponderance of the evidence burden of proof, it is clear that the second step of the Bail Reform Act's analysis— whether any condition or combination of conditions could reasonably assure the appearance of

the person—is indisputably subject to a clear and convincing evidence burden of proof. *Clark*, 865 F.2d at 1435-1436 (quoting 18 U.S.C. §§ 3142(e),(f)) (a person may only be detained if the court finds "by clear and convincing evidence 'that no condition or combination of conditions will reasonably assure the appearance of the person as required.' ").

At bottom, because assessing whether the accused is a risk of flight or otherwise not appearing in court is a speculative enterprise, this analysis is subject to a clear and convincing burden of proof.

Constitutional concerns support using a clear and convincing standard to weigh the Government's claim of flight risk. The Government's burden of proof in a criminal case must be commensurate with the interest of the criminal defendant at stake: the greater the interest, the higher the burden. There is no greater interest in our Constitutional system than the right to be free from physical restraint. *See Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part) ("Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Walker v. McLain*, 768 F.2d 1181, 1183 (10th Cir. 1985) ("The petitioner's interest in this case is one of the most important protected by our constitution – the interest in personal liberty.").

Recognizing the importance of the personal liberty interest at stake, Congress in the Bail Reform Act specified that a detention order based on the safety of any other person and the community must be made by clear and convincing evidence. *See* 18 U.S.C. § 3142(c)(1)(B). The statute does not contain an equivalent provision for a detention order premised on a defendant's flight risk. In the absence of a statutorily specified burden of proof, courts have reverted to the

traditional preponderance of the evidence standard that was utilized prior to the enactment of the Bail Reform Act. *See, e.g.*, *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). But Congress's silence does not bear the significance these courts seek to ascribe to it. Unlike flight risk—which has been a ground for denial of bail throughout the history of our federal judicial system—the community safety rationale for pretrial detention was a creation of the Bail Reform Act. *See United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) ("Section 3142 of the new Bail Reform Act dramatically changes prior law by . . . authorizing detention pending trial where 'no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community.'"). The novelty of this ground required Congress to include specific provisions to guide courts in making determinations under it, as opposed to flight risk decisions, which courts were accustomed to making.

There is no reason for a different burden of proof to apply to detention decisions made on flight risk as compared to community safety. The factors to be considered for either determination are also much the same. *See* 18 U.S.C. § 3142(f). Congress's choice to be more prescriptive in setting out the procedures applying to a community safety decision should not result in lesser protection for the personal liberty interests of the accused who have the means to travel than those of defendants accused of violent crimes or with lengthy criminal histories. The magistrate judge held the Government to an erroneously low burden of proof, and the detention order must be reversed.

Respectfully submitted, this the 24th day of December, 2020.

16
Case 7:20-cr-00167-M   Document 67   Filed 12/24/20   Page 16 of 18

17

TARLTON|POLK PLLC

/s/ Raymond C. Tarlton
Raymond C. Tarlton
Attorney for Defendant
N.C. State Bar # 38784
rtarlton@tarltonpolk.com
P. O. Box 1386
209 Fayetteville St., Suite 105
Raleigh, NC 27601
919-984-6464 (TEL)
919-400-4200 (FAX)

*Designation: CJA Appointed*

## **CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that on the date shown below, he electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to Assistant United States Attorney Barbara D. Kocher.

    This the 24th day of December, 2020.

/s/ Raymond C. Tarlton
Raymond C. Tarlton
