1                  **UNITED STATES DISTRICT COURT**

2               **EASTERN DISTRICT OF NORTH CAROLINA**

3                        )

     **UNITED STATES OF AMERICA,**   )

4                        )   **DOCKET NO. 7:20-cr-00167-M-3**

               **Plaintiff,**   )

5                        )

     **vs.**                   )

6                        )

     **JORDAN DUNCAN,**          )

7                        )

               **Defendant.**   )

8   _____

              **TRANSCRIPT OF DETENTION HEARING**

9         **BEFORE MAGISTRATE JUDGE JAMES E. GATES**

         **WEDNESDAY, DECEMBER 9, 2020; 12:02 PM**

10             **RALEIGH, NORTH CAROLINA**

11  **FOR THE PLAINTIFF:**

         United States Attorney's Office - EDNC

12       By:  Barbara D. Kocher, AUSA

         150 Fayetteville Street

13       Suite 2100

         Raleigh, NC 27601

14

15  **FOR THE DEFENDANT:**

         Tarlton Polk, PLLC

16       By:  Raymond C. Tarlton, Esq.

         209 Fayetteville Street

17       Suite 105

         Raleigh, NC 27601

18

19  Audio Operator:               CLERK'S OFFICE

20

                    eScribers, LLC

21             7227 N. 16th Street

                 Suite 207

22             Phoenix, AZ 85020

               973-406-2250

23             www.escribers.net

24  Proceedings recorded by electronic sound recording; transcript

            produced by transcription service.

25

1                              I N D E X

                                                                    VOIR
2    WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS   DIRE
     For the Government:
3    John Christopher Little    4       72       106

4    For the Defendant:
     Frank Duncan                      116      127
5


6


7    EXHIBITS    DESCRIPTION                            ID.     EVID.

8    For the Government:
     G-1         Iron March post                                71
9    G-2         Wire chat screenshot                           71
     G-3         Liam Collins and Jordan                        71
10               Duncan fake IDs
     G-4         Screenshots of Instagram                       71
11   G-5         Photos of locations and list                   71
     G-6         Instagram photos                               71
12   G-7         Training video                                 71
     G-8         Screenshot of Wire chat group                  71
13


14   For the Defendant:
     D-1         Letter from Stouffer's                         125
15               Auction & Real Estate Company

16
     CLOSING ARGUMENTS:                                PAGE
17   For the Government                                131
     For the Defendant
18

19

20

21

22

23

24

25

Colloquy

1                    P R O C E E D I N G S

2          THE COURT:  Very well, folks, the next case coming

3     before the United States -- coming before the Court, excuse

4     me, is the case of the United States v. Jordan Duncan.  And

5     we're here today for a detention hearing in that matter.  I

6     don't believe it's a presumption case.  I don't believe it is.

7          MR. TARLTON:  It's not, Your Honor.

8          THE COURT:  Meaning that the burden of production at

9     the outset rests with the Government, so Ms. Kocher, ma'am.

10         MS. KOCHER:  Thank you, Your Honor.  The Government

11    calls S.A. Chris Little, with the Naval Criminal Investigative

12    Service.

13         THE COURT:  Very well.  Mr. Tarlton, did you wish to

14    be heard?

15         MR. TARLTON:  Just briefly.  I'd ask that my client's

16    handcuffs be removed, so that he can pass me a note or look

17    through materials that the Government's --

18         THE COURT:  I'm sorry, for what reason?

19         MR. TARLTON:  For what reason?  He needs to be able

20    to write me notes during the detention hearing and look

21    through the exhibits that the Government has given to us this

22    morning.

23         THE COURT:  Well, I'll defer to the deputy marshals

24    that are in the courtroom.  If they consider that appropriate,

25    then I'll approve it.  Otherwise --

John Christopher Little - Direct

1          THE COURT OFFICER:  Are you a righty or lefty?

2          THE DEFENDANT:  Right-handed.

3          THE COURT:  Very well.  Ms. Kocher.

4          MS. KOCHER:  Thank you, Judge.  We would call S.A.

5    Chris Little.

6          GOVERNMENT'S WITNESS, JOHN CHRISTOPHER LITTLE, SWORN

7          THE CLERK:  Thank you, please have a seat.  And can

8    you state your name for the record, please?

9          THE WITNESS:  John Christopher Little (ph.).

10          THE CLERK:  Thank you.

11                    DIRECT EXAMINATION

12    BY MS. KOCHER:

13    Q.   And what do you do for a living, sir?

14    A.   I work for NCIS on Camp Lejeune.

15    Q.   And what is NCIS?

16    A.   It's the Naval Criminal Investigative Service.

17    Q.   And what does NCIS do?

18    A.   We work criminal investigations and counterintelligence

19    investigations that affect the Department of the Navy and the

20    Department of Defense.

21    Q.   And you have authority over violations of the federal

22    United States Code as well?

23    A.   I do.

24    Q.   Do you have familiarity with an investigation of an

25    individual by the name of Jordan Duncan?

John Christopher Little - Direct

1    A.    Yes, I do.

2    Q.    And that investigation involves several other targets as

3    well?

4    A.    That is correct.

5    Q.    Very good.  How did your participation in that

6    investigation get started?

7    A.    My participation started when I was made aware of a

8    source reporting that alleged Liam Collins -- excuse me, that

9    alleged Liam Collins was professing an ability to provide un-

10   serialized weapons and silencers to various individuals.

11   Q.    All right.  And what does un-serialized mean in that

12   context?

13   A.    Well, at the -- now we know it's -- it's weapons that

14   were made but never had serial numbers, that they were

15   manufactured illegally and -- and transferred.

16   Q.    All right.  What did -- the way you answered that makes

17   it sound like you thought differently in the beginning.

18   A.    Initially we thought it could mean firearms with the

19   serial numbers removed, but we came to learn throughout the

20   investigation that they were -- never had serial numbers and

21   were manufactured in that fashion.

22   Q.    All right.  And when did you get involved in this

23   investigation?

24   A.    Approximately April of this year.

25   Q.    What types of investigative steps were taken?

John Christopher Little - Direct

1  A.   Search warrants, surveillance, controlled purchases,

2  financial review of records, interviews.

3  Q.   All right.  Was there any electronic surveillance?

4  A.   Yes, electronic and physical surveillance.

5  Q.   All right, so like a cell phone tracker?

6  A.   Cell phone tracker, GPS tracker, and then actual physical

7  surveillance by agents.

8  Q.   All right.  In sum, what did the investigation reveal?

9  A.    In summary, like the investigation revealed a racially

10  motivated violent extremist group we identified with multiple

11  members that are engaged in the illegal manufacture of weapons

12  and interstate transfer of those weapons to various locations.

13  Q.   All right.  And just so the record is clear, that was

14  illegal manufacture?

15  A.   Correct.

16  Q.   Okay.

17  A.   And by weapons, I mean silencers, short-barrel rifles,

18  and pistols.

19  Q.   All right.  Well, let's start with those.  That is what

20  the indictment charges.  You mentioned controlled purchases.

21  A.   Correct.

22  Q.   So let's go there.  If you would, tell us a little bit

23  more about the information that you'd become aware of about a

24  source.

25  Q.   Once I was given the information that the source

John Christopher Little - Direct

1    provided, I began to look into who Liam Collins was.  I was

2    somewhat aware of a Newsweek article about him, not him by

3    name, but that it had been a, you know -- a Marine aboard Camp

4    Lejeune, but I was not, you know, involved to that point.  But

5    at that point, I did, you know, go back and read a Newsweek

6    article that exposed Liam Collins as a member of a Neo-Nazi

7    online forum named Iron March.

8         Came to learn that Liam Collins had been interviewed

9    by NCIS in November of 2019.  He, you know, chose to ask for

10   an attorney, and there was no, you know, information returned

11   from that interview, but that had happened prior.  I began to

12   look more into the posts made by Liam Collins on Iron March,

13   and it gave credence to what I was hearing as far as the

14   source reporting, so I decided to talk to the source myself to

15   get more detail on, you know, specifically what was being

16   alleged.

17   Q.   Okay.  And what was offered in regard to firearms?

18   A.   Liam Collins had told the -- the source that he could get

19   them a un-serialized Glock and a silencer, and he wouldn't

20   need to register it with the government.  And you know, he

21   gave him the price and, you know, discussed the details of

22   that transaction with the -- with the source.

23   Q.   And that's after you got involved?

24   A.   Correct.

25   Q.   And in what manner were those discussions undertaken?

John Christopher Little - Direct

1    A.    Initially the discussion was undertaken in person.  And

2    in that in-person, you know, meeting, that's when they just

3    discussed the possibility of the -- the deal, that it -- that

4    it could happen.  Liam instructed -- Liam -- Mr. Collins

5    instructed the -- the source to download an encrypted

6    messaging app to discuss it further and instructed him to only

7    discuss it face to face on an encrypted messaging app called

8    Wire.  And that he, you know, didn't want to discuss it in

9    other ways.  He also took other steps to secure his

10   communications like putting his cell phone in the microwave,

11   like he would not -- he did not want to speak around

12   electronics.

13   Q.    All right, and so following the first conversation, which

14   was in person, did the source actually then continue arranging

15   a controlled purchase in one of these other methods that you

16   mentioned?

17   A.    Yes.  The source continued to communicate with Mr.

18   Collins via Wire.

19   Q.    All right, and what ultimately was arranged, if anything.

20   A.    The sale of a -- excuse me -- the sale of an unregistered

21   9mm pistol with no serial number and a silencer that fit

22   the -- that attached to the same pistol.

23   Q.    All right, and was money actually exchanged?

24   A.    It was.

25   Q.    How much money?

John Christopher Little - Direct

1    A.    Approximately 1,500 dollars.

2    Q.    And that was controlled NCIS funds?

3    A.    It was.

4    Q.    And in what manner was that payment made?

5    A.    It was made in a bank transfer, so the -- the final --

6    the finalization of the deal was conducted during a controlled

7    meeting that was recorded via audio and video.  In that

8    meeting, the money was -- they -- they finalized the deal, and

9    then shortly thereafter, you know, transferred the money, the

10   same day.  It was -- they had some technical difficulty during

11   the actual meeting, but the money was transferred very shortly

12   after the -- the meeting.

13   Q.    All right.  Did you or through the source know where the

14   gun and suppressor were to come from?

15   A.    At that time, all we knew was a -- we had indications.

16   We didn't know for sure, but we had indications it was from a

17   Wire user named Deacon (ph.).

18   Q.    All right, and ultimately, were you able to identify

19   where the firearm and suppressor would be coming from?

20   A.    Yes.

21   Q.    All right, and how was that identification made?

22   A.    Well, initially through this first purchase, once we

23   transferred the money, we used financial review to identify a

24   lot of things.  But one of the things that we identified was

25   that the money went from the source to Liam Collins to another

(973) 406-2250 | operations@escribers.net | www.escribers.net

John Christopher Little - Direct

1    group member.  Then it went to another individual named Paul

2    Kryscuk.  Again, financial review indicated that Paul Kryscuk

3    used this money to buy parts that are consistent with what we

4    eventually received, as far as solvent traps that are

5    converted into illegal silencers and the -- the pistol.

6    Q.   If you would, just so the Court is following that term

7    "solvent trap," what is that?

8    A.   A solvent trap is -- by definition, a solvent trap on its

9    own is a item you would -- that can be affixed to the end of

10   a -- any -- like a rifle barrel or pistol barrel.  And what

11   its stated purpose is, it's -- you screw it on the end, and

12   when you clean the barrel, you spray solvents or cleaning

13   material through it, and it traps it at the end of the barrel.

14        And I don't -- I don't know what the advantage to

15   that is, but that is what the stated purpose is.  And a

16   solvent trap, in and of itself, cannot be used as a -- as a

17   silencer.  But the way the solvent traps are made, they are

18   readily converted with very little effort into functioning

19   silencers.

20   Q.   All right.  Now, had there been information given to the

21   source about exactly what the source would be receiving for

22   this 1,500 dollars?

23   A.   Yes.  There was information in the form of a video,

24   which, you know, we felt implied that that's what they were

25   getting.  And then they did talk about specifically that

John Christopher Little - Direct

1    they're getting the pistol and the -- the silencer.

2    Q.    And the video depicted a firearm with this type of

3    suppressor being fired; is that right?

4    A.    Yes.

5    Q.    All right.  Was there any other helpful information in

6    that particular video?

7    A.    Yes.  So because of the information we found through

8    financial review, we believed at the time it was Mr. Kryscuk

9    who had man -- who was going to manufacture and eventually

10   send us the -- the pistol.  At this time, we had not, you

11   know, received it.

12        The video provided had a very distinct tattoo on

13   their forearm.  It was color, and it was very distinctive, and

14   it was easily visible in the actual video provided.  So we

15   began doing open-search -- source research related to Mr.

16   Kryscuk to identify -- to maybe find like a social media post

17   where you could see his tattoo visible.

18        What we ended up finding was yet another alias he

19   utilized to work in the porn industry as Pauly Harker.  And

20   I'm sorry, there -- I think I jumped ahead some, but the -- he

21   utilized other aliases to ship the weapons, which I'll explain

22   in a minute.  But this is a alias he used as Pauly Harker to

23   act in the porn industry from, again -- because of his

24   participation in that, there were numerous photos of him, you

25   know, where you could identify the tattoo.  And we found that

John Christopher Little - Direct

1    it was consistent and -- with the tattoo in the video.

2         It also led us to find out that there was other types

3    of pornography he was involved in that in online communities

4    described it as hate porn.  It was what was described as

5    racially motivated, where they concentrated on minority

6    females and did very degrading things to them throughout the

7    course of the videos.  And there's a lot of people that are --

8    a community of people that are, you know, trying to make, I

9    guess, people aware that that is going on.  But that's where,

10   you know, that search led us.

11   Q.   All right.  So returning to the controlled meeting that

12   you mentioned, at which or shortly after which the money was

13   transferred, do you recall the date or the approximate date of

14   that meeting?

15   A.   I don't -- I don't recall the exact date, but I believe

16   it was in April.

17   Q.   April of 2020 of this year?

18   A.   Yes, ma'am.

19   Q.   All right, and following that meeting in regard to this

20   controlled purchase, what happened next?

21   A.   Following the meeting, it was a lot of the -- you know,

22   review I just -- just described.  That -- that took a lot of

23   time.  It also took time to actually receive the items we

24   purchased because of back orders and, you know -- you know,

25   things associated with COVID that were kind of slowing things

John Christopher Little - Direct

1   down.  But in that time, we identified multiple other

2   individuals who made similar purchases from Mr. Kryscuk and

3   identified other shipments with the same signature of, you

4   know, money coming in, him making these types of purchases and

5   then mailing things from his P.O. box he set up in -- well,

6   using a return address for a P.O. box he set up in Boise,

7   Idaho.

8   Q.   Okay, so he -- there is Mr. Kryscuk.  When you say he

9   received the money, he spent the money, he --

10  A.   Yes.

11  Q.   -- accepted -- he is Mr. Kryscuk?

12  A.   Correct.

13  Q.   All right, and in April of 2020, Mr. Kryscuk was living

14  in Boise, Idaho?

15  A.   Correct.

16  Q.   Ultimately, was this weapon and suppressor that had been

17  ordered delivered?

18  A.   It was.

19  Q.   All right.  How did it come to North Carolina?

20  A.   It was mailed in the U.S. Postal Service from Boise,

21  Idaho to a P.O. box in Jacksonville, North Carolina.

22  Q.   And did you obtain a search warrant and search that

23  package while it was still in --

24  A.   I did.

25  Q.   -- the custody of the postal service?

John Christopher Little - Direct

1   A.   I did.

2   Q.   All right.  Tell us about that.

3   A.   Once we identified the package coming here -- first of

4   all, it was sent to a post office box controlled by another

5   group member other than Liam Collins.  He -- it was kind of

6   a -- a common practice for them to have items shipped to, you

7   know, other people and use other peoples' names and other

8   locations when items were coming for them.

9         So it was shipped to -- actually, it was actually

10  addressed to someone -- even another person that was in Liam

11  Collins' unit.  Also the return address was to a name Shaun

12  Corcoran in Boise, Idaho.  And it went -- actually, the return

13  address was from, I believe, Meridian, Idaho, a P.O. box

14  there.  But it's near -- near Boise.

15  Q.   All right.  So you had earlier mentioned in your

16  testimony the use of aliases by Mr. Kryscuk in particular.

17  Was this Shaun Corcoran -- did that turn out --

18  A.   That's correct.

19  Q.   -- to be an alias of his?

20  A.   Yes.

21  Q.   In what manner were you able to discern that Shaun

22  Corcoran was an alias of Kryscuk?

23  A.   We recovered -- well, first we went to the actual

24  location that the P.O. box exists that is the return address

25  on this and other shipments.  We found that the records used

John Christopher Little - Direct

1    to open the P.O. box in the name of Shaun Corcoran, a fake

2    Idaho driver's license was used with the image of Mr. Kryscuk

3    and the name Shaun Corcoran, and then another fictitious

4    address on the driver's license -- at least fictitious to him.

5    Like, it's not where he lived.

6          Additionally, he -- he altered his own bank records

7    to take his name off and provide a bank statement in the name

8    of Shaun Corcoran to the post-office-box provider to open the

9    post office box.

10   Q.   All right.  So now you're back here in North Carolina.

11   You're looking at the package that came through the mail.  The

12   return address is Shaun Corcoran.  What did you find in the

13   package?

14   A.   Well, it was multiple packages.  It's shipped in three

15   different packages.  And the items are -- you know, like

16   the -- the lower receiver of the pistol would be one box, the

17   upper receiver would be in another box, and suppressor

18   components would be in another box.  And then there might be

19   other accessories mixed in within the three.

20         So the -- the components from the three boxes are

21   easily and -- and readily assembled into a functioning pistol

22   and silencer.  So I obtained the warrant for the packages,

23   opened them, marked them, placed them back, resealed the

24   packages and placed them back into the mail stream and

25   conducted surveillance on the P.O. box.

John Christopher Little - Direct

1   Q.   And what happened next?

2   A.   We observed group members come retrieve the packages and

3   provide it to a second group member, where they brought it

4   back to their home.

5   Q.   All right, and you said that was all surveilled?

6   A.   Yes.

7   Q.   And following that delivery of three packages, did

8   another set of packages come to that same P.O. box?

9   A.   Yes.  Another very similar set of three packages came to

10  the same P.O. box soon after that set did.  And it was

11  extremely similar to the first set, and it happened in a very

12  similar manner.

13  Q.   So you obtained a search warrant and opened it?

14  A.   I obtained a search warrant --

15  A.   And marked it?

16  Q.   -- opened them, marked them, noted that the firearms

17  seemed to be manufactured in a consistent manner.  They seemed

18  to, you know -- the suppressors looked identical to me.  It

19  was, you know, very similar.

20  Q.   All right.  Do you -- were you able to come to an

21  understanding of why there were two separate packages -- or

22  I'm sorry, two separate shipments of three packages each?

23  A.   Yes.  We identified that another group member there in

24  Jacksonville, North Carolina had made a purchase through Mr.

25  Kryscuk shortly before us, before we made our controlled

John Christopher Little - Direct

1    purchase.  So when we initially identified the first package

2    coming in, we learned that that was for that individual, and

3    then the one we ordered through our controlled purchase was

4    the second set.

5    Q.   All right, so would those two sets of packages that

6    you're describing, the first set, be consistent with an

7    allegation that on or about June 19th of '20 two codefendants

8    to include Mr. Kryscuk willfully transported in the State of

9    North Carolina a 9mm pistol with suppressor?

10   A.   Yes.

11   Q.   All right, and as to that second set or the second

12   shipment, rather, that is the suppressor and pistol that came

13   in the second shipment, is it consistent with the allegation

14   and the indictment that on or about June 17th of '20 Mr.

15   Collins and Mr. Kryscuk caused the transport of firearm into

16   North Carolina?

17   A.   Yes.

18   Q.   All right.  Now, ultimately, did you, in fact, receive

19   that pistol and suppressor that had been ordered through the

20   source?

21   A.   Yes.

22   Q.   And how did that come to the source?

23   A.   It was delivered by another group member coordinated by

24   Liam Collins.

25   Q.   All right, and in what manner was it coordinated?

John Christopher Little - Direct

1    A.    Liam Collins directed the source to meet with this other

2    group member to retrieve the pistol and silencer.

3    Q.    All right.  Any more packages that you're aware of came

4    to that P.O. box --

5    A.    Yes.

6    Q.    -- that are of interest?

7    A.    Yes.  We also identified and intercepted another package,

8    I believe in July of this year, that turned out to contain

9    a -- a suppressor, but it -- it was larger, and it appeared to

10   be for a rifle.  It just -- it was more substantial than the

11   other ones, and it had a different attachment method than the

12   other suppressors.

13   Q.    All right, and ultimately, do you know where that

14   suppressor went?

15   A.    Yes.  We -- we ended up recovering it in -- when we

16   served warrants in October of this year.

17   Q.    All right.  Were there any more controlled purchases from

18   Collins?

19   A.    Yes.  We did a subsequent controlled purchase through

20   Collins and Mr. Kryscuk for a short-barrel rifle and a

21   silencer that affixes to the short-barrel rifle.

22   Q.    And would this be consistent with a count in the

23   indictment that alleges on or about September 11th of this

24   year Collins and Kryscuk knowingly transported and delivered

25   from Idaho to Pennsylvania a firearm?

(973) 406-2250 | operations@escribers.net | www.escribers.net

John Christopher Little - Direct

1    A.    That's correct.

2    Q.    All right, and did that package match what you've

3    described for these other packages?

4    A.    Yes.  It was in multiple packages.  I didn't personally

5    inspect this package like I did the others, but I -- you know,

6    I've seen the -- I talked to the agents who did.  And I've

7    seen the -- the photos.  It was again the Shaun Corcoran alias

8    was utilized.  It was pack -- it was spread out amongst

9    multiple packages, and the lower receiver to the rifle was

10   drilled out and milled in the same fashion that the lower

11   receiver to the pistols were, meaning it -- it was purchased

12   without serial numbers and then manufactured by Mr. Kryscuk.

13   Q.    All right.  Did the investigation reveal any more

14   packages from Shaun Corcoran or Paul Kryscuk in Idaho to other

15   states?

16   A.    Yes.  We identified multiple other transactions that

17   indicated firearms purchases that were similar to our

18   controlled purchases and then identified multiple shipments

19   of -- of the same manner, multiple shipments through U.S.

20   Postal.

21   Q.    Okay.  To what states?

22   A.    I remember New York, Texas, South Carolina.

23   Q.    Let me stop you at Texas there.  Now, Mr. Duncan lived in

24   Texas for some time; is that correct?

25   A.    That's correct.

John Christopher Little - Direct

1    Q.   All right.  Does that shipment have any relevance to Mr.

2    Duncan?

3    A.   It does.

4    Q.   All right.  Explain that for us.

5    A.   The shipment followed a Venmo transaction from Mr. Duncan

6    to Mr. Kryscuk in an amount consistent with other suppressor

7    purchases that we've seen.  And then the activity of Mr.

8    Kryscuk within his own bank account after receiving the money

9    was also consistent with the types of solvent-trap purchases

10   and the other types of purchases we've seen in the course of

11   our controlled purchases and the other identified shipments.

12        We also identified the label of the package that was

13   sent after this money transferred to San Antonio, Texas.  It

14   was using the Shaun Corcoran alias that was consistent with,

15   you know, every other box that we opened had illegal firearms

16   or firearm components, you know, utilizing that alias.  And

17   the fact that the -- the package was shipped to an address

18   of -- that is -- appears to the same as Mr. Duncan's younger

19   brother to a alias of Jerry Seinfeld.

20   Q.   Seinfeld?

21   A.   Correct.

22   Q.   And do you recall approximately when that Venmo

23   transaction and package regarding Texas was?

24   A.   I don't recall off the top of my head exactly.  I know it

25   was earlier, but I don't remember when, would be approximately

John Christopher Little - Direct

1    in April as well, but I don't remember the exact date.

2    Q.   Okay.  Were there other guns or suppressors or parts

3    seized?  I think you mentioned that the rifle suppressor had

4    been recovered.  Have others been recovered?

5    A.   Yes.  There was suppressors recovered in - in multiple

6    locations.  There's suppressors recovered from the home of

7    group members here -- or in Jacksonville, North Carolina.

8    There's suppressors recovered from the home of Mr. Kryscuk in

9    Boise, Idaho.

10          There was -- there's also a solvent trap with the

11   internals, you know -- have the internal components of a

12   suppressor, but a end -- end cap for a solvent trap was

13   discovered in Mr. Duncan's room at his apartment.

14          The sticker on it was from the same company that Mr.

15   Kryscuk bought all of his solvent-trap parts from, and it was

16   readily -- it was in a state to where you could remove the end

17   cap and screw on another end cap without any tools to make it

18   a functioning suppressor.

19   Q.   But the other end cap, the one that would turn it into a

20   suppressor, was not located, just to be clear?

21   A.   We did not recover it, no.

22   Q.   Okay.  I want to turn your attention shortly to that

23   audio and video recording of the controlled meeting with

24   Collins that you mentioned.  Were there things said in that

25   meeting of -- that would be of interest to the Court?

John Christopher Little - Direct

1    A.   Yes.

2    Q.   What are they?

3    A.   During the meeting, first, Mr. Collins makes it clear

4    that he's part of a group, that he's not a small part, he's

5    not a pawn, that he's a integral part of a -- a group.  He's

6    not -- he doesn't go further with the CW, but that was our

7    first indication, you know, at that time that there was, you

8    know, something more going on, and that there was an actual

9    group.

10           He also confirms his -- what I would call anti-

11   Semitic and anti-African American overall racist ideology, you

12   know, during the meeting.  He also talks about the type of

13   items that his connection, who we now know is Paul Kryscuk,

14   can obtain to include pistols, rifles, short-barrel rifles.

15   And he claims to be able to acquire rifles that are fully

16   automatic.

17   Q.   All right.  Now, you used the name Paul Kryscuk, I think,

18   in there.  Did he say Paul Kryscuk can get these?

19   A.   No, I -- I mean, who we know -- who we later discovered

20   he was referring to as Paul Kryscuk.  He never gave Mr.

21   Kryscuk's real name.

22   Q.   All right.  Did he give his location?

23   A.   I don't believe so.

24   Q.   Okay, but you tracked the money to Mr. Kryscuk?

25   A.   Yes.

John Christopher Little - Direct

1    Q.   And then verified by the tattoo.  You used CW there

2    shortly, and I just don't think that term has come up today.

3    That would be confidential witness?

4    A.   Or cooperating witness.  I use that interchangeably with

5    source at times.

6    Q.   Okay.  All right.  Well, let's turn then to the ideology

7    that you've mentioned.  You said that you were aware of a

8    Newsweek article and had done some investigation at the

9    beginning in regard to an Iron March; is that right?

10   A.   That's correct.

11   Q.   Let me show you --

12        MS. KOCHER:  If I may approach, Your Honor.

13        THE COURT:  You may.  Thank you.

14   BY MS. KOCHER:

15   Q.   -- what's been marked as Government's Exhibit 1.  Do you

16   recognize that?

17   A.   Yes, ma'am.

18   Q.   And what is it?

19   A.   This is a post made by Iron March user

20   Visions_from_Patmos, who we know is Mr. Kryscuk.  It's a

21   rather long manifesto-style post that he posted to Iron March

22   in March of 2017.

23   Q.   Now, this particular exhibit is a copy of the post; is

24   that correct?

25   A.   That's correct.

John Christopher Little - Direct

1    Q.   And it has been modified, that is, through markings for

2    convenience of the Court today.  It's not -- that doesn't look

3    that way on the original; is that correct?

4    A.   No.  That's right.

5    Q.   All right.  If you would, just very briefly describe what

6    Iron March is.

7    A.   Iron March was a -- it's now, you know, shut down, but

8    it's a online forum associated with Neo-Nazis where many

9    different groups organized and grew out of.  Groups like

10   Atomwaffen and multiple others.  It was a place where anti-

11   Semitic and racist ideology was openly expressed.

12   Q.   All right.  Well, let me turn you to Exhibit 1 then.  You

13   said that this is a posting by Mr. Kryscuk.

14   A.   That's correct.

15   Q.   How do you know this is Mr. Kryscuk?

16   A.   For multiple reasons.  Initially, what first came through

17   our review of Venmo records I identified a IP address utilized

18   in Venmo.  That same IP addressed was utilized to access the

19   Visions_from_Patmos user on Iron March.  Later in cell-phone

20   reviews of Mr. Kryscuk's of items we seized, we see that he,

21   you know -- in his history he logged in as Visions_from_Patmos

22   on Iron March.

23   Q.   All right.  So looking then at Exhibit 1, this is a

24   manifesto-style post?

25   A.   Correct.

John Christopher Little - Direct

1    Q.   And turning to that page 1 of this exhibit where the oval

2    exists, just briefly tell the Court what you learned from

3    that.

4    A.   In this part of it, he's just -- overall, the post, he's

5    talking about how to replace the U.S. government and our

6    society with a national socialist government that is basically

7    a -- you know, for white individuals only.  The -- that's

8    the -- just the overall.

9         In this oval, he's making it clear that there is no

10   political solution to it, and that it will take, you know,

11   what he describes as a possible war, like a war that may last

12   generations.  And he's stating that it's going to take force.

13   Q.   In order to accomplish it will take force?

14   A.   In order to accomplish.  Like, that's -- if we're just

15   talking about this one part, like that's, you know, what he's

16   focused on is just driving the point home that there's no

17   political solution, that, you know, you're not going to be

18   able to work with any, you know -- you know, Jewish or African

19   American individuals to accomplish, you know, what we want to

20   accomplish.  He's just saying that that's impossible.

21   Q.   All right.  What else of relevance does that

22   Visions_from_Patmos manifesto-style post inform the reader?

23   A.   So after making it clear that there is no political

24   solution, he goes through in making suggestions on how to

25   obtain, you know, what they -- what they want.  So like I

John Christopher Little - Direct

1    said, he makes it clear that it would take, you know,

2    violence.  He calls it getting rifles out and going to work at

3    one point.

4           So in making that happen, he talks about first

5    establishing a network in certain locations of the country.

6    He suggests that he's very -- a very big fan of the Northwest

7    Front, which exists in the Pacific Northwest in, you know,

8    states like Idaho, Seattle -- or Washington State, those

9    areas.

10          So that's one thing.  He starts suggesting create a

11   network of others, likeminded individuals so that you can

12   build these paramilitary groups to accomplish their -- their

13   later goals.  So once these areas are established, like moving

14   into areas that are predominantly white, he suggests slowly

15   radicalizing or turning your friends, neighbors, other

16   individuals around you into their line of ideology so that

17   they can begin to get a foothold in the area, a foothold in

18   local government, a foothold in all these, you know, different

19   areas.

20          All of these would be, like as he states in here --

21   he calls himself an accelerationist.  These would be acts

22   designed to further -- to accelerate the fall of the U.S.

23   government, to push the U.S. government over the edge, and

24   then basically fill that void after they, you know, accomplish

25   that.

1          So in the post, after, you know, talking about moving

2    to these areas, he's talking about establishing this network

3    that will lay the groundwork for a guerilla-style organization

4    that will take part in what he describes as a ground war in

5    the United States similar to the war in Iraq.  And that war is

6    after, you know, they've caused all of this chaos with the

7    United States that the -- you know, our society is not the

8    same anymore.  The government is not in control.

9          They take advantage of that chaos, use these Neo-Nazi

10   paramilitaries that they describe to basically come out of the

11   areas they've already colonized or, you know, already

12   inhabited and do what he calls taking back the cities,

13   eradicating it of African Americans, other minorities, and

14   taking it back in that manner.

15         He also expresses the importance of recruiting

16   military members so that they can train these paramilitary

17   organizations, people with, you know specific skill sets that

18   they can make these, you know -- their paramilitary more

19   effective, in other words.  Apart from that, like after the

20   establishment of these paramilitaries, everything else moving

21   forward, they just hope to replace the whole U.S. government

22   as a whole with what their ideal is.

23   Q.   All right.  Do you know when this post was made?

24   A.   March of 2017.

25   Q.   All right, and do you know where Kryscuk was living when

John Christopher Little - Direct

1   he made this post?

2   A.   In the northeast in New York.

3   Q.   All right.  Now, as I go through here, I didn't quickly

4   see the word Iraq.  Is it possible that the formatting of this

5   has left out perhaps some of the various points?

6   A.   It's possible, but I remember reading that in the post.

7   Q.   Okay.  And I was just going to ask was it an intentional

8   cutting?  Is there any reason that there's -- you know, there

9   might be things missing?

10  A.   I see it.  It is possible, but I see it here.

11  Q.   Okay.

12  A.   This will be a ground war -- ground war very reminiscent

13  of Iraq.

14  Q.   And which page are you on, sir?

15  A.   As we -- this would be page 3.

16  Q.   Okay.  In the second column?

17  A.   Yes.

18  Q.   Yes, thank you.  Okay.  Did any of the other group

19  members post on Iron March?

20  A.   Yes.

21  Q.   Who?

22  A.   Liam Collins.

23  Q.   All right.  Tell us briefly about that.

24  A.   Liam Collins was very active on Iron March.  The -- from

25  my reading it, a lot of what I read about his posts are direct

John Christopher Little - Direct

1   messages to others.  He seemed to be a very active networker

2   on the forum looking for other people to network with and join

3   a group that he was involved in.

4   Q.   And what types of things did he post?

5   A.   In these messages, I mean, he made it very clear he was

6   joining the military to get specific experience to take back

7   to his group, that that was -- that he described it as

8   sacrificing four years to the cause.  His four-year enlistment

9   in the military would be sacrificing four years to the cause

10  to, you know, support his paramilitary group and bring the

11  experience back to them.

12  Q.   Did he describe the group at all?

13  A.   Yes.  He described it to others as a group -- at the

14  time, he described it as a group of people of Polish heritage

15  that conducted live-fire training and did in-person meetups,

16  you know, focused on physical fitness among other things.  And

17  he described it as a modern-day SS, which would be a -- that's

18  a reference back to, you know, World War II-era Nazis.

19  Q.   All right.  Was there any evidence that Collins and

20  Kryscuk knew one another or communicated at the time of these

21  posts on Iron March?

22  A.   Yes.  There's direct messages between them both that they

23  discuss ideology, you know, each other's beliefs briefly, and

24  then discuss the need to move off of Iron March and discuss

25  things on Facebook Messenger and then further in person.

John Christopher Little - Direct

1   Q.   In general, were there things -- so right now, just

2   looking at Iron March, were there things from their posts on

3   Iron March that give an indication of their view of the

4   federal government?

5   A.   I mean, just in general the fact that they're talking

6   about overthrowing or replacing the federal government is the

7   thing that comes to my mind first.

8   Q.   All right.  To your knowledge, has this defendant, Mr.

9   Duncan, ever posted on Iron March?

10  A.   Not to my knowledge.

11  Q.   When was it taken offline?

12  A.   I believe in late 2017.

13  Q.   Okay.  So let me turn your attention to defendant Jordan

14  Duncan then at this time.  If you would tell the Court a

15  little bit about Mr. Duncan.

16  A.   Mr. Duncan was formerly in the United States Marine Corps

17  where he worked as a -- he worked in signals intelligence on

18  Camp Lejeune.  I believe he joined sometime around 2013, got

19  out in late 2018 approximately.

20       After that, he became a contractor for the United

21  States Air Force.  Worked in San Antonio, Texas.  Then

22  recently, he quit working there, became a contractor for the

23  Department of the Navy and moved to Boise, Idaho.

24  Q.   Can you tell me what signals intelligence is?

25  A.   With -- specifically for Mr. Duncan, he was trained by

1    the Marine Corps in signals intelligence, which is -- it can

2    mean a lot of things for him.  He specialized as a Russian

3    linguist, so he was sent to the Department of Defense Language

4    Institute where he learned Russian.  Then he received training

5    where just -- he received a lot of training, but just in

6    summary, it's where they basically train you on the -- the

7    design and organization of the United States intelligence

8    community, and then specifically, signals intelligence

9    regard -- regards like the interception of communications,

10   utilizing, you know, certain means and methods to, you know,

11   intercept.  It can mean a wide variety of things.  It doesn't

12   have to be just radio waves or, you know, anything -- it's

13   like any kind of over-the-air communication.

14   Q.   All right, and is there any relevance of that particular

15   position to any of the Iron March posts to which you've

16   referred?

17   A.   Yes.  In a Iron March post, Liam Collins is talking to

18   another individual that he -- I believe that the other

19   individual had some military experience, and Collins was

20   trying to figure out if that individual was close by or

21   someone like he could, you know, I guess work with.  But

22   the -- the main, you know, takeaway that I'm referring to is

23   Collins specifically states that he is looking for an

24   intelligence/comm guy for his group.  He wants someone with

25   that specific skill set for his group.

John Christopher Little - Direct

1    Q.   All right, and so it's -- given Mr. Duncan's background,

2    it fits, in your opinion, that phraseology of an intel/comm

3    guy?

4    A.   That describes signals intelligence to me and that they

5    have training in communications and intelligence.

6    Q.   Well, then moving forward, and keeping in mind the goals

7    stated in Government's Exhibit 1 by Mr. Kryscuk, did the

8    members of the group begin execution of any of the goals?

9    A.   Yes.  I mean, the first -- I mean, like Liam Collins

10   joined the United States Marine Corps.  I mean, that's part

11   of, you know, where -- where it started.  And the vast

12   majority of the group members, PSYOP military experience and

13   training, or they recruited heavily from within the Marine

14   Corps or within the -- the military even at large.  As far as,

15   you know, speaking to executing those goals, they successfully

16   recruited within the military, as Mr. Kryscuk stated, you

17   know, they suggested they should.

18   Q.   All right.  Is there any evidence that the group actually

19   existed back in '17?

20   A.   Yes.

21   Q.   What is that?

22   A.   Evidence in the form of photos, photos that we've

23   recovered from search warrants, like on iCloud.

24   Q.   And the photos depict Collins and Kryscuk and maybe other

25   members?

John Christopher Little - Direct

1    A.   Yes.   They -- it depicts individuals we know are Collins,

2    Kryscuk and other members.   And specifically in some images,

3    they're wearing face coverings, but they're doing a -- you

4    know, the well-known, like, Nazi salute in the image.   And

5    then in subsequent images, the masks are removed, and you can

6    see their face, and so that's, you know, how they were

7    identified.

8    Q.   Is Mr. Duncan present in any of those older photos?

9    A.   Not in the older ones.

10   Q.   Okay.   Is he present in any of the photos?

11   A.   Yes.

12   Q.   From approximately what date?

13   A.   From approximately in late 2018.

14   Q.   Was Mr. Duncan ever based at Camp Lejeune?

15   A.   Yes.

16   Q.   And did it -- was Mr. Collins ever based at Lejeune as

17   well?

18   A.   Yes, he was.

19   Q.   And did those times overlap?

20   A.   They did.

21   Q.   Do you recall when they would have overlapped, and both

22   been there?

23   A.   You know, from the time -- so Mr. Duncan was in well

24   before Mr. Collins, so they would have overlapped as soon as

25   Mr. Collins got to Camp Lejeune.   So Mr. Collins went to boot

John Christopher Little - Direct

1    camp in I believe August of 2017, so that would have put him

2    back on -- like actually on Camp Lejeune most of 2018, and

3    that's when they would have overlapped.

4    Q.   All right.  So let's talk about the group a little bit

5    more, on the idea of operational security first.  You

6    mentioned in regard to the controlled purchase that Collins

7    had referred the source to an encrypted app Wire.  Tell us

8    about that.

9    A.   Wire is an encrypted messaging app that automatic -- you

10   can set timers to automatically delete messages.  It -- you

11   know, it alerts you if -- it has a lot of security features

12   built into it.  It's a very secure form of communication.

13   It's on a server that's not housed in the United States.  It's

14   very secure.

15   Q.   All right, and were you able to get any communications

16   between the members of the group on Wire?

17   A.   Yes.

18   Q.   And how is that?

19   A.   Through screenshots they took and -- and that were

20   available on iCloud accounts, and through the review of

21   electronic devices.

22            MS. KOCHER:  If I may approach, Your Honor.

23            THE COURT:  Yes.

24   BY MS. KOCHER:

25   Q.   Let me hand you what's been marked as Government's

John Christopher Little - Direct

1   Exhibit 2.  Do you recognize that?

2   A.    I do.

3   Q.    What is that?

4   A.    This is a screenshot from the group's Wire chat group.

5   And I also recognize the Wire usernames.

6   Q.    All right.  What are the Wire usernames?

7   A.    The ones visible in this screenshot are Deacon and

8   Disciple.

9   Q.    And I believe that you earlier testified that Kryscuk

10  used the name Deacon.

11  A.    That's correct.

12  Q.    And who would Disciple be?

13  A.    Mr. Collins.

14  Q.    And is this particular Wire chat relevant to the idea of

15  operational security?

16  A.    It is, and it's -- also I recognize the actual chat --

17  that it's a chat group.  This is not a direct communication

18  between Deacon and Disciple.  But specifically what I

19  recognize, it's these ground rules they lay out that touch

20  heavily on operational security.

21        In it, Mr. Kryscuk as Deacon says 1, no specific

22  plans discussed on or around electronics.  That's something

23  we've seen, you know, they consistently attempt to do, you

24  know, first with advice given by Mr. Collins to the source,

25  and you know, the placement of a phone in the microwave.  You

(973) 406-2250 | operations@escribers.net | www.escribers.net

John Christopher Little - Direct

1    know, seems to be adhering to that -- that same, you know,

2    piece of advice.

3          Again, number 2, it's no face no case.  That is a

4    reference to face coverings, which they, you know had and

5    frequently wore.  You know, aside from the COVID pandemic, not

6    related to that, but you know, well before they frequently

7    wore face coverings in their photographs.

8          No prints no hints is, you know, self-explanatory.

9    Talking about not leaving behind physical evidence in the form

10   of prints.

11         And then a -- the final one, it says snitches go in

12   ditches, referring to those that, you know, give evidence will

13   be punished.  You know, says if they abide by these rules,

14   there's a high probability they'll survive and complete their

15   missions.

16         And another -- I also believe that pertains to OPSEC

17   is when Mr. Collins here refers to any rightwing group that

18   makes a name for themselves literally always gets taken down.

19   I feel like they adhere to that by purposely trying not to

20   name themselves, or you know, going through different names

21   over the years they existed and just kind of evolving in that

22   manner.  I think they purposely stayed away from that as far

23   as, you know, this statement indicates.

24   Q.    All right.  If I can turn you to page 2 of the same

25   exhibit.  Now, this is not a Wire chat; is that right?

John Christopher Little - Direct

1    A.    That's correct.

2    Q.    Or it might be an attachment, I guess.

3    A.    Correct.

4    Q.    To a Wire chat, but not necessarily this Wire chat.   What

5    is depicted here on page 2 of Exhibit 3?

6    Q.    This is a continuum that I've also seen in an

7    unconventional warfare manual or, you know, it's very -- or

8    something very similar.   But it's a continuum stating you are

9    here, as far as these types of group actions.   And it says by

10   here, they're saying you're at overt and covert pressures

11   against government strikes, riots, and disorders.   The next

12   stage is sabotage, terror, to demonstrate weakness of

13   government.

14          It culminates with guerilla actions and large-scale

15   guerilla actions against the government.

16          THE COURT:   Let me just stop for the record.   This is

17   Exhibit 2, I believe.

18          MS. KOCHER:   Apologize, Your Honor.   Yes, it is.

19          THE COURT:   Quite all right.   I just want the record

20   to be clear --

21          MS. KOCHER:   Thank you.

22          THE COURT:    -- Ms. Kocher.

23   BY MS. KOCHER:

24   Q.    All right, so whoever drafted this "You are here"

25   believed they're at the covert and overt pressures against the

John Christopher Little - Direct

1  government to include strikes, riots, and disorders; is that
2  right?
3  A.   That's right, and this also is in line with the -- you
4  know, what's mentioned in Mr. Kryscuk's manifesto-style post
5  as far as the -- the method and means he lays out to get to
6  their end state.
7  Q.   All right.  Now, you had also earlier mentioned in regard
8  to Kryscuk a false identification that he used to get a P.O.
9  box.  Were there other false identifications used in the case?
10  A.   Yes.
11       MS. KOCHER:  If I may approach, Your Honor.
12       THE COURT:  Yes.
13  BY MS. KOCHER:
14  Q.   Let me turn to what's been marked as Government's Exhibit
15  3, page 1.  What is that?
16  A.   These are driver's licenses that are, you know, fakes.
17  3-1 -- Exhibit 3-1 is the image of Liam -- Liam Collins with
18  the name Logan Grady (ph.), which is not his name, and it's
19  also a  Colorado state ID, which is not where he's from or
20  ever lived, to my knowledge.
21  Q.   All right, and was this recovered in photo form, or was
22  the actual ID recovered?
23  A.   The ID was recovered.
24  Q.   All right, and let me turn you to page 2.  What's that?
25  A.   It is a similar fake ID bearing the picture of Mr. Duncan

John Christopher Little - Direct

1  with a fake name, or a name that's, you know, not Jordan

2  Duncan.  And again, it's Colorado.  This was also recovered

3  from the residence of Mr. Duncan, placed inside of an official

4  U.S. passport.

5  Q.   You mean, it was kept by Mr. Duncan inside of an official

6  U.S. passport?

7  A.   It was kept with the passport, yes.

8  Q.   Now, that passport -- by official U.S. passport, what do

9  you mean?

10  A.   I mean, not -- it's not like a -- a personal passport

11  that you would get issued by the Department of State.  It's an

12  official U.S. passport that are generally issued by the

13  Department of Defense.  It's -- it's, you know, different than

14  a -- like a diplomatic passport or a, you know, passport you

15  would travel on for like vacation.

16  Q.   So it basically certifies that he would be on U.S.

17  business?

18  A.   Yes.

19  Q.   Was he properly in possession of that passport?

20  A.   Not to my knowledge.  We interviewed his current employer

21  in Boise, and they said he had no actual need for that, and

22  they weren't aware that he had it, and the -- the passport was

23  active.

24  Q.   All right.  So I need to turn you back to the umbrella of

25  operational security.  Were there other things besides the

John Christopher Little - Direct

1    four rules, the use of Wire, the false ID, and the supporting

2    documentation?

3    A.    Yes.   There's multiple discussions of their operational

4    security and operational security of others, as far as in the

5    form of a critique.

6    Q.    In the form of what?  I'm sorry.

7    A.    A critique, critiquing the operational security of

8    others.  The first thing that comes to mind is their use of

9    burner phones and in-person meets.  There's a conversation

10   between Mr. Duncan and Kryscuk at a point where they feel the

11   group has been compromised.  They tell -- Mr. Duncan is told

12   to mask up and go put money on his burner phone.  A burner

13   phone refers to a pre-paid phone that's paid for in cash and

14   is not attributable to a specific individual.  They also

15   organized a, you know, in-person meeting in a park to discuss

16   what's going on.

17         We also know at that time, from looking at cell

18   phones and electronic devices recovered during the searches,

19   that group members attempted to delete the Wire application

20   from their phones in, you know, what -- you know, appears to

21   be an attempt to get rid of information because they feel like

22   they've been compromised.

23   Q.    Let me bring you what's been marked as Government's

24   Exhibit 4.  These are screenshots taken of Mr. Duncan's phone

25   at the time of its seizure and his arrest; is that correct?

Case 7:20-cr-00167-M   Document 80   Filed 13/21   Page 40 of 151
escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

John Christopher Little - Direct

1   A.   Yes.

2   Q.   And if I can turn you toward the back of Exhibit 4, you

3   had mentioned a conversation with Mr. Duncan in regard --

4   between Mr. Duncan and another person in regard to use of

5   burner phones.  Is that conversation found there?

6   A.   Yes.

7   Q.   And if you would, what page are you looking at?

8   A.   I'm looking at when they're talking about meeting in the

9   park on page -- page 3.  That's the conversation I remember

10  when I referred to the park.  And then I don't see the

11  conversation about the burner phone in this.

12  Q.   Okay.  So what had transpired at this point, at the time

13  of that conversation?

14  A.   About the --

15  Q.   Why did they need to meet in a park?

16  A.   Oh, they felt one of their group members had been

17  compromised as far as their association.

18  Q.   What does the message itself say about that?

19  A.   Says, you know, yeah, the park should be fine.

20  Pertaining to who?  They're saying are we compromised.  It

21  says what happened to Liam happened to Dealer, which is Liam

22  was exposed online, and you know, they're saying the same

23  regarding Dealer.

24  Q.   All right, so a group member who goed (sic) by -- who

25  went by the name of Dealer had been exposed?

John Christopher Little - Direct

1   A.   Correct.

2   Q.   And that caused the need for a personal meeting in a

3   park, according to that text stream?

4   A.   Yes.

5   Q.   Very good.  Do you have any evidence of any more recent

6   planning by the group?

7   A.   Yes, I do.

8   Q.   Okay.  Tell us about that.

9   A.   The first thing that comes to mind is information we

10  learned that, you know -- from items seized from Mr. Kryscuk's

11  house.  We found a handwritten list with multiple locations in

12  multiple states in the, you know, western part of the United

13  States.  It was a list of these intersections, literally just

14  like an intersection of two streets.  At each of these

15  intersections were things I would describe as infrastructure

16  important to the -- the power grid, power stations,

17  transformers, things of that nature, with the exception of one

18  location, which was a -- a large-scale fuel depot.

19  Q.   And how was that determined?

20  A.   We -- for one, we've conducted research on the locations.

21  Agents have gone to many, if not all, of the locations.  And

22  then specific to the locations in Idaho, agents from the FBI

23  and Idaho went and met with Idaho Power and discussed, you

24  know, what was at these locations.  And they confirmed that,

25  you know, damage to these locations would cause, you know,

John Christopher Little - Direct

1    significant disruption in -- in power.  And it would take, you

2    know, significant amount of time to restore.

3              MS. KOCHER:  All right.  If I may approach again,

4    Your Honor.

5              THE COURT:  You may.

6              MR. TARLTON:  Is that 5?

7              MS. KOCHER:  It's 5.

8              MR. TARLTON:  Okay.

9    BY MS. KOCHER:

10   Q.   I'm going to show you what's been marked as Government's

11   Exhibit 5.  What are these?

12   A.   These are what's at the, you know -- some of the

13   locations that we found on the handwritten list.

14   Q.   And just to be clear, these photos that you're looking at

15   now in Exhibit 5 were not recovered.

16   A.   No, they were not.  They were recovered when -- or they

17   weren't recovered.  They were discovered when -- when we

18   conducted research into what was at those -- those

19   intersections.

20   Q.   All right.  So looking at page 1 of that, what is that

21   photo of?

22   A.   That is a power station.

23   Q.   All right, and what is the nomenclature on -- is it a

24   intersection, as you've described, or is it a place?

25   A.   It's a intersection.

John Christopher Little - Direct

1  Q.   All right.  And going to page 2.  Does that reflect an

2  intersection or a place?

3  A.   This is a place.

4  Q.   All right.  So I just wanted to clarify the list included

5  some names of places, not just intersections.

6  A.   Correct.

7  Q.   Okay, so that particular place was on the list, and

8  that's what it looks like.

9  A.   That's correct.  So at -- at some of the places as well,

10 as opposed to just intersections, but it's -- were items or

11 locations of the same -- same type.

12 Q.   Right, so everything you said is accurate otherwise.

13 A.   Yes.

14 Q.   All right.  Very good.  Now, was there other

15 conversations -- besides the recovery of that list, was there

16 other evidence uncovered or developed regarding power grids?

17 A.   Yes.  There was posted with -- from another group member,

18 and what I've seen as a screenshot from Wire is a picture of

19 an individual.  I've seen it other places as well, but the

20 first time I saw it was as a screenshot from a -- a Wire

21 posting.

22      It's a picture of a person wearing a mask, consistent

23 with the mask they wear in their photos and videos we have of

24 their training.  It's a person wearing that same mask with a

25 rifle, standing in front of a -- a -- what appears to be like

John Christopher Little - Direct

1    a power substation.  And it's discussing, you know -- it's

2    discussing the idea of, you know, blowing up power stations in

3    general.

4            MS. KOCHER:  All right.  If I may approach once

5    again, Your Honor.

6            THE COURT:  You may.

7    BY MS. KOCHER:

8    Q.   Let me hand you what's been marked as Government Exhibit

9    6.  Now, this exhibit has page numbers in a blue border at the

10   top, so for clarity of the record, I've asked you to use that

11   page number rather than counting through the pages.

12   A.   Okay.

13   Q.   Is this picture on the very front of that exhibit -- it's

14   designated page 44.  Is that similar or the picture that

15   you're describing?

16   A.   It is.  It is.  It's -- it's the same that I've seen

17   other places as well, in addition to this -- this Instagram.

18   Q.   All right, so this one's a little bit dark.  You

19   described an individual carrying a rifle.  Is there a rifle?

20   A.   I can't see it on this one, but I -- I've -- you know, I

21   can't quite make it out in this photo, but I can see the mask

22   I described.  And then the -- the other one I've seen on that

23   return from electronic devices is -- is more clear.

24   Q.   All right.  I want to -- before we go into the other

25   pages of Exhibit 6, I wanted to stay with the idea of the

John Christopher Little - Direct

1  power grid for a moment.  Were there evidence developed in

2  regard to the use of explosives?

3  A.   Yes.

4  Q.   All right.  Tell us about that.

5  A.   To start, the -- the first indication of explosives we

6  saw was on Mr. Kryscuk's iCloud returned.  There was several

7  schematics on there on how to build various improvised

8  explosive devices and then other specific components used in

9  what I would call IEDs, like remote detonators, blasting caps,

10 other components that could be used.  So there's schematics of

11 complete components and then schematics or how-to -- how-to-

12 type guides of others, of like remote detonators and --

13 Q.   And where was that material found?

14 A.   On Mr. Kryscuk's iCloud.

15 Q.   All right.  Were there other materials recovered in

16 regard to explosives?

17 A.   Yes.

18 Q.   And where was the other found?

19 A.   We recovered an external hard drive from Mr. Duncan's

20 room.  There was what I would call an extensive library of a

21 lot of different topics, but for one, it's explosives.  Why it

22 was particularly significant is because all the ones that I

23 saw on Mr. Kryscuk's iCloud were also contained within this

24 external hard drive, except this external hard drive had

25 significantly more than what Mr. Kryscuk had.  But it was the

John Christopher Little - Direct

1   same, you know, ones that were, you know, labeled as certain

2   types of car bombs.  And then specifically on this hard drive,

3   it went further than just explosives.  It went into chemical

4   weapons, how to make ricin, how to make other types of

5   chemicals, you know, similar to that that could be, you know,

6   used in the same manner.  There were multiple military

7   manuals.  There was folders labeled "propaganda".  There

8   were -- it's -- it's a -- it's a very large amount of

9   information that's still being reviewed as well.

10  Q.   Now, in regard to the military manuals, are those

11  available on the internet?

12  A.   Yes.

13  Q.   All right.  Were all the military manuals you saw

14  available on the internet?

15  A.   I don't -- I guess I can't answer that.  I haven't been

16  able to check, you know, every one because of the true volume

17  of manuals I saw.  But I do know that there is a approved use

18  for those and a unapproved use.  Use in furtherance of a group

19  like this would not be proper use of some of those manuals.

20  Q.   All right, and from your recollection on your first

21  review, did some of those manuals appear to be on topics

22  consistent or relevant to the group?

23  A.   Yes, and they were stored with other topics like

24  explosives, propaganda, you know, reading material consistent

25  with their ideology.  All of that was stored in the same hard

John Christopher Little - Direct

1    drive and the same, you know, organizational structure.

2    Q.   All right.  Were there other -- let's leave the power

3    grid now and were there other types of acts that were

4    discussed among the group?

5    A.   Yes.

6    Q.   All right.  Tell us about some.

7    A.   The way I -- these were actually designed to either cause

8    chaos or hurt others.  Specifically one that comes to mind is

9    a screenshot of a Wire conversation I've read between group

10   members that Mr. Duncan was -- his screen name was visible in

11   the -- the chat, and then Mr. Kryscuk's and another group

12   member were also visible in that chat.

13          One group member's talking about a seemingly

14   complicated way to cause chaos at a protest.  And they're

15   going into it.  Mr. Kryscuk and Duncan begin to chastise that

16   individual for the elements of their plan, and then Mr.

17   Duncan -- excuse me, Mr. Kryscuk then just suggests we should

18   just blast -- and then he uses a racial slur for African

19   Americans.  To which Mr. Duncan endorses that -- that comment.

20   Q.   All right.  Was there other -- did you say that was in

21   regard to Black Lives Matter?

22   A.   That was not specifically said, but the use of the racial

23   slur and a protest and what's, you know, other discussions

24   they've had, that's how I took it.  But they did not

25   specifically mention BLM in that instance.

(973) 406-2250 | operations@escribers.net | www.escribers.net

John Christopher Little - Direct

1    Q.    Okay.  Have there been other instances where BLM was

2    mentioned?

3    A.    Yes.

4    Q.    All right.  Tell us about that.

5    A.    BLM was a -- you know, a frequent topic of conversation

6    with multiple group members.  Specifically I remember Mr.

7    Kryscuk telling Mr. Duncan over I believe it's Instagram that

8    he suggests he follow the BLM Boise Instagram page because

9    he's getting a lot of good intelligence from the page.

10        We then find that Mr. Kryscuk is conducting

11   surveillance at BLM rallies, like he's -- we know through

12   physical surveillance and electronic surveillance that he's

13   gone to them, and he's even said himself that he, you know,

14   was -- was at these rallies and, you know, watched.  They made

15   other, you know, various extremely -- at this point, I

16   probably -- just generally racist comments in conjunction

17   with, you know, these types of conversations.

18   Q.    All right, and some of those would be found in

19   Government's Exhibit 6; is that right?

20   A.    Yes.

21   Q.    Now, this is the result of an Instagram disclosure; is

22   that right?

23   A.    Yes.  Another one that comes to mind too is a specific

24   conversation that Mr. Duncan had with Mr. Kryscuk about

25   physically assaulting African Americans that are at protests.

John Christopher Little - Direct

1    And the way I took the comment, could mean either people

2    participating in the protest that are on that side, or African

3    Americans, you know, specifically, but it talks about a way to

4    physically assault them and not get caught.

5    Q.   All right.  Let me turn you to the page that's marked

6    795.  It's just the back of the second physical page, I

7    believe.  Have you seen that photo that's depicted at the

8    bottom of that page?

9    A.   Yes.

10    Q.   And what is that?

11    A.   It is a photo that I've seen in more than just here, but

12    here it's in the, you know, Instagram return.  It's a color

13    photed -- a color photo posted by Mr. Duncan to Mr. Kryscuk.

14    It's from the group's training event they conducted in Boise

15    in July of this year.  It depicts four group members to

16    include Mr. Duncan aiming assault rifles at the -- at the

17    camera.  And the text in it reads "POV, you're a race mixer,"

18    which is meant to mean point of view, like this is what you

19    see if you're a race mixer.

20    Q.   And is this consistent with memes -- is there a POV meme?

21    A.   Yes.  I've seen other -- like just in general, you know,

22    internet culture, and I'm not talking specifically to this

23    type of stuff.  But I've seen other memes that are similar

24    that say POV, you know, your football team just lost, and

25    then, you know, it's got some guy crying maybe.  Just

John Christopher Little - Direct

1   something in general, it's something I've seen, you know,

2   other places.

3   Q.   All right, and for the Court's awareness, this Instagram

4   it lists just above that photo -- it says, "Author JCD".  Who

5   is that?

6   A.   That is Mr. Duncan.  That's his initials.  And then we

7   also recognize the "honey badger XC" (ph.).  I don't know if

8   it would be called a username or whatever, associated with

9   this account is also associated with his Venmo.

10  Q.   Okay.

11          THE COURT:  Associated with who?

12          THE WITNESS:  His Venmo account, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          THE WITNESS:  That account's also associated with

15  this Navy Fed bank account.

16          THE COURT:  Okay, thank you.

17  BY MS. KOCHER:

18  Q.   All right.  And the other author that's presented on

19  these pages is Slim Reaper?

20  A.   That's correct.

21  Q.   Do you know who that is?

22  A.   We know that to be Mr. Kryscuk.

23  Q.   All right.  Let me turn your attention to page 800.  In

24  the center of that page, what was the exchange between Slim

25  Reaper and Jordan Duncan there?

John Christopher Little - Direct

1    A.   Mr. Kryscuk tells him to follow BLM Boise.  I'm getting a

2    lot of good intel from their social media.  To which Mr.

3    Duncan responds that he will do.

4    Q.   All right.  If I can move you on to page 829.  At a post

5    in the left column dated August 2 of 2020.

6    A.   I'm sorry.  I don't see 829.  I got it, sorry.

7    Q.   Mr. Duncan is saying I'm like four weeks away from being

8    up there, fam.

9    A.   Correct.

10   Q.   And follows that up with been thinking a lot more about

11   stuff you and I need to be doing.

12   A.   Correct.

13   Q.   How does Slim Reaper respond?

14   A.   Says we're going to lay major groundwork.

15   Q.   What's going on in this time frame?

16   A.   At this time frame, members of their group are

17   collocating in Boise, Idaho.  They're moving there permanently

18   from other parts throughout the country -- country, like, Mr.

19   Duncan moved from Texas.  Mr. Kryscuk moved from New York.

20   Liam Collins is coming from North Carolina.

21   Q.   And Duncan moved to Boise in early September; is that

22   right?

23   A.   That's correct.

24   Q.   And this post was in August, early August?

25   A.   Correct.

John Christopher Little - Direct

1    Q.   And so he's forecasting I'm like four weeks away.

2    A.   That's correct.

3    Q.   All right.  On the same day, in the second column, they

4    have further conversation.  Can you tell us about that?

5    A.   This is a conversation where Mr. Kryscuk says eco-fascism

6    requires brown genocide.  To which Mr. Duncan says yes, it

7    always has.  And then they go on to, you know, further

8    discussions about why that, you know, is accurate.  That is --

9    the term eco-fascism is something that is becoming more --

10   more frequent.  It's something that was used by the -- in the

11   manifesto left by the attacker in the Christchurch, New

12   Zealand shootings.

13        It's -- in these contexts, it's referencing

14   protecting the earth by kind of getting rid of, you know -- by

15   curing overpopulation.  And you know, in here, this context

16   they say brown genocide.  So on its face, you know, they're --

17   it's just a -- you know, there's some ecological concern to

18   eco-fascism, but at the end it -- it's about racism and, you

19   know, in this instance brown genocide.

20   Q.   All right.  Let me turn you to the next page or next page

21   in the exhibit, page 833.  This is the next day.  What's the

22   exchange between the two at that point?

23   A.   Mr. Kryscuk says that playtime is over.  He's so serious

24   lately that he's not enjoying his life.  He looks forward to

25   getting Mr. Duncan out here so they can get shit done.  That's

John Christopher Little - Direct

1    a -- you know, quote from what they're saying.

2            Mr. Duncan agrees.  He says the closer you get the

3    more he thinks about everything he has to do.  And brother,

4    we're going to have to move mountains.  That's the

5    conversation they're having, and it's referencing what they're

6    going to do when he, you know, is able to collocate in Boise

7    with Mr. Kryscuk.

8    Q.   All right.  Now, you've mentioned the Christchurch

9    shootings.  Are there comments in the Instagram return

10   regarding Christchurch?

11   A.   Yes.

12   Q.   Tell us about those.

13   A.   There's a conversation between Mr. Kryscuk and Mr. Duncan

14   where they praised the Christchurch shooting.  And for

15   reference, this shooting occurred in New Zealand in 2019.

16   Fifty-one people were murdered in two different mosques in New

17   Zealand.  They -- Mr. Duncan refers to the attacker in that

18   instance as a legend.

19   Q.   If I can, I think this is at page 938 of Exhibit 6 in the

20   lower right-hand column.  What was the name of the New Zealand

21   shooter?

22   A.   His last name was Tarrant.  So this is the content of the

23   conversation I was referring to.  They are -- what spurred

24   this conversation is what appears to be an article that was

25   shared about some of the victims' remaining family, victims of

John Christopher Little - Direct

1    the shooting's remaining family.  They're chastising the

2    remaining victims, saying that your dad's still dead though,

3    chopped him in half with my automatic shotgun.  These are the

4    type of comments, like here, Mr. Kryscuk says yeah, too bad my

5    auto shot, he broke him in half first.  Uses a racial slur,

6    heil Hitler.

7             And then Mr. Duncan follows that up by calling the

8    legend Tarrant hit him with Allahu Akbar at the end of that

9    melodramatic speech.  They go on to say I'm -- I'm deaf to the

10   mournful pleas of sub-humans.  Mr. Duncan calls that a useful

11   trait.

12            So that is also significant to me because I know,

13   from interviews and other materials I've seen, that as a group

14   they frequently discuss this shooting and the events that took

15   place when it happened.  Some of the group members maintained

16   video of the -- the shooter broadcast his attack over the

17   internet as it was happening.

18            Group members maintained video of the shooting on

19   their electronic devices.  I haven't seen that on Mr. Duncan's

20   but I've seen it on other group members.  I know they

21   discussed it as a group, and you know, I also know from

22   looking at the, you know -- the information surrounding the

23   shooting in New Zealand, the New Zealand shooter also

24   referenced eco-fascism in his manifesto.  And on the cover of

25   his manifesto he left an emblem that is also utilized by our

John Christopher Little - Direct

1    group, by this group here that we're discussing.

2    Q.   All right.  Let me turn your attention lastly in this

3    exhibit to page 1051.  In the left column, what are they

4    discussing there?

5    A.   This would be that discussion I'm talking about where Mr.

6    Duncan's discussing physically assaulting individuals.  So

7    they appear to be referencing a -- a video where some Trump

8    supporters were being harassed at some point, and then Mr.

9    Duncan says imagine doing that without throwing a fit and

10   making a huge verbal altercation beforehand.  Like, what if

11   you just wanted to walk up to people like this and drop them,

12   walk away, and nobody would be filming.  There'd be no

13   consequences.

14        Mr. Kryscuk says I'm honestly going to start doing

15   that.  Mask up, which is something I've heard before with

16   them, and you know, they frequently wear masks like was

17   evident in their training -- and just crack -- and then uses a

18   racial slur again.

19        Mr. Duncan suggests hold up the black power fist with

20   your left hand, then throw a huge sucker punch.  And then he

21   says yes, so that's, you know, something they're discussing,

22   that he's, you know, stating it's something that there would

23   be no consequences for.

24   Q.   All right.  Thank you.  If I can have you pull the

25   exhibit that is the series of screenshots from Mr. Duncan's

John Christopher Little - Direct

1    phone and inform the Court of that exhibit number.

2              THE WITNESS:  Exhibit 4.

3    Q.   What is the first page of that exhibit?

4    A.   That's a gear list.

5    Q.   And what is that?

6    A.   That is a gear list that Mr. Duncan provided for the rest

7    of the group.  I've also seen a longer gear list like this in

8    a -- on his iCloud account that was --

9    Q.   What are the items on that list?

10   A.   The items on this list, chest rig, belt, new optic, two

11   weapon lights, plate carrier, boots, utilities pack, CC

12   holster, which would stand for -- likely stand for concealed

13   carry holster, and overt holster.

14   Q.   And what's a chest rig, did you say?

15   A.   A chest rig would be a piece of tactical gear that the

16   user would wear over their chest, and it holds rifle

17   magazines, pistol magazines, and ammunition, but generally

18   it's rifle magazines.

19   Q.   All right.  What's the second page of Exhibit 4?

20   A.   It is a screenshot that says all my friends are on

21   federal watch lists.

22   Q.   Okay, and the third page?

23   A.   It's the conversation we previously referenced about

24   arranging a meet in the park.

25   Q.   All right.  Thank you.  Did you see in Instagram or

John Christopher Little - Direct

1   elsewhere statements by Mr. Duncan as -- regarding recruiting

2   other members to the group?

3   A.   Yes.

4   Q.   Tell us about that.

5   A.   What first comes to mind is a conversation on Instagram

6   between Mr. Duncan and Mr. Kryscuk.  Mr. Duncan states -- is

7   referencing a call that the group had previously, where they

8   discussed the fact that certain individuals are making it hard

9   for them to recruit within the military.  They go on to

10  specifically mention Tim Kennedy (ph.) and Matt Vest (ph.),

11  that these individuals are making it difficult for them to

12  turn people to their form of ideology or getting others to

13  accept their form of ideology.

14  Q.   And who are those people?

15  A.   Tim Kennedy is -- and Matt Vest are -- Tim Kennedy's

16  currently in the U.S. military, and Matt Vest is a veteran.

17  They both have significant social media presences.  They're

18  followed by a lot of people.  Matt Vest operates a successful

19  business now.  They are both well-respected members of the

20  special operations community, and they're just widely known.

21  They are also -- both do a lot of outreach and things outside

22  of the military.

23       So in the conversation, they're saying that -- them

24  or anyone else that will not name Jewish people as the actual

25  problem are part of the problem and -- or, you know, the --

1    from the tone of the conversation --

2    Q.    All right.

3    A.    -- that's what the issue is.

4    Q.    Did Duncan --

5    A.    It was making it more -- it's difficult for them to turn

6    military members.

7    Q.    And by turn, you mean recruit?

8    A.    Recruit, open their mind to their ideology.

9    Q.    All right.  Did Duncan have messages or resource on

10   potential ways to recruit individuals with particular

11   personalities?

12   A.    Yes.  I saw notes on his -- I believe it was his iCloud

13   account that mentioned specific books and reading lists.

14   Suggested people based on their -- what you know about their

15   background, what you know about their, you know, religious

16   background, their upbringing, their current political views,

17   and then specific books you can suggest to those individuals

18   to begin to recruit or, you know, open their mind to the type

19   of ideology you're trying to -- that they specifically adhere

20   to.

21   Q.    And do you have evidence that Mr. Duncan played a part in

22   vetting new members of the group?

23   A.    Yes.

24   Q.    And is that from Instagram as well?

25   A.    That is from Instagram, the conversation between him and

John Christopher Little - Direct

1    Mr. Kryscuk where they need to discuss a new member.

2    Q.   All right.  Let's turn to the arrests and what might have

3    been seized at or about that time.  Tell us what, if anything,

4    was seized that you haven't discussed.

5    A.   At Mr. Kryscuk's residence, we seized his fake ID.  We

6    also seized components consistent with the ID schematics found

7    on his iCloud and found on Mr. Duncan's hard drive.  Those

8    were seized along with additional -- from specifically Mr.

9    Kryscuk's house, additional SBR -- short-barrel rifles and a

10   suppressor.

11         Suppressors were also seized in search warrants

12   served here in North Carolina and, you know, other items that

13   we previously examined during our search warrants we were

14   talking about previously.

15   Q.   Were there items found in Kryscuk's residence that would

16   assist in the manufacturing of the firearms and suppressors --

17   A.   Yes.

18   Q.   -- that you've described?

19   A.   There's a drill press, drill bits, and then an actual jig

20   that's used to manufacture these firearms.  A jig would be

21   like a pattern.  A -- it would hold the actual lower receiver,

22   and then it guides the drill bit where to drill holes, so that

23   the weapon can be built and made functional.

24   Q.   Is there any evidence that Mr. Duncan participated in the

25   purchase of a jig?

John Christopher Little - Direct

1    A.    Yes.

2    Q.    And what is that?

3    A.    Previous Venmo transactions prior to this investigation

4    that we found from looking at the historical Venmo records.

5    We saw transactions between him and Mr. Kryscuk.  The memo for

6    the transactions said jig, and then -- or -- and then Mr.

7    Kryscuk went and -- we can see in his bank account activity

8    that he went and purchased -- made a purchase at a retailer

9    that specializes in what's called eighty-percent lowers, which

10   is another term for these types of lower receivers that he was

11   manufacturing.  And they sell jigs.

12   Q.    All right.

13   A.    Along with other eighty-percent-lower accessories.

14   Q.    And there was a lot of material recovered, both in

15   electronic form and perhaps in some printed form, regarding

16   this ideology that you've described today; is that right?

17   A.    Yes.

18   Q.    Was there anything of note in regard to fighting law

19   enforcement to avoid capture and distrust and maybe even

20   hatred of the government?

21   A.    That is a common theme, you know, as -- as far as with

22   the overall theme and ideology of the group.  The government,

23   particularly the federal government is the enemy.  The -- they

24   often critiqued what happened.  They would like watch videos

25   of police officers that got shot and, you know, critique it as

John Christopher Little - Direct

1    the police officers are not -- say things like -- like comment

2    on how the police officer whimpers when he gets shot.

3            When -- that the police officer's not a true warrior

4    and imagine how they'd react if they were confronted with a

5    fire team, which is a fire team is like about the size element

6    that they -- they have as far as their numbers.  They -- I

7    remember seeing specific screenshots of -- of writings that

8    talk about their movement and how it's your duty to fight

9    police if confronted.

10           I remember conversations between Mr. Duncan and Paul

11   Kryscuk about how easy it is to pick handcuffs, and you know,

12   which would conceivably be used to escape law enforcement,

13   things of that nature.

14           MS. KOCHER:  All right.  If I may approach one last

15   time.

16           THE COURT:  Yes.

17   BY MS. KOCHER:

18   Q.   Let me hand you what's been marked as Government's

19   Exhibit 8.  And this actually goes back to the recruitment,

20   and I apologize, but what is -- what are we looking at in

21   Government's Exhibit 8?

22   A.   This is a screenshot of the Wire conversation that we

23   referenced before, the group chat that we've previously talked

24   about.

25   Q.   And so what does it say?  What does it lay out?

John Christopher Little - Direct

1    A.    This is a -- what's visible on the screenshot is a

2    conversation with Mr. Duncan, with his screen name or in this

3    instance he's using a different spelling, but his screen name

4    was Soldier.  But in here, he often used the name soldier

5    spelled in different languages.  So I've seen it in Arabic and

6    other languages here.  So here this is Soldier, and Deacon,

7    and Disciple are visible in this, so that would be Mr.

8    Collins, Kryscuk, and Mr. Duncan.

9          So after Mr. Duncan says the whole crew's going to be

10   knocking over armored trucks and beating Mexicans to death at

11   Jimmy John's before we know it, Mr. Kryscuk says Disciple has

12   definitely sacrificed the most and contributed the most for

13   the cause.  He added three leathernecks, which is a term used

14   for U.S. Marines.  Added three leathernecks and got us tons of

15   gear and training while suffering in the court for years.

16   Thanks, buddy.

17         Later, Mr. Duncan says Disciple appreciation day.

18   He's basically congratulating Mr. Collins for his

19   accomplishment.  And this appears to be around the time when

20   Mr. Collins was getting out.

21   Q.    All right, and is there evidence of stolen military gear?

22   A.    Yes.  There's evidence that Mr. Collins himself or got

23   others to steal military equipment in the form of body armor,

24   multiple sets of body armor, and then other types of military-

25   issued equipment that it -- pretty much anything they were

John Christopher Little - Direct

1    able to steal, anything -- they would go drive around base and

2    just see what was left unsecured.

3          And they would steal items that they -- that they

4    deemed useful to them, like things I've seen in large numbers

5    that they've had are like rifle slings or tourniquets, things

6    like that.  There's also an indication that they took

7    military-issued rifle magazines.

8    Q.   All right.  Now, you mentioned body-armor plates.

9    A.   Mm-hmm.

10   Q.   Those are serialized?

11   A.   Those are serialized to the individual Marine or soldier

12   that they're issued to.  The -- we ended up recovering body

13   armor from Mr. Kryscuk's house and a shipment that Liam

14   Collins -- it was a pallet Liam Collins was shipping to Mr.

15   Duncan's residence.  It was bound for his residence, but we

16   intercepted it before it got there.  It also contained body

17   armor from -- looking at the body armor, it was definitely

18   issued by the U.S. military, but they removed -- there's a --

19   a sticker affixed to it.  You can see where that had been

20   removed, so there's -- you couldn't run the serial number, but

21   you could still tell that it was military issued.

22   Q.   All right.  Now, was that the only set of plates that

23   were recovered?

24   A.   I believe there was at least two sets recovered.  And

25   then through other interviews, we know there were more.

(973) 406-2250 | operations@escribers.net | www.escribers.net

John Christopher Little - Direct

1  Q.  Okay.  All right.  I'm going to turn you to the arrests

2  just very briefly.  Anything concerning come of the arrests of

3  Mr. Collins, Mr. Kryscuk, and Mr. Duncan?

4  A.  Specifically Mr. Kryscuk, when he came to the location

5  where we had the arrest set for, you know, he had a handcuff

6  key hidden in his -- inside the belt he was wearing, in the

7  small of his back, so it would be accessible in the place

8  where his hands could be cuffed behind his back.  He wore

9  that.  That was hidden on his clothes, and that's, you know,

10  consistent with that conversation I referenced before where

11  him and Mr. Duncan discussed how easy it was to pick or shim

12  handcuffs.

13  Q.  All right, and in general, I think you mentioned from Mr.

14  Collins' early statements on Iron March, that physical fitness

15  and that type of training was important?

16  A.  It was.

17  Q.  Do you know that if Mr. Duncan in particular maintained

18  fitness or knew any martial arts or --

19  A.  They did.  They frequently trained at a MMA gym and very

20  frequently discussed, you know, mixed martial arts or

21  Brazilian jujitsu or -- or weightlifting, also, you know,

22  firearms, obviously, and tactics.  Those types of things were

23  frequently discussed.

24  Q.  All right.  You mentioned earlier in your testimony it

25  was in regard to that photograph in the Instagram, the POV

John Christopher Little - Direct

1    you're a race mixer, that you had seen that photograph before.

2    In what context had you seen that photograph before?

3    A.   I'd seen that specific photograph from the video.  I

4    mean, like the -- the -- I know that that photograph was taken

5    the same day as the video that we've seen of their training.

6    Q.   Okay, so we haven't seen a video yet.  That's why --

7    A.   That's what I'm saying that I saw.

8    Q.   Yes, okay.  So yes, so tell the Court about the training.

9    A.   We ended up identifying that they were -- before -- they

10   have a -- the other individuals had not moved to Boise at this

11   time.  But we identified that other members intended to travel

12   to Boise in July of this year, so we began doing surveillance,

13   electronic and physical, to see, you know, what -- what was

14   happening.  What we ended up seeing was that Mr. Duncan drove

15   up from San Antonio, Texas to Boise and the other group

16   members flew in, where they all collocated in -- in Boise.

17        So then there was surveillance going and conducting

18   what appeared to be firearms training in the desert, and just,

19   you know, frequently meeting together while they were there.

20   Q.   And in the searches of various devices, did you actually

21   come across photos or videos compiled of that training?

22   A.   We came across multiple photos, videos of just the

23   training in and of itself, and then what appears to be like a

24   propaganda-style video in the iCloud returns.

25   Q.   And we have prepared a copy of one of the particular

John Christopher Little - Direct

1    videos.  There were multiple versions; is that correct?

2    A.   I -- yeah, I wouldn't call it versions.  They just

3    made -- like this is the only version of this video.  They

4    made another video that seems to be propaganda style, and then

5    there's just video clips that I've seen of just the training

6    in and of itself.  It's not edited.

7    Q.   All right, and if I can turn you back to Exhibit 6 to

8    that photograph, if you could identify for the Court which

9    person of those four in that photograph --

10   A.   I'm sorry.

11   Q.   This is -- what's the page number at the top?

12   A.   That would be page 796.  Mr. Duncan is the individual to

13   the far right.

14   Q.   All right.

15           THE COURT:  Sir, is it 795?

16   A.   Oh, I'm sorry, Your Honor.  It's 795.  It's dual columns.

17   Q.   Yeah.

18   A.   It's page 795, the page on the left, and Mr. Duncan's the

19   individual on the far right.

20   Q.   Very good.

21           MS. KOCHER:  With Court's permission, I would play

22   what's been marked as Government's Exhibit 7.

23           THE COURT:  Yes, ma'am.

24           MS. KOCHER:  If the equipment --

25           (Video recording played)

John Christopher Little - Direct

1  BY MS. KOCHER:

2  Q.   And was Mr. Duncan in that video?

3  A.   Yes.

4  Q.   Was he throughout the video?

5  A.   Yes.

6  Q.   Did I also see a short-barreled rifle being fired by a

7  man in a blue-colored T-shirt perhaps?

8  A.   Yes.

9  Q.   At the end, it said, REDCON 2020 and BSN.  Do you know

10 anything about those statements?

11 A.   Those are terms they frequently use internally to

12 reference themselves and also at times say, you know, how many

13 of them are together at a given time, from what I noticed in

14 their -- in their posts.

15 Q.   All right, so they refer to themselves as BSN.

16 A.   Correct.

17        MS. KOCHER:  I think that's all my questions for now,

18 Your Honor.

19        THE COURT:  Okay, very good.  Before we begin your

20 cross-examination, I need to -- why don't we just take a brief

21 break, because I need to talk about scheduling because we're

22 running into some real scheduling problems for the remainder

23 of this afternoon.

24        Mr. Tarlton, I know you can't be precise, but how

25 long do you estimate your cross will be?

John Christopher Little - Direct

1              MR. TARLTON:  I mean, it could take a little while,

2     Your Honor, probably at least half an hour or more.

3              THE COURT:  Okay.  And does the defendant have

4     evidence to present?

5              MR. TARLTON:  Yeah, we do.  We have his father, a

6     third-party custodian we propose to the Court.

7              THE COURT:  Okay.  So let me -- let's take just a

8     brief recess and I'll confer with the clerk, thirty-minute

9     recess.

10             THE CLERK:  All rise.  The court stands in recess.

11            (Recess from 1:42 p.m., until 1:54 p.m.)

12             THE COURT:  Folks, I'm aware that Mr. Duncan's not

13    here.  I need to talk about scheduling though.  We've got a

14    settlement conference telephone call, which I think will be

15    brief at 2.  And we also have attorney admissions at 2, so

16    we're going to do the settlement conference status update, and

17    then we'll do attorney admissions.  I imagine getting back to

18    this case at 2:15.

19             I've got a hard stop at 3.  I expect to be back here

20    no later than 4:30, and then I don't think we'll be done with

21    Mr. Duncan's case.  And the clerk has already spoken to

22    counsel in the other case, in the Woods case about continuing

23    it potentially until another date.  I regret any inconvenience

24    to the folks who are here in that case.  The Duncan case is --

25    some cases take longer than others, and it's taken longer so

John Christopher Little - Direct

1    far already than anticipated.

2         One order of business that's I guess not

3    administrative, and we can, I guess, make note of this.  The

4    Government has not yet moved to admit the various exhibits

5    that were presented, but we could take that up when we resume,

6    which I anticipate will be around 2:15.

7         MS. KOCHER:  Thank you, Your Honor.

8    (Discussions off the record)

9         MS. KOCHER:  For the purpose of swearing in, do we

10   need to remove from the tables?

11        THE COURT:  No, you're welcome to keep your materials

12   there.  But the courtroom does need to be clear for purposes

13   of the settlement status conference --

14        MS. KOCHER:  Yes.

15        THE COURT:  -- because it is settlement.

16   (Discussions off the record)

17        THE COURT:  Okay.  Very good.

18        Okay, folks, well, I appreciate it and anticipate

19   reconvening again in the Duncan matter around 2:15, so we'll

20   be in a brief recess.

21        THE CLERK:  All rise.

22   (Recess from 1:58 p.m., until 2:38 p.m.)

23        THE COURT:  Okay, we're here for a continuation of

24   the detention hearing in Mr. Duncan's case.  Ms. Kocher, is

25   there a motion to admit the various exhibits?  I think it's 1

John Christopher Little - Direct

1    through 8 that were presented during the examination of the

2    Government's witness.

3              MS. KOCHER:  If I may approach, Your Honor, with

4    Exhibit 7 which was the video.

5              THE COURT:  Very well.

6              MS. KOCHER:  Yes, Your Honor, I move to admit the

7    exhibits.

8              THE COURT:  Very good.  Any objection?

9              MR. TARLTON:  No, Your Honor.

10             THE COURT:  Mr. Tarlton?  Very well, Government's

11   Exhibits 1 through 8 are admitted.

12             Mr. Tarlton.

13             If I could ask the witness to resume the stand and

14   remind you, sir, that you do remain under oath.

15             THE WITNESS:  Yes, Your Honor.

16             MS. KOCHER:  Thank you.  Your Honor, I do only show

17   through 7.  Did I have an 8?  Did I hand up an 8?

18             THE COURT:  I believe there's a Government's Exhibit

19   8.

20             THE CLERK:  A screenshot.

21             THE COURT:  Yes, it is a --

22             MS. KOCHER:  The last -- the one that I forgot.  That

23   one's the bane of my -- yeah.  Thank you.

24             THE COURT:  Mr. Tarlton.

25             MR. TARLTON:  Thank you, Your Honor.

Christopher Little - Cross

```
 1                      CROSS-EXAMINATION

 2    BY MR. TARLTON:

 3    Q.   Good afternoon.  It's Agt. Little?

 4    A.   Yes, sir.

 5    Q.   And you said you're with NCIS?

 6    A.   That's correct.

 7    Q.   What's the name of that agency again?  Is that Navy

 8    Criminal Investigative Service?

 9    A.   Naval -- Naval Criminal Investigative Service.

10    Q.   Okay.  What department is that under?

11    A.   Department of Defense.

12    Q.   Okay.

13    A.   Department of the Navy, which is under Department of

14    Defense.

15    Q.   So ultimately, you're an agent of the Department of

16    Defense, for lack of a better description?

17    A.   I'm a government employee that's a federal agent.

18    Q.   Okay, but you work for the Department of Defense, not the

19    Department of Justice?

20    A.   Correct.

21    Q.   Where's your -- where is your office?

22    A.   Camp Lejeune, North Carolina.

23    Q.   It's on a military base?

24    A.   I work from multiple locations, but my -- my main office

25    is on Camp Lejeune, and then I work other locations as needed.
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1    Q.    Okay.  Other military bases?

2    A.    No, I could work out of other field offices.  Some -- not

3    all of our field offices are located on military bases.  I

4    could work out of another agency's field office.  It varies.

5    Q.    Yeah.  When did your investigation start?

6    A.    My investigation started for me personally in April of

7    this year.

8    Q.    2020.

9    A.    Yes, sir.

10   Q.    And that was based on information that you received about

11   Mr. Collins?

12   A.    Correct.

13   Q.    Now, your investigation has I guess gone -- well, I guess

14   other -- beyond Camp Lejeune, right, into other states and

15   things --

16   A.    Yes, sir.

17   Q.    About how much evidence -- or in terms of electronic

18   evidence, would you say has been accumulated in this case?

19   A.    A large amount, it's -- it's hard for me to put a

20   specific number on it.

21   Q.    Okay, like --

22   A.    Terabytes.

23   Q.    We're talking about multiple terabytes?

24   A.    I believe so.  I don't have a, you know, exact number for

25   you, sir, but it's, you know, multiple devices.

Christopher Little - Cross

1  Q.   Right.

2  A.   And still reviews ongoing.

3  Q.   Right.  And then search warrants executed on services

4  that provide cloud-based storage; is that --

5  A.   Yes, sir.

6  Q.   -- where electronic devices are being backed up to these

7  online servers; is that right?

8  A.   Yes, sir.

9  Q.   And this is for people -- even accounts belonging to

10  people even beyond those named in this current pending

11  superseding indictment; is that right?

12  A.   Yes, sir.

13  Q.   In this investigate -- you said that there was even

14  surveillance done, that you participated in surveillance?

15  A.   I have participated in surveillance.

16  Q.   Yeah.

17  A.   And there was also surveillance conducted that I was not

18  a part of.

19  Q.   Okay.  Were you -- did you participate in some of the

20  surveillance on my client out in Idaho or Texas?

21  A.   I did not.

22  Q.   Okay.  Other -- was it other NCIS agents or?

23  A.   Other FBI agents.

24  Q.   Okay.  What kind of surveillance did you actually do

25  yourself?

Christopher Little - Cross

1   A.   Specifically related to Mr. Duncan or just in general?

2   Q.   Just in general.

3   A.   I conduced physical surveillance in Jacksonville, North

4   Carolina.  I also in the form of electronic surveillance

5   monitored GPS and like -- electronic like GPS trackers.

6   Q.   Okay, trackers on my client or other people?

7   A.   Others.

8   Q.   Okay.  And where were these other people being tracked,

9   what areas?

10  A.   Boise, Idaho and our district here.

11  Q.   Okay.  Any tracking in Texas -- were you a part of

12  looking at -- after one of the packages went to a house, I

13  think, that was believed to belong to my client's brother in

14  Texas?

15  A.   Yes.  I -- I reviewed the information.

16  Q.   Okay.

17  A.   And that was from a partnership with the U.S. Postal

18  Inspector Service.

19  Q.   Okay.  Now, this tracking that you're talking about that

20  you were involved in, in Idaho, that wasn't on any military

21  base, was it?

22  A.   No.

23  Q.   Okay.  Are these -- during part of this investigation,

24  Mr. Collins, he was -- he was active-duty military.  Right?

25  A.   Yes.

Christopher Little - Cross

1    Q.    Was Paul Kryscuk -- was he active-duty military during

2    this -- when you --

3    A.    Not during this investigation.

4    Q.    Okay.  Not in April of 2020 or afterwards?

5    A.    No, sir.

6    Q.    Okay.  And my client, he was not active-duty military

7    either.  Right?

8    A.    No, but he was a DOD contractor.

9    Q.    A civilian contractor?

10    A.    Yes, sir.

11    Q.    Okay, at a private company?

12    A.    That works aboard a military installation, yes, sir.

13    Q.    Okay.  But he'd been honorably discharged from the Marine

14    Corps.  Right?

15    A.    He was discharged from the Marine Corps, yes, sir.

16    Q.    All right.  And Mr. Kryscuk -- well, apparently, he was a

17    porn star.  Right?  Is that his employment?

18    A.    At -- at times, yes, he previously worked in the porn

19    industry.

20    Q.    That would be a civilian.  Right?

21    A.    He's a civilian.

22    Q.    Mr. Collins, he was actually kicked out of the military;

23    wasn't he?

24    A.    He was separated with a general discharge.

25    Q.    That was over the hateful and toxic ideology attributed

Christopher Little - Cross

1    to him?

2    A.   I -- I guess I don't know the specific conditions of his

3    discharge.  He received a general discharge under honorable

4    conditions, and I believe it was related to his initial

5    enlistment and not disclosing certain, you know, facts on his

6    initial enlistment, but I do not know the specific details of

7    that discharge.

8    Q.   The facts he didn't disclose were what, the postings on

9    this Iron March board?

10   A.   That's what I understand, but again, I have not, you

11   know, been apprised of, you know, specifically what that is.

12   Q.   Right.

13   A.   And I just know the character of his discharge was a

14   general discharge, and it was a separation.  It was not a

15   punitive, you know -- a punitive discharge.

16   Q.   He wasn't criminally prosecuted, but he lost his job, for

17   lack of a better word?

18   A.   Correct.  He was not criminally prosecuted inside of the

19   Marine Corps, no.

20   Q.   Okay.  There was another individual named JZ (ph.)-- or

21   initials of JZ involved in this.  I think texts with him were

22   recovered from my client's phone.  Is that right?

23   A.   The username JZ?

24   Q.   His initials were JZ.

25   A.   Or like the contact, yes.

Christopher Little - Cross

1    Q.   Okay, and that was an individual who's -- based on

2    hateful and toxic ideology attributed to him, he was fired

3    from his job as a police officer.  Is that right?

4    A.   Yes.  Mr. Zacharek was fired.

5    Q.   All right.  And presumably, if my -- well, my client

6    after this arrest was -- you're aware he was fired from his

7    job.  Right?

8    A.   I'm not officially aware, but I'm also not surprised.

9    Q.   Right.  And then I guess Mr. Collins became a civilian

10   after he was separated from the Marine Corps.  Is that right?

11   A.   Yes.  He became --

12   Q.   All right.  Is it -- and your investigation of him

13   continued --

14   A.   Yes.

15   Q.   -- after he left.  Right?

16   A.   That's correct.

17   Q.   Where was he located living?

18   A.   He ended up moving to Boise and living with Mr. Duncan.

19   Q.   Okay.  My client doesn't live on a military base or

20   anything.  Right?

21   A.   No.

22   Q.   All right.  All this to say you're aware of the Posse

23   Comitatus Act's constraints on military investigators from

24   enforcing civilian federal laws, aren't you?

25   A.   I'm aware of what you're referring to, and I'm also aware

Christopher Little - Cross

1    of how that doesn't apply here.

2    Q.   Right.  The controlled -- the controlled buy that you

3    were referring to in North Carolina that -- that was a

4    transaction, based on your investigation, between Mr. Kryscuk

5    and Mr. Collins, along with this informant.  Is that right?

6    A.   Yes.  It was a controlled purchase between those

7    individuals.

8    Q.   Okay.  My client Mr. Duncan, as far as your investigation

9    has shown, did not send that package to North Carolina that

10   contained that pistol or that silencer.  Right?

11   A.   Correct.

12   Q.   All right.

13   A.   I do not believe he mailed that package.

14   Q.   All right.  And he wasn't present when there was

15   discussions in North Carolina with the informant and Mr.

16   Collins.  Is that right?

17   A.   He was not physically present, no.

18   Q.   All right.  As far as you know, he's not on a text thread

19   about that purchase of that -- or chat room about -- exchange

20   about the purchase of that firearm in North Carolina.

21   A.   About that specific firearm?

22   Q.   Right.

23   A.   Not that I'm aware of.

24   Q.   All right.

25   A.   I do know he later -- you know, was in contact with

Christopher Little - Cross

1    people involved in that transaction.

2    Q.   But not -- he didn't discuss -- there's no evidence you

3    have that he discussed that transaction, is there?

4    A.   No, not --

5    Q.   Right.

6    A.   -- not that -- that specific transaction, but I also find

7    it unlikely that he wouldn't know about it.

8    Q.   What's that?

9    A.   I also find it unlikely that he wouldn't know about the

10   transaction.

11   Q.   But that's just your speculation; isn't that fair to say?

12   A.   Yes, sir.

13   Q.   Okay.  What -- what you have -- what your investigation

14   has zeroed on as it relates to my client, in terms of the

15   indictment being based on the unlawful manufacture of a

16   firearm or firearm part involves a package that your

17   investigation attributed to Paul Kryscuk being sent to my

18   client's brother's house in Texas; is that right?

19   A.   That's part of it.

20   Q.   Well, I know, but I'm saying -- well, that's part of the

21   reason you have a specific focus on my client with an

22   allegation that he was involved in an unlawful -- either an

23   unlawful -- unlawfully manufactured firearm or firearm part, I

24   guess lack of better word a silencer; is that -- that's what

25   your investigation was -- that you've described says leads to

Christopher Little - Cross

1    believe my client possessed something of that nature.  Is that

2    right?

3    A.   That's part of it, yes.  That's an aspect of --

4    Q.   Okay.  Was that package actually intercepted and examined

5    at my client's brother's house in Texas?

6    A.   It was not.  It was identified after it was already

7    delivered, and we looked at the -- what the postal inspector

8    was able to retrieve is a scan of the outside of the package.

9    That's how we knew where it went and who the return sender,

10   and we saw a scan of the actual package that was --

11   Q.   So what you've physically seen as to that package is just

12   the package itself.

13   A.   Correct.

14   Q.   You haven't seen the contents of that package.

15   A.   We did not intercept or inspect that package, no.

16   Q.   Okay.  And you don't have surveillance showing my client

17   picking up that package at his brother's house or anything

18   like that, do you?

19   A.   No, sir.

20   Q.   Okay.  It's fair to say that there was never a search

21   done on my client's brother's house that -- where what could

22   be defined as a firearm was recovered; is that right?

23   A.   We did not search his little brother's house, no.

24   Q.   Didn't search it at all?

25   A.   No.

Christopher Little - Cross

1    Q.   And on the search of my client's house, correct me if I'm
2    wrong, but I didn't hear you say that you recovered anything
3    that would constitute an unlawfully manufactured firearm or
4    firearm part from my client's house in Idaho; is that right?
5    A.   What we recovered were -- was the solvent trap I
6    previously described, firearms that were visible in the video
7    belonging to Mr. Duncan that we previously played.  And then
8    we also recovered an illegal suppressor, a lower receiver to a
9    rifle, and a un-serialized pistol in a pallet shipment that
10   was addressed to Mr. Duncan's apartment.
11   Q.   Well, my question might have been confusing.  I'm talking
12   about actually from his apartment.  What did you actually
13   recover from his apartment?
14   A.   That's what I just described there.
15   Q.   So you recovered -- you're saying you did recover a
16   firearm that was unregistered from my client's apartment?
17   A.   We -- I said we recovered it from a pallet that was
18   intercepted before it could be delivered to your client's
19   apartment.
20   Q.   So to be precise, you did not recover that from my
21   client's apartment?
22   A.   No, sir.
23   Q.   Okay.  All right, I think you brought up when you were
24   discussing what I guess you attribute to be sort of the
25   summary of the ideology of the group, I guess, you say was

Christopher Little - Cross

1   created by Collins on this Iron March platform.  That was in

2   2017 before Collins joined the Marine Corps?

3   A.   Correct.

4   Q.   All right.  My client left -- my client left the Marine

5   Corps in 2018; is that right?

6   A.   Yes, sir.

7   Q.   All right.  You don't have any actual evidence that my

8   client knew and talked to Mr. Collins while they were in the

9   Marine Corps; is that right?

10  A.   I do.

11  Q.   That they were -- okay, they actually knew each other?

12  A.   I know at some point they met in the Marine Corps due to

13  images we have of him and --

14  Q.   Okay.

15  A.   -- other group members together at a gathering.

16  Q.   Okay, but put another -- put it -- state it another way,

17  there's no evidence that my client knew Mr. Collins when these

18  posts were made on this Iron March platform in 2017.  Right?

19  A.   That's correct.

20  Q.   In fact, Mr. Collins was pretty young, wasn't he?

21  A.   Yes, it was right -- it was prior to him joining the

22  Marine Corps.

23  Q.   Wasn't he only like sixteen in high school?

24  A.   It depends what post you're talking about because he

25  stayed active for so long.  If it's the post right before he

1    joined, he could have been seventeen or eighteen.  I don't --

2    I don't remember exactly.

3    Q.   He joined the Marine Corps at an unusually young --

4    unusual -- he was a minor when he joined the Marine Corps.

5    Right?

6    A.   That's not unusual.

7    Q.   Okay.

8    A.   You graduate high school and then you join.

9    Q.   All right.  Okay.  So to summarize, those postings very

10   likely were made by Mr. Collins while he was a high schooler?

11   A.   Or after he graduated, while he's getting ready to go to

12   the military.

13   Q.   Right.  And correct me I'm wrong, but I don't think you

14   said that you saw posts from my client on this Iron March

15   platform; is that right?

16   A.   At this point, I have not.

17   Q.   Okay.  Thank you.  Is a part of Mr. Collins' -- his

18   involvement in a sale of that pistol at Camp Lejeune to the

19   informant, based on the surveillance, you were put onto a

20   platform called -- it's called Wire, some encrypted platform?

21   A.   We were aware of that just -- we've been aware of that

22   for a while.  It's not from surveillance.

23   Q.   Okay.  I think this was Government's Exhibit 2.  You

24   testified about a chat between, I believe it was Mr. Paul

25   Kryscuk and Mr. Collins.  Right?

Christopher Little - Cross

1  A.   Yeah, there's a -- it's -- it's a group chat for their

2  group.

3  Q.   Okay.  By their group, you mean Mr. Kryscuk and Mr.

4  Collins.  Right?

5  A.   And Mr. Duncan and others.

6  Q.   Well, is Mr. Duncan on this group chat?

7  A.   He's visible in other group chats of the same name.

8  Q.   But the precise question is in this group chat.

9  A.   He's not visible in that screenshot, but he's visible in

10  other screenshots with the group having the same name.

11  Q.   But sir, let me stop you right there.  As to this group

12  chat, my client's not on it, is he?

13  A.   No, he's not on that group chat.

14  Q.   All right.  So what you have are kind of different

15  scattered group chats.  There's not one -- one giant group

16  chat where they're all in the same chatroom; isn't that fair

17  to say, based on your investigation?

18  A.   Based on my investigation, they are in the same chat.

19  Q.   Well, you've just testified that my client is not in this

20  group chat right here.

21  A.   That's not what I said.  I said -- okay, more accurately,

22  he's not in that screenshot, but I'm not saying he's not in

23  that --

24  Q.   But you don't know one way or the other.  You haven't

25  analyzed that, have you?

Christopher Little - Cross

1    A.   He's not in that screenshot of that group chat.

2    Q.   Okay.  All right.  I think you talked about a passport

3    that my client had that's a Department of Defense issued

4    passport.  When you found that passport, I guess he had left

5    the military within about two years before that or -- having

6    that passport?

7    A.   Approximately.

8    Q.   Okay.  Are you -- is there any evidence that you found

9    reflect that he was -- it was demanded that he turn that in or

10   destroy it or anything like that, that he wasn't allowed to

11   have it?

12   A.   It's common knowledge that you're supposed to return an

13   official passport when you leave the unit.

14   Q.   What do you mean by common knowledge?

15   A.   It's part of your checkout procedure.

16   Q.   Okay.  And so you reviewed that he was -- are you saying

17   that you reviewed that he was requested to turn it in, or you

18   just don't know?

19   A.   I don't have -- I specifically don't know that he was

20   requested to turn it in, but it is common practice for it to

21   be turned in.

22   Q.   Okay, but as far as you can tell, it hadn't expired or

23   anything like that.  Right?

24   A.   Correct.  It was still active.

25   Q.   Okay.  When you obtained my client's cell phone -- were

Christopher Little - Cross

1   you present when my client was arrested in Idaho?

2   A.   When he -- I was present when he was brought to the jail.

3   Q.   Okay.

4   A.   But I was not present when he was physically apprehended.

5   Q.   Okay.  Are you aware of the details surrounding his

6   arrest?

7   A.   Broadly.

8   Q.   Okay.

9        THE COURT:  Mr. Tarlton, I hate to cut you off, but

10  I've reached my stopping point.

11       MR. TARLTON:  Yes, Your Honor.

12       THE COURT:  So I do need to take a recess.  I

13  anticipate it'll be 4:30.  If it's longer than that, I'll let

14  you know.

15       MR. TARLTON:  Yes, Your Honor.

16       THE COURT:  Very good.  Thank you, folks.  We'll be

17  in recess.

18       THE CLERK:  All rise.  The court will be in recess

19  until 4:30

20       (Recess from 3:01 p.m., until 4:45 p.m.)

21       THE CLERK:  This honorable court's back in session.

22  Be seated and come to order.

23       THE COURT:  We're reconvening in the detention

24  hearing on the case of the United States v. Jordan Duncan.

25  Mr. Tarlton, you may continue your cross-examination.

Christopher Little - Cross

1          I'd ask the witness to resume the stand and remind

2     you, sir, that you do remain under oath.

3          MR. TARLTON:  Thank you, Your Honor.

4                    RESUMED CROSS-EXAMINATION

5     BY MR. TARLTON:

6     Q.   Good afternoon again, Agt. Little.  Was the shipment --

7     was the shipment that was destined for, I guess, my client's

8     brother's house in Texas, was that before the evidence that

9     Collins sold a gun to an informant in Camp Lejeune, or was

10    that shipment after the sale of that pistol to the informant

11    at Camp Lejeune?

12    A.   I don't remember the specific date of that shipment.  I

13    know it was around the same time, but I know it was subsequent

14    to other shipments of illegal guns by Mr. Kryscuk.

15    Q.   Okay.  To other people.  Right?

16    A.   Yes, sir.

17    Q.   I think based on your testimony of the -- for lack of a

18    better term, the Government's theory is that the shipment

19    going to Texas was ultimately a silencer being purchased by my

20    client; is that the theory in essence of what that shipment

21    was?

22    A.   I would say that -- that it was likely a silencer in a

23    purchase organized by Mr. Duncan.  I -- I don't know the

24    ultimate, you know end user, but that the -- the payment was

25    made to Mr. Kryscuk.  Mr. Kryscuk shopped and bought, you

Christopher Little - Cross

1  know -- had bought items consistent with what he uses to turn

2  solvent traps into suppressors, and it was all around the same

3  time.

4  Q.   So based on what you have, it's evidence of my client

5  buying something, in essence, from Mr. Kryscuk?

6  A.   Correct.

7  Q.   And my client's living in Texas at the time?

8  A.   Yes, sir.

9  Q.   Okay.  You didn't have surveillance or controlled

10  purchase or anything where my client's actually making a

11  firearm or a silencer himself and selling it to somebody.

12  That didn't -- that was never established in this

13  investigation; is that right?

14  A.   That's correct.

15  Q.   Okay.  Going to his arrest, I think where his cell phone

16  was seized, are you familiar with where it took place?  Was it

17  at where he worked in Idaho, this contractor, in the parking

18  lot?

19  A.   Yes.  It was in the parking lot, I believe, of -- of his

20  place of work.

21  Q.   Okay, like while he's on his phone walking in to work?

22  A.   I -- I don't know if he was on his phone, but I -- I am

23  aware that it was in the parking lot.

24  Q.   Okay.  Presumably, they have like security where you just

25  don't walk into your workplace with guns; is that right, based

Christopher Little - Cross

1   on what you've seen in this investigation and knowledge of

2   that contractor?

3   A.   I don't know.

4   Q.   Okay.

5   A.   I don't --

6   Q.   Would you be surprised if you could just walk in to work

7   with guns on you, you know?

8   A.   No.

9   Q.   That would surprise you?

10  A.   No, it would not.

11  Q.   Oh, you could bring guns to work there?

12  A.   I don't know, and it would not surprise me if Mr. Duncan

13  were able to get a gun in to his work.

14  Q.   Okay.  And you're aware that he wasn't armed actually,

15  when he was arrested, right?

16  A.   I'm aware of that.

17  Q.   All right.  And you're aware that it was what, roughly

18  twenty agents with assault weapons and flashbang grenades that

19  were used in the parking lot on my client?

20  A.   I'm aware that a, you know -- a threat matrix, if you

21  will, was consulted, and you know, we used what was -- was

22  warranted, based on our perceived threat.

23  Q.   Yeah, and through the flashbang grenades, the cell phone

24  gets knocked out of his hand, and then it's taken off the

25  ground; is that right?

Christopher Little - Cross

1    A.    I do not know.

2    Q.    All right.  You've no reason to dispute that.  Right?

3    A.    I just -- I wasn't there.

4    Q.    Okay.  Have you seen the write-up report about the

5    cursory search of the cell phone, I guess at the scene of

6    arrest?

7    A.    I have not seen the write-up, but I was at the jail where

8    the -- the phone was being reviewed at the time.

9    Q.    Okay.

10   A.    But I do not recall what's in the FBI write-up of what

11   was there.

12   Q.    All right.  There's a reference to a search incident to

13   arrest of the phone, but also there's a reference to a search

14   warrant.  Did you ever see the search warrant for the phone?

15   A.    I did not write that search warrant.

16   Q.    All right.  Do you know whether it's just a warrant to

17   seize the phone or was the warrant actually for the contents

18   of the phone?

19   A.    I --

20   Q.    You don't know?

21   A.    I -- I just don't know.

22   Q.    Okay.  On the -- on this phone, I think you -- you

23   mentioned you'd reviewed screenshots that agents took of the

24   phone, I guess after the arrest.  I think you -- you talked

25   about he's texting with Mr. Paul -- it could have been a Paul

Christopher Little - Cross

1    Kryscuk about another fellow, I guess Joseph, no longer

2    wanting to be involved with them.  And there's a discussion

3    about being compromised, remember that?

4    A.    Yes.

5    Q.    All right.  And in this specific exchange with Paul, it's

6    asking are we compromised, and then the answer being what

7    happened to Liam happened to Dealer.  Remember that?

8    A.    Yes.

9    Q.    All right.

10           THE COURT:  What exhibit number is that?

11           MR. TARLTON:  Your Honor, I believe it is --

12           MS. KOCHER:  I think that's 4, Your Honor.

13           MR. TARLTON:  Is it 4?

14           THE COURT:  Okay.  Thank you.

15   BY MR. TARLTON:

16   Q.    Liam is Liam Collins, right?

17   A.    Yes, sir.

18   Q.    And then Dealer is this fellow Joseph, last name Z.  Is

19   the pronunciation -- you might have said his last name.  And

20   there's a text thread with that Joseph, last name starts with

21   a Z, in this phone; is that right?

22   A.    Yes, sir.

23   Q.    All right.  And Joseph is the police officer we talked

24   about who was fired from his job.

25   A.    That's correct.

Christopher Little - Cross

1   Q.   All right, over his political and social ideology.

2   Right?

3   A.   It was -- I believe, from what I recall, it was

4   specifically over Iron March.

5   Q.   Right.  Yeah, there were newspaper headlines about it.

6   Right?

7   A.   There was -- yes, there was articles.

8   Q.   Like if they were -- yeah.  It's -- all right, so he was

9   fired.  And that's something -- well, Liam Collins, he was --

10  he was not honorably discharged from the military, it's fair

11  to say.  Right?

12  A.   He received a general discharge.

13  Q.   Right.  And it very well may be traced to Iron March

14  comments that he probably failed to disclose in his

15  application to join the Marine Corps.

16  A.   It -- it could be.  I -- I -

17  Q.   You just don't know?

18  A.   I just -- I wasn't -- that's separate from our

19  investigation.  That's a Marine Corps administrative function.

20  Q.   Okay.  Well, this message that same thing that happened

21  to Liam happened to Dealer, and so what -- doesn't that

22  suggest if it's public knowledge that we espouse -- we embrace

23  this ideology and social view, we'll be fired from -- we'll

24  lose our jobs?  Isn't that what that's getting at?

25  A.   No.  I mean, that's not how I --

Christopher Little - Cross

1    Q.   Liam lost -- he was separated from the Marine Corps and

2    it was not honorable.  Right?

3    A.   That's -- it doesn't say that there.  And --

4    Q.   Well, it says what happened to Liam happened to Dealer.

5    A.   Which Liam was -- the way I -- the way I see it is

6    they're talking about Liam was publicly exposed as a member of

7    a Neo-Nazi forum.

8    Q.   Right.

9    A.   And then they're saying that this happened to him as

10   well.

11   Q.   But why?  But when Liam was exposed, he was fired, and

12   that was the headline in the local papers, wasn't it?

13   A.   He was not immediately fired, no.

14   Q.   It was never in the papers that a police officer was --

15   what was --

16   A.   You just said Liam.  I -- I'm sorry, yes.  There was --

17   Q.   Yeah -- no, I'm talking about Joseph.

18   A.   Right.

19   Q.   That's Dealer.  That's who's being referenced in this

20   text; is that right?

21   A.   Correct.  There was a -- after he was outed, there was

22   also subsequent headlines and once the police department found

23   out about it that they chose to let him go.

24   Q.   Right.  And so this text is connecting what happened to

25   Dealer, losing his job, to Liam.  Right?

Christopher Little - Cross

1    A.    Not in my opinion, no.

2    Q.    Okay.  And if my client publicly had this ideology

3    attributed to him at this point in time, it's reasonably

4    likely he would have been fired from the contractor that he

5    worked for; isn't that right?

6    A.    If he was public about his ideology?

7    Q.    Yes.

8    A.    If he was public about his ideology and his membership in

9    this group, he would have been separated from the Marine Corps

10   at the time, if he was open about that.

11   Q.    Right.

12   A.    He would not have been granted security clearance.

13   Q.    Right.

14   A.    Additionally, if he would have answered truthfully on his

15   SF 86 that he also -- it's a standard form you use to update

16   your clearance.  If he could have answered truthfully on that

17   when he was either updating his clearance or getting a new

18   clearance this year, that would also not be granted.

19   Q.    Right.  To put it a more straightforward way, to be

20   publicly associated with this ideology he would lose through

21   the loss of his job just like it did in this case when he was

22   arrested; is that right?

23   A.    It would because of his --

24   Q.    Right.

25   A.    -- security clearance.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1  Q.   Okay, or maybe other reasons too.

2       MS. KOCHER:  Objection.

3  A.   Well, what I know specifically, it's for -- for the

4  security clearance required for his job because of the access

5  to information.

6       MR. TARLTON:  Yes, I'll move on.

7  Q.   Based on the phone that you reviewed a screenshot from

8  his Apple Notes that said "Gear List," remember talking about

9  that?

10  A.   Yes, sir.

11  Q.   I believe your testimony that that was a list for the

12  group, as you styled it, the group?

13  A.   If we're talking about this screenshot here --

14  Q.   Exhibit 4.

15  A.   -- there's another -- it's either another version of this

16  same list or like a -- another version of where this list came

17  from in his notes section on his iCloud as well.  So

18  there's -- it exists in another format on his iCloud in his

19  actual notes.

20  Q.   Exactly.  This is an app in an iPhone for taking notes.

21  This is not a chat room or anything like that.

22  A.   Correct.

23  Q.   Some people might use it for a grocery list or taking

24  notes on a meeting or something.  Right?

25  A.   Any number of things.

Christopher Little - Cross

1    Q.   Okay.  And this equally could just be a list of items he

2    wants to buy for himself, each of which are lawful to own.

3    A.   This could be, but the other list I saw was, you know --

4    was actually labeled as a packing list.

5    Q.   Right.

6    A.   And then it's consistent with other items he -- you know,

7    that are discussed with other members that they should have.

8    Q.   Sure.  But this is not a group chat; isn't that fair to

9    say?

10   A.   Which one are we referring to, sir?

11   Q.   The first page in Exhibit 4, the screenshot of a gear

12   list in my client's iPhone.

13   A.   No, this -- this also looks like it's in notes.

14   Q.   Right.

15   A.   I think the confusion is I'm -- like when I look at it on

16   a extraction, it's -- it's in a different format than just

17   what's on the screen.

18   Q.   Right, okay.  You talked about gaining access to Paul

19   Kryscuk's iCloud account and the things that you found in the

20   iCloud account, including bomb-making material, military

21   manuals, and propaganda manuals.

22   A.   I -- I specifically referred to Mr. Kryscuk's iCloud

23   account IED schematics and other -- basically schematics on

24   how to make things like detonators.

25   Q.   Right.

Christopher Little - Cross

1    A.    That's what I was referring to with Mr. Kryscuk.

2    Q.    I think I heard you attribute this account to the group,

3    but just so we're clear, is there any evidence my client had

4    the login information and otherwise accessed this iCloud

5    account belonging to Paul Kryscuk?

6    A.    I did not attribute that iCloud account to the group, and

7    there's no evidence that he had access to log into his --

8    Q.    All right, so the evidence very well may be Paul Kryscuk

9    had exclusive access to his own iCloud account?

10   A.    It may be.

11   Q.    All right.  Like I said, no evidence that my client

12   was -- had that account shared with him, was logging in, and

13   using -- looking at -- dealing with these materials that you

14   talked about in Kryscuk's iCloud account?

15   A.    I think the -- no.

16   Q.    Okay.

17   A.    I don't think I said that.  If I did, that's not --

18   Q.    I'm just clarifying, you know.  All right, so that's fair

19   to say, is that --

20   A.    Yes.

21   Q.    All right.  Was the apartment that my client lived in

22   that he lived in, in Idaho, was -- did Liam Collins also live

23   in that apartment?

24   A.    Yes.

25   Q.    All right.  Do you -- did they each have, based on your

Christopher Little - Cross

1  recollection of the investigation, like their own separate

2  bedrooms and stuff, or what?

3  A.   There was adjacent bedrooms that it looked like, you

4  know, that's where -- Mr. Duncan had one room that was --

5  Q.   Okay.

6  A.   -- adjacent to Mr. Collins.

7  Q.   Okay.  What was actually recovered from my client's

8  bedroom and let's say not Liam Collins' bedroom?

9  A.   The items that I -- I recall are -- specifically in Mr.

10  Duncan's bedroom are the -- the external hard drive that I

11  described that had the -- you know, the same schematics for

12  IEDs that were on Mr. Kryscuk's iCloud plus a vast amount

13  more.  And the other items I've previously described, the

14  solvent trap that I previously described, the fake ID and

15  official passport stored together that I described, and then I

16  know -- I don't -- like I said, I -- I didn't do the -- the

17  full search of the house.  I don't know where the -- like the

18  assault rifles, the other things recovered --

19  Q.   Right.

20  A.   -- I don't know where they were physically stored --

21  Q.   Okay.

22  A.   -- at the time they were discovered.

23  Q.   But as to the solvent trap and the hard drive, you're

24  saying that was in Mr. Collins' bedroom?

25  A.   No.  I'm saying that was in Mr. Duncan's room.

Christopher Little - Cross

1   Q.   Oh, okay.   In the -- when you described for the Court

2   these -- I think it was -- well, these photographs of these

3   various power stations in Idaho, those were photographs based

4   on what, addresses found in Mr. Kryscuk's possession?   Is that

5   right?

6   A.   They were recovered from his home.

7   Q.   Kryscuk's home, right?

8   A.   Correct.

9   Q.   Not my client's house; is that right?

10  A.   No, that's right.

11  Q.   Okay.   Based on the surveillance that was done in this

12  investigation, there was never a time where my client was seen

13  as present where there were at least three or more people

14  involved in some kind of protest or anything like that; is

15  that fair to say?

16  A.   That Mr. Duncan was not seen at a protest?

17  Q.   Right, or at least any kind of gathering where there's at

18  least three or more or assembly of three or more people.   Your

19  investigation never showed him kind of present at a situation

20  like that?

21  A.   I mean, they're assembled with three or more people in

22  the video, in their propaganda video.

23  Q.   Okay.

24  A.   I guess I don't understand.   I did not see him at like a

25  protest.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1    Q.   Right, or I guess -- how do you say it, people outside of

2    the group you attributed to him where there's an immediate

3    danger of property destruction or violence.  You never saw him

4    present at something like that, that you would characterize as

5    that kind of environment, would you?

6    A.   I did not see him present at something like that.

7    Q.   In talking about that video you showed, were any of

8    the -- there was no silencers in that video; is that right?

9    A.   Not in that video, no.

10   Q.   Okay, and that's the only video that was shown in this

11   courtroom today.  Right?

12   A.   Yes, sir.

13   Q.   And as to those rifles that we saw on the video, as far

14   as you know -- or were those manufactured without a license,

15   based on what you can see in the video?

16   A.   We've seized those rifles.

17   Q.   Those exact rifles?

18   A.   Yes, and examined them.

19   Q.   Those -- all right, so can you see the serial numbers in

20   the video, or how -- I mean --

21   A.   Well, they don't have serial numbers on some of them, for

22   one.  And they have distinctive, you know, characteristics on

23   the rifles that -- they are in other photos that are available

24   to us that are closer up to where, you know, we -- we seized

25   them from Mr. Kryscuk's house and some of -- some of the other

Christopher Little - Cross

1   rifles we feel are visible in the video from Mr. Duncan as

2   well.

3   Q.   Okay, so it's the similarity of the rifles in the video

4   that you're using to compare them to what were actually later

5   seized at a later date.  That's what's leading you to conclude

6   that those are the actual rifles in the video?

7   A.   It's more than that.  It's pictures of all of the rifles

8   laid out inside of Mr. Kryscuk's garage prior to the training

9   and, you know, we know the date of, you know -- coincides with

10  the training.

11  Q.   Right.

12  A.   We can see, you know -- see them very clearly in those

13  photos.  We can see them clearly in the videos -- in the other

14  videos that they took of their training.

15  Q.   Right.

16  A.   And then we can see them very clearly when we examine

17  them in person where we seized them from the same residence

18  where they were pictured at the day of the -- the training.

19  Q.   Right.  Well, it's not every -- not every firearm you

20  seized is one that was manufactured without a license; is that

21  correct?

22  A.   That is correct.

23  Q.   Okay.  Some -- because any of these AR-15-style assault

24  rifles, you can buy those at sporting stores like Dick's or

25  other locations, I guess.  I don't know what they have out in

Christopher Little - Cross

1  Idaho, but those can be bought at gun stores; is that fair to
2  say?
3  A.   Some of them can.  I mean, all of them can, but you need
4  proper paperwork like tax stamps and --
5  Q.   Right.
6  A.   -- like that kind of thing.  There's a process to go
7  through.  And you know, yeah, then some of them can be
8  purchased at -- at gun stores.
9  Q.   Right.  And just like there is nothing inherently illegal
10  about going out in a field and engaging in target practice or
11  even militia-type training.  Right?
12  A.   I would -- they say there's nothing illegal about target
13  practice.
14  Q.   Right.  That would be protected by the Second Amendment.
15  Right?
16  A.   Correct, I mean, that's -- yeah, if we're talking about
17  target practice.
18  Q.   Right, or any other kind of militia training; isn't that
19  right?
20  A.   I don't know.  I mean, it would probably depend on the
21  purpose of that training.
22  Q.   Right.  As we discussed a little bit ago, that there was
23  not surveillance showing my client near three or more people
24  where violence or property destruction was on -- in immediate
25  danger of erupting or breaking out.  Remember that?  Your

Christopher Little - Cross

1  surveillance never showed anything like that?

2  A.   I --

3  Q.   We commonly think of it as like a protest or something

4  that could become violent, that he was never seen at something

5  like that.

6  A.   No, he was never seen.

7  Q.   Okay.  And you went through Instagram records between the

8  chats between my client and Paul Kryscuk.

9  A.   Yes, sir.

10  Q.   You remember -- discussed like a series of exchanges.

11  And a lot of what they were talking about are the protests

12  that -- and social unrest that were being widely reported in

13  the news earlier this year.  Those were some of the

14  discussions you saw in those texts?

15  A.   Yes, they discussed it.

16  Q.   Okay.  Do you recall roughly an exchange where -- between

17  Paul and my client where they're saying wait until it gets

18  bad; we aren't an army; we don't gain anything by blowing our

19  load before it even matters; an army will rise when that

20  starts happening?  Do you remember those lines?

21  A.   Yes.

22  Q.   Okay.  That's not a statement that they're about to go

23  right out there and use their guns or any weapons against

24  anybody, is it?

25  A.   That -- you're saying that that's not a statement that

Christopher Little - Cross

1    they're not a threat?

2    Q.   They're talking about some --

3    A.   Or you assume they're not an imminent threat or they're

4    not a threat?

5    Q.   Isn't that a statement about what could happen at some

6    unknown point in the future?

7    A.   That is a statement to me that sounds like that they are

8    planning something.

9    Q.   But that would not be an immediate danger.  Right?

10   A.   To -- to me, we don't know when they would decide -- when

11   they could change their mind, and the fact that they're

12   preparing for it still strikes me as imminent danger.

13   Q.   That's imminent to you?

14   A.   It could be.

15   Q.   Okay.

16   A.   Just the fact that they are preparing for those types of

17   things, it could be.  I do understand what you're saying as

18   far as the context of the text though.

19   Q.   Right.  That's not a situation where they're planning to

20   show up at a specific event on a specific date, where there'll

21   be at least three people or more, where violence could break

22   out.  That's not what that statement is, is it?

23   A.   That statement does not contain those facts, sir, no.

24   Q.   Right.  It's about unknown events, depending how other

25   events may shape up; isn't that right?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1   A.   In that particular statement, yes.

2   Q.   So it does not meet the definition of a civil disorder,

3   does it, under the law?

4   A.   That's not for me to decide, but I agree -- you know,

5   I've agreed with the other statement you made.

6   Q.   Did you testify in the grand jury?

7   A.   No.

8   Q.   Okay.  You're aware that part of the conspiracy charge on

9   my client is based on a theory of a conspiracy to violate the

10  Federal Civil Disorder Act?  Are you aware of that?

11  A.   Yes, sir.

12  Q.   But you're not aware of the definition of that law?

13  A.   Yes, sir, but I'm saying -- I guess my confusion is that

14  I don't think that it's based on that statement.

15       MR. TARLTON:  Okay.  No further questions at this

16  time, Your Honor.

17       THE COURT:  Thank you.

18       Ms. Kocher?

19       MS. KOCHER:  Thank you, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MS. KOCHER:

22  Q.   Agt. Little, first of all, you were asked about Posse

23  Comitatus and said that you knew the reason that that did not

24  apply here.  Could you explain that?

25  A.   Well, there's active-duty Marines involved in this

Christopher Little - Cross

1    investigation and one that's currently indicted.

2    Q.   All right.  And who would be the currently indicted that

3    is an active-duty Marine?

4    A.   Justin Hermanson.

5    Q.   And would -- if there were no active-duty Marine, would

6    that be the end of it?  Would you be out of the case?

7    A.   No, ma'am.

8    Q.   And why is that?

9    A.   Because there's a strong DOD nexus to the case.  The

10   group is actively recruiting within the military, which is a

11   force protection issue for the military.  It's a myriad of

12   issues for the military on a -- from the perspective of

13   counterintelligence, from a lot of different avenues.

14   Q.   All right.  You were asked about any text thread or the

15   Wire screenshots I think is what was being referenced,

16   regarding the controlled purchase and whether Mr. Duncan had

17   any presence in that screenshot of the controlled purchase of

18   the pistol and suppressor that was obtained and charged in the

19   indictment.  And your answer was not on that specific

20   purchase.

21   A.   Correct.

22   Q.   Do you recall that testimony?  Do you have recollection

23   of other evidence that exists about Mr. Duncan's participation

24   in discussions or purchases of such weapons?

25   A.   Yes.  I recall another screenshot, and this is kind of

Christopher Little - Cross

1   a -- it's also a good example of kind of how when I say

2   screenshots and group chats what I mean.  So the group chats

3   exist on Wire where multiple -- you know, multiple members

4   discuss when the -- when the -- you know, the group discusses

5   topics.  Then when an individual takes a screenshot of that,

6   it saves it on their phone, and that's you know, what I'm

7   referring to.

8           In this particular screenshot is a screenshot from

9   the phone of -- or from the iCloud account of Mr. Collins.  In

10  that screenshot, Mr. Duncan is involved in the conversation.

11  Mr. Kryscuk is involved in the conversation.  And another

12  group member is involved in the conversation.  The -- Liam

13  Collins as Disciple was not visibly involved in the

14  conversation, yet, he has the screenshot of the group chat and

15  is privy to the information in the group chat that the rest of

16  the group was in.

17          Specifically, in this chat that I'm -- or in this

18  screenshot that I'm referencing, after making a anti-Semitic

19  statement, Mr. Kryscuk posts a -- an item that's like a

20  solvent trap, but in this case, I believe it's a fuel filter

21  that can easily be converted to a suppressor in the same

22  manner that he did with the solvent traps on numerous

23  occasions.  He discloses the price of it, how cheap it is, and

24  how they can easily manufacture suppressors for a very cheap

25  price, which is well -- like a fraction of the cost of doing

Christopher Little - Cross

1    it the -- in a legal manner of like buying a silencer and

2    getting a tax stamp for the -- for the device.

3    Q.    And was Duncan present for that?

4    A.    Yes.

5    Q.    And he appears --

6    A.    He's present in the screenshot for that conversation.

7    Q.    All right.  You were asked about the presence of the

8    explosives material in Kryscuk's iCloud, but I think the

9    question also included a string of other information.  The

10   word propaganda caught my ear.  That larger amount of material

11   you described to include propaganda, and I think nerve toxins

12   and gases were found in Duncan's hard drive; is that correct?

13   A.    That's correct.

14   Q.    All right.  From that, did the members of the group, or

15   specifically looking at Collins, Kryscuk, and Duncan -- was

16   there a leadership order, or did they all have different

17   roles?  Is there any way you can describe their participation

18   in this group?

19   A.    I wouldn't say that there was a leader.  It seemed like,

20   you know, there was people that had specific roles, and, you

21   know, there's definitely core members, with, you know,

22   different -- I don't know if specialties is the right word,

23   but definitely a different focus.  You know, Collins was a

24   networker that seemed to be focused on recruitment.  With Mr.

25   Duncan, I feel like he was -- you know, from what I've seen,

Christopher Little - Cross

1    you know, definitely involved in vetting new members and some

2    of the assessment of, you know, potential members that would

3    join.  Also it was kind of like an organizational force

4    within, you know, like -- provide the organization skills.

5    Q.   All right.  And would that material in his hard drive be

6    an evidence of that organizational skill?

7    A.   Yes.  The evidence on his hard drive was very organized.

8    And you know, what it would appear to be, like, a very

9    methodic, you know, fashion that would take some time.  And

10   what I was describing from the -- the hard drive was the --

11   the explosives schematics that were present on Mr. Kryscuk's

12   iPad were also present on that hard drive.  I was not saying

13   that he had access to that.

14   Q.   All right.

15   A.   (Indiscernible).

16   Q.   Now, in regard to Mr. Duncan's organization and role,

17   perhaps, in the group, did you see at some point an after

18   action report that was in the note section of Mr. Duncan's

19   report?

20   A.   Yes.  It was basically just a -- well, you know, it was,

21   to my eye, very similar to what you would see in the military.

22   An after action report after you do training or any kind of

23   movement where you would identify things you want to sustain

24   and deficiencies you want to improve.

25   Q.   And what was that after action report in regard to?

Christopher Little - Cross

1   A.   Their training in Boise.

2   Q.   Okay, that July training that was part of the video --

3   A.   Yes, ma'am.

4   Q.   -- that we showed?  In regard to the video, you were

5   asked if there were silencers present in that video.  Were

6   there?

7   A.   No.

8   Q.   Did you see other photos and videos which did include the

9   silencers?

10  A.   Yes.

11  Q.   At the end of that video, there appears four persons

12  masked giving what I think you called a Nazi salute.

13  A.   Yup.

14  Q.   Above their heads was an image.  Did you notice that?

15  A.   Yes, ma'am.

16  Q.   What was that image?

17  A.   It was a sun wheel.

18  Q.   A sun wheel?

19  A.   Correct.

20  Q.   Had you seen that prior?

21  A.   Yes.

22  Q.   Where did you see it?

23  A.   It's, you know, frequently used in -- in neo-Nazi, you

24  know, type of imagery, but specifically, I saw it on the cover

25  of the manifesto left by the shooter in New Zealand who --

Christopher Little - Cross

1    that I mentioned earlier, that, you know, killed fifty-one

2    individuals at two mosques in Christchurch, New Zealand.

3    Q.   All right.  And we saw that same -- or a very similar

4    picture in the Instagram results -- that's Exhibit 6, that had

5    been turned into a meme, that had POV race mixer -- you're a

6    race mixer -- is that --

7    A.   I believe so.  I mean, it's -- it's to that effect of --

8    I want to -- POV you're a race mixer.

9    Q.   All right, and can you explain a bit more about -- from

10   your readings and understanding of the evidence in this case

11   what race mixer means, and what the meme may inform a reader

12   of?

13   A.   It's a -- the image is sent by Mr. Duncan to Mr. Kryscuk,

14   and it's -- the image is taken from their training that they

15   conducted.  Part of the significance, too, is that their

16   training was offensive in nature.  It was -- they were doing

17   things in a very para-military, militaristic style, advancing

18   on targets, covering each other's movement, communicating

19   about when they were reloading their magazines, everything

20   else.

21   So the fact that that training took place, and then that they

22   choose to take photos from that training and label it as the

23   point of view you're a race mixer is -- is significant to me

24   and indicates that that was the -- you know, had something to

25   do with the purpose of that training for them -- for their

Christopher Little - Cross

1    group.

2    The actual piece about the race mixer is a theme that I've

3    seen throughout review of various electronic devices.

4    Even going back to Mr. Kryscuk's manifesto-style post in 2017,

5    he described -- when he was describing that there is no

6    political solution to what they want to accomplish, he says --

7    he made the misstatement that -- and -- and he's speaking to

8    what he perceives as other white individuals -- if you think

9    that you can accomplish this with what he refers to as good

10   Jews or base African Americans, which would mean people that

11   are sympathetic or you know, that they can get along with --

12   you're mistaken.

13   And he goes on to say that you will be executed or deported

14   along with your friends when the time comes.  That is a

15   description of what they would -- they would view as a race

16   mixer.  Like a white Christian that, you know, tries to align

17   and work things out with these other groups.

18   Q.   All right.  You were asked about civil disorder.

19   Specifically in regard to a possible civil disorder, does any

20   particular evidence that you've seen or reviewed or heard of

21   come to mind?

22   A.   I mean, the stuff I previously mentioned regarding -- you

23   know, and rallies.  That's what, you know, particularly comes

24   to mind at first.

25   Q.   All right, and that would be the punching or the black

Christopher Little - Cross

1    fist raised?

2    A.    That and --

3    Q.    And assaulting?

4    A.    -- the mention of -- from the other mention -- I

5    discussed regarding, actually, just -- just shooting at a

6    protest.  The surveillance of BLM rallies by Mr. Kryscuk, the

7    following of BLM by Mr. Kryscuk and Mr. Duncan for intel.

8    Even at some point, Mr. Duncan instructs Mr. Kryscuk to go to

9    a rally and look at it.  And at this point, I don't believe

10   that's a BLM rally.  That may have been a -- like a gay rights

11   rally or something else going on in Boise, but it's still a

12   rally for, basically, a minority community that would not

13   align with their views, to which Mr. Kryscuk complies and

14   goes.

15   Q.    Do you know if Kryscuk and/or the group were receiving

16   money from some of the sales of these weapons?

17   A.    Yes, they were making a profit from the sale of these

18   weapons.

19   Q.    And is there evidence that profit was for the group

20   itself, ultimately?

21   A.    Yes.  There's, you know, group discussions about things

22   they want to purchase as a group.  And then there's also a

23   discussion, I recall, between Mr. Collins and Mr. Kryscuk

24   about how much they're going to charge initially for, like,

25   someone's first purchase, and then subsequent purchases of

Christopher Little - Cross

1    firearms and suppressors to -- you know, as far as how that

2    impacts the profit.

3    Q.   And did Collins post on Iron March, the fact that all of

4    his resources were going to buy items for the group --

5    A.   Yes.

6    Q.   -- or going for the group?

7    A.   He -- he posted that -- you know, he was -- his financial

8    resources before the group.  They were looking to buy land,

9    gear, equipment.  And he did buy, you know, fairly expensive

10   equipment.

11   Q.   Collins did?

12   A.   Yes, Collins.

13   Q.   What type of fairly expensive equipment did Collins buy?

14   A.   For one -- one of the items we seized from the pallet

15   that was destined to Mr. Duncan's address -- it was a -- I

16   don't remember the brand, but it's an expensive optic that we

17   looked up for rifles, that was about 3,000 dollars.

18   Q.   What is an optic?

19   A.   An -- like a -- an object you attach to a rifle, to use

20   to aim it.

21   Q.   So like a scope?  Is that --

22   A.   A scope, yeah, like a scope.

23   Q.   Okay.

24   A.   But this -- I would call this an optic, because it's --

25   uses a red reticle, and it's just what I would generally refer

Christopher Little - Cross

1    to it as.

2    Q.   I'm sorry, I didn't hear the end.

3    A.   Because it uses a red reticle, like an illuminated

4    reticle, and it's just what I would generally refer to it as,

5    but it's the same as a scope.

6            MS. KOCHER:  No further questions, Your Honor.

7            THE COURT:  Very well.

8            Mr. Tarlton?

9            MR. TARLTON:  Nothing further, Your Honor.

10           THE COURT:  Very well, thank you, sir.

11           THE WITNESS:  Thank you, Your Honor.

12           THE COURT:  Is that the evidence for the Government?

13           MS. KOCHER:  It is, Your Honor.

14           THE COURT:  Okay, I'll note for the record that I've

15   reviewed the pre-trial services materials.

16           Mr. Tarlton, sir, any evidence for the defendant?

17           MR. TARLTON:  Yes, Your Honor.  We would call Frank

18   Duncan, my client's father.

19             DEFENDANT'S WITNESS, FRANK DUNCAN, SWORN

20           THE CLERK:  And if you'll state your name for the

21   record.

22           THE WITNESS:  Frank Duncan.

23           THE CLERK:  Thank you.

24                        DIRECT EXAMINATION

25   BY MR. TARLTON:

Christopher Little - Cross

1   Q.   Good afternoon, Mr. Duncan.

2   A.   Hi.

3   Q.   You're Jordan's father?

4   A.   Yes.

5   Q.   Where do you currently live?

6   A.   Greencastle, Pennsylvania.

7   Q.   How long have you lived there?

8   A.   Just shy of six years.

9   Q.   And who else lives with you?

10  A.   At my address, my wife and our eleven-year-old daughter.

11  Q.   And that's my client's mother and sister; is that right?

12  A.   Yes.

13  Q.   Sir, what do you do for a living?

14  A.   I'm a pastor.

15  Q.   Okay.  Where?

16  A.   Paramount Baptist Church in Hagerstown, Maryland.

17  Q.   Okay.  How long have you been doing that?

18  A.   Just shy of six years at that church.

19  Q.   Okay.

20  A.   I'm in my twenty-first year of pastoral ministry.

21  Q.   Well, how'd you get into the ministry?

22  A.   Well, we Baptists believe it's a calling.

23  Q.   Okay.  And when you were younger, did you ever have any

24  run-ins with the law?

25  A.   Yes, a few.

Christopher Little - Cross

1    Q.    And what were those?

2    A.    Two DUIs, a couple of driving under suspensions, public

3    disorderly conduct.

4    Q.    Okay.  And what year was that, roughly?

5    A.    The last occurrence of that would have been 1992.

6    Q.    How old were you then?

7    A.    Twenty-four.

8    Q.    And then, how old are you now?

9    A.    Fifty-three.

10   Q.    All right, and so it sounds like at some point you got --

11   went with the calling of the church.  I guess is -- how many

12   children do you have, sir?

13   A.    Four.

14   Q.    All right, well -- and what are their ages, and --

15   A.    Jordan is the oldest.

16   Q.    Okay.

17   A.    His younger brother, the first younger brother is Ben

18   (ph.); he's twenty-four.

19   Q.    Okay.

20   A.    And then the third son, Jared (ph.) is twenty-one.  And

21   then Maddy (ph.), the daughter at home with us is eleven.

22   Q.    All right.  How long have you lived in your home in

23   Pennsylvania?

24   A.    We've lived in the home we currently live in for a little

25   over three years.  We've been in that community for -- for

Christopher Little - Cross

1    going on six.  But we -- once we moved there, we were waiting

2    on a home in North Carolina to sell before we purchased the

3    home we live in now.

4    Q.   Okay.  When did Jordan leave the home?

5    A.   When he enlisted in the Marine Corps out of high school.

6    Q.   When was that?

7    A.   2013.

8    Q.   All right.  How did he do in the Marine Corps, as far as

9    you're aware?

10   A.   He did great.  He was recruited into intelligence, based

11   on outstanding scores on the ASVAB, and then the language

12   battery.  He went through a year and a half of language

13   training at DLI, which is extremely intensive.  He made it

14   through that, did very well.  He served five years and was

15   honorably discharged.

16   Q.   Has he tried to get good jobs since he got out of the

17   military?  Or is he --

18   A.   He's had great jobs.  He's only had two.

19   Q.   Okay.  And it's fair to say that -- or was he living with

20   you at all during the -- any part of 2020 or 2019?

21   A.   No, he stayed with us for about five months when he first

22   was discharged, while he was waiting on a job.

23   Q.   Um-hum.

24   A.   And once he got the job offer in 2018 -- I think 2018, he

25   moved to San Antonio, 2017, 2018.  Had to be 2018.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1    Q.    Okay.  During that little bit of time he was living with

2    you as an adult, when he got out of the Marine Corps, did you

3    ever have disagreements about, sort of, your rules of the

4    house, or your wife's rules of the house?

5    A.    Well, I mean I don't know of any parents whose children

6    have always agreed with them, but Jordan, as an adult, has

7    always respected and followed whatever rules we have.

8    Q.    Okay.

9    A.    I'm a pastor.  We don't allow drinking or smoking or

10   anything like that in our home, and he knows those rules, and

11   he's always respected those, and knows that --

12   Q.    Okay.

13   A.    -- that's what's expected.

14   Q.    All right.  And were there any firearms in your house

15   anymore?

16   A.    There are not.

17   Q.    Did you have those removed or what?

18   A.    I did.

19   Q.    Okay.  Is there -- I don't think I asked you this

20   already -- how big is the house where you guys live?

21   A.    It's about 2,400 square feet.

22   Q.    Okay.  Extra room for Jordan --

23   A.    Four bedrooms.

24   Q.    -- if he were allowed to live there?

25   A.    Yes.  We have two spare rooms.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1    Q.    All right.  And do you remember a phone call we had

2    earlier with probation about your cell phone?

3    A.    Yes.

4    Q.    That you said you have a strong cell phone signal that

5    should, based on what you've learned, support --

6    A.    Yes.

7    Q.    -- (indiscernible).

8    A.    We've never have any trouble with it.

9    Q.    All right.  And that would -- as far as you're aware,

10   would support electronic monitoring, based on the information

11   you've been given?

12   A.    I know it's a good signal.  I don't know --

13   Q.    Yeah.

14   A.    -- anything about --

15   Q.    All right.

16   A.    -- electronic monitoring, but I know it's a strong

17   signal.

18   Q.    Okay.

19   A.    I've never had trouble with --

20   Q.    Yeah.

21   A.    -- dropped calls or anything like that.

22   Q.    All right.

23   A.    I know the triangle looks big.

24   Q.    Yeah.  Now, I realize Jordan's kind of starting out in

25   life, and I guess in the civilian world, working outside the

Christopher Little - Cross

1   military.  Has he -- to your knowledge, does he have a lot of

2   money saved up, or any foreign bank accounts, anything like

3   that?

4   A.   No, he doesn't have much of any money at this point.

5   We've been handling his bills.

6   Q.   You've been helping him financially?

7   A.   Well, we've had to.  He's been in custody for over a

8   month now.

9   Q.   Right.  But even before that, before he went into

10  custody?

11  A.   No, before he went into custody we'd never -- he managed

12  his own finances very well.

13  Q.   From what your perspective, though, was he making a lot

14  and saving a lot, or is he --

15  A.   No.

16  Q.   All right.

17  A.   He's never been really good at saving.

18  Q.   Okay.

19  A.   He's made money, but he --

20  Q.   All right.

21  A.   -- he likes to spend it.

22  Q.   You know what kind of car he had?

23  A.   Yes, he has a 2009 Ranger pickup truck.

24  Q.   All right.  Did he own it outright, or do you think he

25  still owed money on -- like, payments?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

```
1    A.    Oh, he still owes money on it.

2    Q.    Yeah.

3    A.    Because I made the last payment.

4    Q.    Okay.  What about credit card debt?  Are you aware of

5    that, or --

6    A.    Yes, he has a few thousand dollars on his credit card.

7    Q.    All right.  It's fair to say just not a lot of money in

8    savings or anything like that?

9    A.    No, he doesn't have any money --

10   Q.    All right.

11   A.    -- in savings.

12   Q.    And knowing everything you know, would you -- if he were

13   allowed to be released, even under strict conditions, would

14   you allow him to live in your home with your wife?

15   A.    Of course.

16   Q.    Okay.  Have you actually taken any efforts to help him

17   look for employment, if he were to be released back in

18   Pennsylvania?

19   A.    I have.  We have several business owners within the

20   church, and I've talked with one of them, who actually my

21   middle son worked for, before he went into the Air Force.  And

22   he has guaranteed Jordan a job, and he sent a letter stating

23   such, that I have forwarded to you.  And it's my understanding

24   that the probation -- I don't know, probation officer or

25   whatever the title is -- has a copy of as well.
```

Christopher Little - Cross

1    Q.    All right.

2    A.    So he has a job waiting on him.

3              MR. TARLTON:  Thank you, sir.

4              May I approach the witness?

5              THE COURT:  You may.

6    BY MR. TARLTON:

7    Q.    Sir, I'm showing you what's been marked for

8    identification purposes as Defendant's Exhibit 1.  Do you

9    recognize this?

10   A.    Yes.

11   Q.    What is it?

12   A.    That's the letter that Denny Stouffer, a church member

13   and a close friend, sent when I discussed the issue with him,

14   and he assured me that he had a place for Jordan and would

15   have a job waiting on him.  I asked him would he put it in

16   writing, and he did so.

17   Q.    All right.

18   A.    And that's what he sent me.

19   Q.    I think -- and this letter appears to be what you

20   received?

21   A.    It is.

22             MR. TARLTON:  Your Honor, at this time I would move

23   to enter this into evidence, Defendant's Exhibit 1, letter

24   from Stouffer's Auction & Real Estate Company.

25             THE COURT:  Any objection, Ms. Kocher?

Christopher Little - Cross

1          MS. KOCHER:  No, Your Honor.

2    BY MR. TARLTON:

3    Q.   And as far as you're aware, this gentleman is aware of

4    what Jordan's charged with?

5    A.   He is; I've told him.

6    Q.   Now, has Jordan told -- offered you any detail about this

7    case, other than, I guess, just the nature of the charges?

8    A.   No.  I've heard a lot of detail today.  Probably more

9    than I wanted to hear, but --

10   Q.   Yeah.  Okay.  And you haven't talked -- have you talked

11   with anybody else about the details of this case?

12   A.   My wife and I have discussed it, of course.

13   Q.   What are your work hours?

14   A.   Depends on the week and what's going on.  I work with

15   volunteers, I mean we have a staff that -- of course, much of

16   our work is with the congregation, so there's meetings at

17   night, and so my schedule is flexible.

18   Q.   Okay.  Are you at home -- do you ever work from home to

19   now, especially?

20   A.   I am.  I mean, we worked at home for a while during the

21   COVID shutdowns and quarantine, and I have the flexibility of

22   doing that if I choose.

23   Q.   Okay.  Does your wife work outside of the home?

24   A.   She does not.

25   Q.   All right.  So she's pretty much there most of the day?

Christopher Little - Cross

1  A.   She is.

2  Q.   If this Court were to place trust in you as a third-party

3  custodian, would you be willing to enforce pretty strict rules

4  that would govern any release order that may be set, such as

5  curfews on Jordan, prohibitations (sic) from talking with

6  people in this case or witnesses or defendants, stuff like

7  that?

8  A.   We've already touched on that.  Speaking with him,

9  there's -- I mean, I love my son and I'm going to do anything

10 I can to support him, but I have a wife and an eleven-year-old

11 daughter, and I serve a congregation of over 500 people, and

12 I'm not going to put that in jeopardy.  He knows that if he's

13 fortunate enough to be released pending trial, he's going to

14 follow the rules.

15 Q.   Yeah.  Is that a sentiment your wife shares too?

16 A.   It is, absolutely.  She might say it a little more

17 strongly than I just did.

18 Q.   But if it were apparent to you that the rules were

19 violated, are you willing to call probation and report your

20 son's violating the rules?

21 A.   It would break my heart, but yes, I'd have to.  I -- I

22 can't jeopardize my family and my wellbeing and their future

23 and my service to my church.  I mean, nobody wants to be in

24 that situation, but I would have to.

25          MR. TARLTON:  Thank you, Your Honor.  No further

Christopher Little - Cross

1    questions at this time.

2            THE COURT:  Ms. Kocher?

3            MS. KOCHER:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MS. KOCHER:

6    Q.    Good afternoon, Mr. Duncan.

7    A.    Hi.

8    Q.    You mentioned waiting for a home here in North Carolina

9    to sell before you found a home in Pennsylvania.  Where here

10   in North Carolina was that home located?

11   A.    That was in Nash County.  In Nashville, in the town of

12   Nashville.

13   Q.    And how long had you lived here in North Carolina?

14   A.    We were in North Carolina from the first week of 2005,

15   and we moved from North Carolina to Pennsylvania in 2015.  So

16   roughly ten years.

17   Q.    All right, and Jordan was with you during that time?

18   A.    Until he left to go in the military, 2013.

19   Q.    All right, so he attended high school here locally?

20   A.    He did.  He attended Southern Nash High School.

21   Q.    All right.  And were you a pastor there in Nashville?

22   A.    Yes.

23   Q.    All right, of which church was that?

24   A.    I pastored at Bailey Baptist Church for just shy of four

25   years, and then I went on staff at Englewood Baptist Church in

Christopher Little - Cross

1    Rocky Mount, North Carolina.  And that was where we moved from

2    North Carolina to Pennsylvania.

3    Q.   Were you aware that Jordan met Liam Collins in the

4    Marines?

5    A.   I had never really heard of Liam Collins until Jordan was

6    getting a roommate.

7    Q.   Okay.  In Boise, you mean?

8    A.   Right.

9    Q.   All right, so he let you know that this Liam Collins was

10   moving to Boise?

11   A.   Yes.

12   Q.   Okay, what was the context of that conversation?

13   A.   Buddy that he had met and was moving to Boise and was

14   going to room with him.

15   Q.   What did Jordan tell you about his own move to Boise?

16   A.   He didn't like San Antonio.  Didn't like the city there,

17   it was too crowded.  The job situation who he had worked for,

18   the contract had come to an end.  He visited some friends in

19   Boise, said he really liked the wide open spaces, beautiful

20   area of the country.  He believed it was a good place to

21   settle, and somewhere he'd like to live, and he was moving.

22   Q.   Yup.  He took a pay cut to go there?

23   A.   That was my understanding.  It was a slight pay cut.

24   Q.   How much do you understand the cut was?

25   A.   I don't really know.  I mean, he mentioned that it was a

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1    slight one, but he believed he would be able to work his way

2    up.  I don't ask him exactly how much he makes.

3    Q.   Okay.  Well, but you've got his -- access to his accounts

4    now.

5    A.   I do now.

6    Q.   Okay.  And you didn't notice in your looking at them how

7    much the pay cut was?

8    A.   Looked at the balance and what he had to pay the bills

9    that were due.

10   Q.   Okay.  So you didn't look to see how he had spent his

11   money in months past, either?

12   A.   We haven't had time.  There's been a --

13   Q.   Okay.

14   A.   -- lot going on.  We've tried to cover him.  Not

15   everybody wants to accept your paperwork and they think it's

16   some kind of scam, and it's a headache.

17   Q.   Like power of attorney reference?

18   A.   Yes.

19   Q.   Okay.  So were you aware of the ideology that was

20   expressed here in the courtroom today?

21   A.   I was not.

22   Q.   Mr. Duncan never informed you that he did not approve of

23   brown people?

24   A.   Some of his best buddies when he was in high school were

25   African Americans.  So it was -- to hear those allegations is

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Cross

1   surprising to me.

2   Q.   Okay.  And in regard to the Jewish religion, had he ever

3   expressed that particular ideology to you --

4   A.   No.

5   Q.   -- before?  Did you ever see him discussing with his

6   brothers, in a more heated fashion, any of those topics?

7   A.   No.

8   Q.   Were you aware that he had a false identification?

9   A.   No.  I've tried to raise my kids in a way to avoid making

10  some of the same dumb mistakes I made.  I can't rem -- I can

11  remember repeatedly telling them, you don't have to make those

12  mistakes.  Let me tell you what it's like banging your head

13  against the wall, and then you don't have to go out there and

14  so.  But --

15  Q.   But here you sit?  Is that a fair ending to your

16  sentence?

17          MS. KOCHER:  Record reflect a shrug.

18          THE COURT:  Okay.

19          MS. KOCHER:  No further questions, Your Honor.

20          THE COURT:  Mr. Tarlton?

21          MR. TARLTON:  Nothing further, Your Honor.

22          THE COURT:  Very good.  Thank you, sir.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Mr. Tarlton, any further evidence from

25  the defendant?

Christopher Little - Cross

1          MR. TARLTON:  No further evidence, Your Honor.

2          THE COURT:  Thank you, sir.

3          Ms. Kocher, let me just confirm no further evidence

4    from the Government at this time?

5          MS. KOCHER:  That is correct, Your Honor.

6          THE COURT:  Very good.  And I'll be happy to hear the

7    Government's argument now.

8          MS. KOCHER:  Thank you, sir.  In sum, the evidence in

9    the case individuals a group -- excuse me -- indicates a group

10   of individuals that engaged in a concerted effort to

11   manufacture and ship firearms and -- the manufacture and

12   shipment of which was illegal because it crossed state lines,

13   and they didn't have the proper licenses to do so.  That it

14   was in part and in conjunction with this deep-seated Aryan VE,

15   that is, racially motivated violent extremism ideology that

16   was expressed on different online forums in different types of

17   chat rooms, and the plan had been set out as early as March

18   2017 by the codefendant Kryscuk.

19          And if Your Honor reviews that Exhibit 1, ultimately

20   everything forecast in that manifesto-style post was worked on

21   by Collins and Duncan.  The Court didn't hear evidence about

22   Hermanson today, because it's irrelevant to the point of

23   detention, but the members of the group worked toward those

24   ultimate goals.  He said in 2017 that he wanted to move to the

25   Northwest.  I don't recall if he specifically mentioned Boise,

Christopher Little - Cross

1    but he definitely moved from New York to Boise.

2         The Instagram messages that were part of Exhibit 6

3    today reference this particular defendant talking about his

4    move to Boise, how much he was looking forward to that move,

5    the great work that they had to do when he got there.  That

6    work was further training and establishing and moving that

7    group up the exhibit that is the unconventional warfare

8    pyramid that you were shown.  They perceived themselves to be

9    at the level of creating riots and protests, and both overt

10   and covert actions against the United States government.

11        Significant to me in this case, and going

12   particularly to this particular defendant, is we're not here

13   on the statements of a confidential informant about this

14   ideology.  That we don't have to guess or predict what this

15   particular defendant believed, and what was in the works -- at

16   an unknown date, admittedly, but the -- we have his own face

17   in photographs as described.  We have his own face and actions

18   in the video that was submitted.  The assault rifle that he is

19   using in that video was actually seized at his apartment,

20   pursuant to the agent's testimony.

21        We have repeated in many statements in that Instagram

22   account and otherwise, both submitted in writing to the Court

23   as well as detailed other statements by the agent's testimony

24   about the hatred and the acts that would be taken against

25   these people.  The point being acceleration of the collapse of

Christopher Little - Cross

1    the United States government and ultimate takeover.  And the

2    plan, according to Kryscuk in that 2017 post, was to inhabit a

3    small local area and slowly grow out from there, eventually

4    creating a ground war reminiscent of that in Iraq.

5          They had, in fact, gathered guns, they had gathered

6    suppressors, they had gathered -- and I should say

7    manufactured.  Not only gathered, but they'd got the skill to

8    manufacture the weapons.  Mr. Duncan's role in this was

9    specifically sought by Collins, but I would also argue by

10   Kryscuk as well, because of his military connection and the

11   access he had to the very material that was addressed by the

12   agent's testimony, and that is explosives, material,

13   schematics, documents.  And a vast library, I think, was the

14   terminology used by the witness, of all this type of material,

15   even down to nerve toxins and poisonous gases.

16         There were files on propaganda.  All of that -- and

17   some military manuals that certainly were not in an

18   appropriate place, consistent with the apparent mindset of the

19   individual who had gathered all of that together, particularly

20   next to a folder, for instance, named propaganda.  That is of

21   great concern, and his training in that regard -- is of great

22   concern.

23         In regard to the evidence against the defendant for

24   his participation in this conspiracy, the evidence is strong.

25   And again, I go back to -- it's his own words.  It's his own

Christopher Little - Cross

1    video.  It's not even whether any witness has been credible.

2    The witness is the defendant himself.

3            As to the risk of flight and the risk of danger to

4    the community, should this defendant then be released?  I very

5    much appreciate a parent supporting their child.  I -- you

6    know, as the Court may be aware, I have my own set of

7    children, and not all of my experiences with them have been

8    pleasant, or even on the legal side.  The -- well, I mean, all

9    of my actions have been legal.  You know what I mean.  But I

10   understand the conflict, is my point.  I understand the

11   conflict of a parent needing to support a son.

12           In this case, this side of Mr. Duncan's life was

13   completely hidden from his parents.  They had no clue.  They

14   have no clue, even today, what his money was going toward.

15   And it could have been guns, ammo, could have gone for an

16   expensive optic that was purchased.  Could have gone to Venmo

17   transactions for jigs for a suppressor.  Those are just a few

18   of the transactions that were mentioned in the courtroom

19   today.

20           The defendant had a false ID.  We know from the use

21   of the Shaun Corcoran ID that Mr. Kryscuk had actually rented

22   a PO box and had altered supporting documentation for that --

23   was a bank statement that we just happened to also have, so

24   that the agent was very able to look and say, oh, this is --

25   it's been falsified by Mr. Kryscuk, to make it in the name of

Christopher Little - Cross

1    Shaun Corcoran.

2           We have no -- it's impossible to tell whether Mr.

3    Duncan has done something similar.  I wouldn't even know where

4    to start in asking the world if they have any PO boxes or any

5    apartments rented or anything else in the name of Callahan

6    (ph.), which was the name on his fake ID.  The mere presence

7    of that fake ID is significant.

8           Second, that fake ID was found in an active -- that

9    is, not expired official U.S. passport.  That is a significant

10   concern.  Now that passport has been seized, but the fact that

11   the defendant took the passport with him when he left official

12   work -- he was no longer with the military, and that was a

13   Department of Defense passport -- and kept it, and kept it

14   with the fake ID, is of concern.  I think it all goes to how

15   easily -- and in part, that is his military training in

16   intel -- in intelligence -- is how to come up with those fake

17   IDs, how to use those processes, and to abuse and misuse

18   materials that he may have had access to, because of his

19   military position.

20          He speaks Russian.  Not only does he speak Russian,

21   but he speaks Russian well.  He was a linguist for the

22   military.  It was part of his specific training, so he has

23   travelled for the military in the past.  He's been overseas.

24   He could do that again, as well.  It does give him the ability

25   to get along in another country, in a foreign area.  It is

Christopher Little - Cross

1    also, I believe, a matter of public record -- the agent didn't

2    speak to it.  I could put him back up, but Russia is one of

3    those countries, Your Honor, that their ideology aligns very

4    closely to the ideology -- some.  I don't mean all Russians,

5    but that is a hotbed, if you would, of the same type of

6    ideology.  So the very fact of the specific language he speaks

7    is of concern to the Government as well.

8         That all goes to risk of flight.  The very sincere

9    parent's testimony that the defendant doesn't have any money

10   is not convincing to me, particularly when Mr. Duncan hasn't

11   been open about any other aspect of his life in these last

12   several years.  The danger to the community, in particular to

13   an eleven-year-old little sister in the house, is significant.

14   This man has expressed hatred and attraction to violence.  He

15   has spoken in his writings in support of the Christchurch

16   event over in New Zealand, calling that shooter a legend.

17        Their group, in the video in which he appears, has

18   taken on the black sun wheel that was used on the front cover

19   of the manifesto of that person in Christchurch.  He has

20   discussed shootings.  He has discussed physical assaults.  He

21   has discussed genocide, specifically brown genocide.  All of

22   those are in conversations with the members of his group.

23   What we have, what we've shown to the Court today are what

24   we've gotten just from the screenshots they saved.

25        And the agent explained the difference between the

Christopher Little - Cross

1    screenshot and the group chat, group chat being like a group

2    text.  Everybody has it, everybody gets the text.  It's just

3    the screenshot is when somebody snaps the photo of it, and

4    they've saved, for whatever reason, the rules of the group,

5    for instance, the four rules that were admitted into evidence.

6    And this defendant appears in a number of those -- just even

7    the screenshots.  And the agent testified that he knows from

8    the other evidence that he is a larger participant in some of

9    the other group chats.  Just that one particular one of

10   interest that is the four rules, he doesn't appear within that

11   screenshot, but knows Duncan to be a member of that group chat

12   from other chats -- from other screenshots he's seen.

13          It begs the question of what other information, what

14   other conversations they may have had, that we don't have

15   access to, because it was, in fact, an encrypted app.  It is

16   of grave concern, the amount of weapons that were recovered

17   overall from the group, the number of suppressors, the short-

18   barrel rifles which are in and of themselves illegal, the

19   ammo, the military magazines, the praise Mr. Duncan gave Mr.

20   Collins for having stolen so much military gear -- calls it, I

21   believe the reference is Disc, D-I-S-C.  That would be short

22   for Disciple, which is a username of Collins.  Disc

23   appreciation day.  They pat him on the back because of all the

24   thefts he took from the military.

25          Now, we're aware of body armor plates, which were

Christopher Little - Redirect

1    serialized.  Not only is it a military theft, but those are

2    not to be put out into the public.  They would have to be

3    destroyed or demilitarized, is what would happen.  But you

4    can't demilitarize body plates.  The numerous magazines that

5    were military issued, or very identical to military issued

6    magazines that were found in the pallet that were headed to

7    Mr. Duncan's house.

8          All of that going to say, Your Honor, I don't know if

9    Mr. Duncan has a storage unit someplace else, that contains a

10   ready bag, contains the items on the packing list or the gear

11   list.  I know with the fake ID, with the other operational

12   securities, with the other aspects that we saw, with him

13   giving the action -- the after action report following that

14   July training that we watched, that there is no reasonable --

15   there is no set of conditions that would protect the public

16   from the danger of this type of hatred and anger with such a

17   specific plan, and would not account for the risk of flight

18   that he presents through his training and the gathering of

19   these various things that I've mentioned.

20         THE COURT:  Thank you, ma'am.

21         Mr. Tarlton, sir?

22         MR. TARLTON:  Thank you, Your Honor.  When we look at

23   the indictment in this case, and what he's actually charged

24   with, he's charged only on one count, the conspiracy count.

25   And it appears to be predicated on two different federal

Christopher Little - Redirect

1    statutes.  One is essentially, Your Honor, the unlawful or

2    unlicensed manufacture of firearms, and then two, this civil

3    disorder act.  It's a 371 conspiracy.  We pointed this out in

4    the beginning of the hearing -- Your Honor did, that there's

5    not a presumption of detention.  That's a statute that carries

6    with it the maximum possible penalty of five years in prison.

7           Assuming someone received the maximum punishment, the

8    way the Bureau of Prisons immediately calculates credits, he

9    would only do eighty-five percent of that time.  There is sort

10   of -- and sentence structures do play a role in the bail order

11   format for what the Court is actually tasked with doing.

12   Danger to community and risk of nonappearance in court, and

13   whether they are released, there are conditions that can be

14   fashioned to address those two concerns under a mandate

15   considered the least restrictive conditions to accomplish

16   those goals.

17          So not only do we have a lack of presumption of

18   detention, go back to the Supreme Court's case in Stack v.

19   Boyle, and then the bail order format -- Court's interpreting

20   the bail order format, we actually have a statutory and

21   constitutional presumption of release in this type of case.

22   And that the government ultimately has to prove danger by

23   clear and convincing evidence and flight risk.

24          I know that there's -- for purposes of this hearing,

25   we wouldn't fight the standard of preponderance of the

Christopher Little - Redirect

1    evidence for a flight risk.  And then that may actually not --

2    there may not be a Fourth Circuit case on that, but I know

3    that that's been kind of settled and -- at least in our

4    district, and -- but even under a preponderance standard, the

5    Government hasn't met its two burdens under whether -- and

6    certainly least restrictive combinations of conditions that

7    can be assembled, that there's issues can be adequately

8    addressed at this point in time.

9          There's been a massive federal intervention into my

10   client's life.  It is much -- his life is much different now

11   than when he was working for this contractor living in Idaho.

12   What we are talking about is what the probation reports have

13   proposed.  Release to his parents under very strict

14   conditions, electronic monitoring, curfews, seeking active

15   employment, introduced the letter that somebody that will hire

16   him and put him to work.  Say, like, supervision of the

17   probation office, electronic tracking, monitoring with that.

18         This -- what you've heard, this is not someone who's

19   going to give up their life without the assets to flee on a

20   speculative theory by the Government to go to Russia or

21   whatever that they think might happen over someone who's right

22   now is charged with something that he wouldn't even -- if he

23   received the maximum sentence, would not even amount to five

24   years in prison.

25         To weigh that against the bigger issues really going

Christopher Little - Redirect

1    on here, Your Honor, because he's not charged with any

2    substantive firearm offense here, only the conspiracy.  His

3    maximum exposure right now is five years in prison.  It's

4    something he's well aware of.  It's in -- the Government's own

5    indictment recognizes an attenuation between my client and the

6    actual substantive firearm offenses.  He's not charged in the

7    substantive firearm offenses.  Under cross-examination, what

8    you ultimately heard is that there were packages --

9    circumstantial evidence theory that my client was buying a

10   gun-cleaning device that could be turned into a silencer, or

11   maybe it was.

12          I mean, this is all -- they never seized, they never

13   got into the package.  But they have a circumstantial case

14   that he is -- that they presented, if true.  There's

15   allegations, and he's presumed to be innocent, but those

16   allegations are -- he's buying 155 dollar gun silencer from

17   this Paul Kryscuk fellow.  A buy-sell relationship cannot

18   support a conspiracy.  There is no evidence that my client was

19   actually out himself, manufacturing or selling to others.

20   That's just not what the evidence that was presented.

21          And then, on the civil-disorders component of this

22   conspiracy, there's -- he's not present at an assemblage where

23   there's a likelihood or immediate danger of violence breaking

24   out.  That is not -- you've heard a lot about ideology and

25   we'll talk about that, but that -- their case as to civil

(973) 406-2250 | operations@escribers.net | www.escribers.net

Christopher Little - Redirect

1    disorder is completely attenuated.

2         So when we -- that's what happens when you set aside

3    all of the hateful, reprehensible, and toxic ideology

4    attributed to my client that's been presented in this hearing

5    today.  It's in a very attenuated case, as to the actual

6    firearm offense that faces this five-year statutory maximum

7    conspiracy charge.  The continuing cases to this civil

8    disorder act that this -- forms the basis of this conspiracy

9    charge.

10        So then we've got to go into the ideology that's

11   overshadowing this whole case, that's been the thrust of the

12   Government's case today in this argument.  Your Honor, it's

13   easy to defend free speech when it's viewpoints that the vast

14   majority of society all agree about.  That's an easy thing to

15   do.  What you've heard today, it is very, very difficult.

16        But when you trace the first principles of our first

17   amendment case law, that ultimately touches on something

18   that's very important in terms of what the Government's really

19   doing to drive its case for detention in this case, you

20   have -- the ideas that censorship is the greater evil than

21   even toxic and abhorrent speech, that you have to allow a

22   marketplace of ideas where a robust exchange of the kind of

23   things that drive people to anger takes place, because the

24   ideas -- the greater good is the best speech prevailing and to

25   avoid censorship at all costs in our republic.

Christopher Little - Redirect

1    And that -- those are the principles that drove

2    ultimately cases that I think are very important to consider.

3    The Brandenburg case and Hess v. Indiana, and that's about

4    advocacy of violence.  Your Honor, those cases came out in the

5    height of political and social unrest, not unlike a lot of

6    what we saw in 2020, Your Honor, where people are considered

7    to be communist or anti-war protestors -- that those were the

8    ones who were a threat to those in power, and a lot of rioting

9    and violence was erupting in American urban cities.

10    And so there were prosecutions for people engaged in

11    advocacy of violence.  And Brandenburg -- that's -- it made it

12    clear that our First Amendment case law has a very narrow

13    exception to an otherwise free speech protections for those

14    that advocate violence.  There has to be imminency.  Imminent

15    violence that has to occur, not some advocacy of violence or

16    taking up of force against government, overthrowing tyranny,

17    or whatever the rhetoric is.  It has to be advocacy of

18    violence that is likely to cause imminent destruction or

19    injury.

20    That's what's absolutely lacking in this case.  It's

21    apparent from all the messages that there was no imminency,

22    that as hateful and toxic and reprehensive as the ideology

23    very well may -- it is and was attributed to my client, you

24    don't have an imminent plan that is about to take place.

25    And so the hateful, reprehensible, toxic ideology

Christopher Little - Redirect

1    attributed to him falls right within the protections of what

2    the Supreme Court has said, censoring those viewpoints is

3    actually the greater evil, without imminency.  You -- people

4    have the right to espouse these beliefs.  And this is for the

5    marketplace of ideas.  This is for bigger social debate.

6    That's -- and so when we look at the reality of that, that --

7    the Government's asking for detention based on ideology

8    that's -- despite reviled, is Constitutionally protected.

9          And they're combining it with what is actually

10   protected by the Second Amendment, which is firearms training,

11   and the right to assemble and engage in militia activities, if

12   there's no imminent plan to violence.  I mean, that's just

13   what all of these constitutional cases lead us to.  And he's

14   not charged with any actual charge of terrorism or -- he's

15   ultimately charged with a conspiracy to be engaged in a

16   regulatory firearm offense, for which at this point, what Your

17   Honor is considering in terms of issues in this case, he could

18   not receive more than five years.

19         He has every incentive to stay here and fight the

20   good fight.  And there are absolutely -- despite the toxic

21   ideology attributed to him, there's no actual claim that he's

22   ever gone out and been violent.  He has no criminal history.

23   He has an honorable discharge from the military.  He's showed

24   up at his job.  By all accounts, he wasn't -- well, by all

25   accounts, he was -- that's what he was doing, working.  He

1   wasn't getting charges and failing to go to court.  He hasn't

2   been convicted of anything before.  That's who we have here.

3           And he's not going to -- if released, would not be

4   back in Idaho, hanging out with the people that he's charged

5   with doing these things.  He would be at his parents' house,

6   under monitoring, just as probation has recommended to this

7   Court.  Monitoring and supervision, curfews -- all of those

8   sorts of things.  There's no actual -- by all accounts, he

9   didn't try to flee at his arrest, or engage in violence at his

10  arrest, or anything like that.

11          You have to -- I know a lot has been thrown around

12  about the group, but also, at some point -- and we understand

13  the law of conspiracy, but you have to individualize the

14  assessment as to my client, not Mr. Collins, not Mr. Kryscuk.

15  The case against him is much different as the case some of the

16  others.  And so, when you weigh all of that, they're

17  absolutely conditions that can be fashioned in this case, that

18  will reasonably assure his appearance, that will address the

19  Government's concerns of danger.

20          And balance, frankly, and ensure that we're not

21  getting -- detaining somebody based on hateful, toxic ideology

22  attributed to him, that's actually protected by the

23  Brandenburg and Hess decisions and NAACP v. Claiborne.  Those

24  three cases, when the absence of imminent likelihood of

25  violence or injury to others.  And they failed on putting this

Christopher Little - Redirect

1    speech as crossing the line and falling into that narrow

2    category of incitement to violence that can be criminalized or

3    used to otherwise suppress these liberties.  For those

4    reasons, we ask the Court to fashion the conditions of release

5    recommended by probation and allow my client's father to be a

6    third-party custodian.  Thank you.

7            THE COURT:  Thank you, sir.  Just one moment.

8        (Pause)

9            THE COURT:  Mr. Tarlton, do you have citations for

10   these three cases that you mentioned?

11           MR. TARLTON:  Yes, I do, Your Honor.  And I'll give

12   you the -- Brandenburg v. Ohio, which is 395 U.S. 444 (1969).

13   The pin cite would be page 447.  The predecessor to Hess v. --

14   to Brandenburg was Hess v. Indiana, 414 United States 105

15   (1973).  The pin cite is 108 through 109.  And in NAACP v.

16   Claiborne, there was a third incitement case -- yeah, NAACP v.

17   Claiborne Hardware, 458 U.S. 886 (1982).

18           And ultimately, I'm looking at a district court

19   opinion from 2019, Judge Carney in the -- I think it was in

20   the Central District of California, and I'll get the case

21   number cite -- dealt with a case where members of a white

22   supremacist group were charged with planning to commit

23   violence at political rallies, under the federal anti-riot

24   act.  And he struck down the constitutionality of -- on

25   Constitutional First Amendment overbreadth grounds -- struck

Christopher Little - Redirect

1    down the federal anti-riot act, and in large part relying on

2    these decisions.

3         And that's -- there was a recent oral argument.

4    That's the United States v. Rundo is an oral argument on it in

5    the Ninth Circuit.  But his opinion summarizing sort of all of

6    these first principles, and again, analyzing -- what he said

7    was hateful, reprehensible, toxic ideology, but you cannot

8    sacrifice the First Amendment and engage in censorship.  And

9    so anyway, that citation is case number 2:18-cr-759 out of the

10   Central District of California.

11             THE COURT:  What's the reporter?

12             MR. TARLTON:  It's --

13             THE COURT:  California Reports or something?

14             MR. TARLTON:  Yes.  I just -- I'm going off a PACER

15   document.

16             THE COURT:  Okay.

17             MR. TARLTON:  It's an opinion that's available on

18   PACER.  It's also the subject, as I said, of a recent --

19             THE COURT:  I got you.

20             MR. TARLTON:  Yeah.

21             THE COURT:  Okay.  Great.  Thank you, sir.

22             MR. TARLTON:  Yes, Your Honor.

23             THE COURT:  Ms. Kocher?

24             MS. KOCHER:  Very briefly, Your Honor.  Those cases

25   go to conviction, not the idea of detention.  So I would point

Christopher Little - Redirect

1  out the evidence presented here clearly, as the agent

2  testified, he cannot even estimate the amount of evidence --

3  terabytes, I think, was the word that finally came out.  So

4  this is not consideration of whether there is constitutional

5  viability for the larger claim or unstated claim -- I'm not

6  even sure how it's up.  But addressing the ideology of the

7  group.  That is not -- the question is whether there is a

8  current concern that is not capable of being addressed through

9  conditions of release, and whether it should follow for the

10  defendant's detention.

11        To that end, I would note that this is not free

12  speech.  The overt acts are listed.  This -- there is action.

13  This was not just a call to violence on the internet.  There

14  are numerous overt acts by Mr. Duncan himself, as well as

15  others, listed in paragraph 22 of the indictment.  And of

16  course, the indictment in full is available for your

17  consideration, and the facts in it were established by

18  probable cause before the grand jury.

19        Specifically, I would also call your attention to

20  paragraphs 13, 15, and 17 as alleging various statements and

21  pertinent facts for your consideration in that guard -- in

22  that regard.

23        And finally, Your Honor, I would just note that the

24  job that's been offered to the defendant -- again, significant

25  effort in regard to the parents of Mr. Duncan.  It is,

Christopher Little - Redirect

1    however, involving computer data entry, and we would have

2    additional concerns about any job that would allow internet

3    access and computer access overall.  Again, going back to the

4    intel and communication systems training.  And I think that

5    particular job is unsuited as an appropriate job for this

6    defendant, should he be released.

7         THE COURT:  Very well, folks.  I think I need -- I

8    understand the argument that -- the case law that Mr. Tarlton

9    has cited.  I take counsel's word for it that it relates to

10   convictions.  But that could be relevant to weight of the

11   evidence, even if it's -- even if the overarching issue before

12   the Court is risk of flight and risk of danger, and the extent

13   to which conditions can reasonably address those concerns by

14   the applicable standard, preponderance as to flight risk, and

15   then clear and convincing as to danger.  I think I need to

16   review them -- they've been cited and if they are

17   potentially -- have some relevance.  And I don't think there's

18   time, realistically, to do that today.

19        So my suggestion would be to reconvene in this case

20   tomorrow for the Court to announce its decision.  I know that

21   may inconvenience Mr. Duncan, the defendant's father.  I'm

22   sorry about that, but the overriding concern is to get it

23   right, so to speak.

24        MR. TARLTON:  Yeah, it is, Your Honor.  I don't think

25   he's driving back tonight anyways.

Christopher Little - Redirect

1          THE COURT:  Okay.  Well, that's good to hear.  Let me

2     confer with the clerk.  She knows more about our schedule for

3     tomorrow than I do at this point.

4          (Pause)

5          THE COURT:  Okay, folks, I think the best course of

6     action would be to set this case for 10:30 tomorrow.  So we'll

7     lead off tomorrow with this case.  That was -- I think that

8     would make the most sense.  And I'll review this case

9     overnight and give more consideration to this.  Very good.

10    And of course, by law Mr. Duncan must remain in custody.  That

11    is, Mr. Jordan Duncan must remain in custody pending the

12    continuation of the proceedings tomorrow morning.

13          Anything further, Mr. Tarlton?

14          MR. TARLTON:  Nothing further at this time, Your

15    Honor.

16          THE COURT:  Ms. Kocher, anything?

17          MS. KOCHER:  No, sir.

18          THE COURT:  Very well.  I remand Mr. Duncan in

19    custody of the United States Marshal.  The Court will be in

20    recess.

21          THE CLERK:  All rise.  The Honorable Court stands in

22    recess.

23                  (Court is adjourned)

24                     * * * * *

25

```
1                    CERTIFICATE OF TRANSCRIBER

2

3              I, Tamara Bentzur, court-approved transcriber, in and

4     for the United States District Court for the Eastern District

5     of North Carolina, do hereby certify that pursuant to Section

6     753, Title 28, United States Code, that the foregoing is a

7     true and correct transcript from the official electronic sound

8     recording of the proceedings held in the above-entitled matter

9     and that the transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12                         Dated this 12th day of January, 2021.

13

14                         /s/ Tamara Bentzur

15                         _____

16                         TAMARA BENTZUR, CET-824

17                         COURT-APPROVED TRANSCRIBER

18

19

20

21

22

23

24

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net