UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:20-CR-00167-M-3

| UNITED STATES OF AMERICA | MOTION TO DISMISS THE INDICTMENT DUE TO ERRONEOUS LEGAL INSTRUCTION TO THE GRAND JURY |
|---|---|
| v. | |
| JORDAN DUNCAN | |

The undersigned, on behalf of Defendant JORDAN DUNCAN, respectfully moves this Honorable Court to dismiss all counts alleged against him in the Third Superseding Indictment (the Indictment), specifically Counts One and Five, on the basis that the grand jury were instructed in error on the law, and that this error seriously prejudiced Mr. Duncan. This motion is made pursuant to Mr. Duncan's rights under Federal Rule of Criminal Procedure 12(b)(3)(A)(v). In the alternative, Mr. Duncan respectfully moves this Honorable Court to order the Government to produce to the undersigned (and, alternatively, to the Court for *in camera* review) transcripts and/or minutes of the legal instructions provided to the grand jury, pursuant to the First, Fifth, and Sixth Amendments to the United States Constitution, and Rules 6 and 16 of the Federal Rules of Criminal Procedure.

In support of this motion, Mr. Duncan shows as follows:

## INTRODUCTION

Jordan Duncan is not charged with any substantive offense in this case. Instead, he is charged with two conspiracy counts: Count One, conspiring to commit offenses under 18 U.S.C. § 922(a)(1)(A), and Count Five, conspiring to damage and attempt to damage property of an energy facility of the United States. *See* [D.E. 149].

The investigation which led to the arrest and charging of Mr. Duncan began in April of 2020, when the Naval Criminal Investigative Service (NCIS) became aware of a source reporting that

alleged Liam Collins (a codefendant) was professing an ability to provide un-serialized weapons and silencers. What followed was an investigation into an alleged group that Collins was a part of (the group), spanning search warrants, electronic and physical surveillance, controlled purchases, financial reviews of bank records, and interviews with sources and suspects. The FBI joined in the investigation.

The NCIS had previously become aware of Liam Collins after a Newsweek article labelled him as a member of a Neo-Nazi online forum named Iron March. The NCIS carried out a controlled purchase of a firearm and suppressor from Collins, and traced the money through financial review to one Paul Kryscuk (a further codefendant). Kryscuk was discovered to be purchasing parts to convert into illegal silencers. The FBI and NCIS discovered that Kryscuk manufactured the firearms, and in their controlled sales, sold them through Collins. At this point in the investigation, there was still no record nor implication on Mr. Duncan.

During the investigation, NCIS identified multiple purchases of firearms and silencers from Kryscuk, who was living at the time in Boise, Idaho. NCIS obtained a search warrant on some of the packages Kryscuk sent, under an alias of Shaun Corcoran, to North Carolina. These packages were found to contain the firearms and suppressors described above. As a result of these shipments, the FBI and NCIS came to the conclusion that Collins and Kryscuk caused the transport of a firearm into North Carolina. Collins had described himself as an integral part of the group to NCIS' source. Again, at this point in the investigation, there was still no record no implication on Mr. Duncan.

Kryscuk was active on the Iron March forum, having posted a manifesto-style post in March of 2017, which detailed racist and anti-Semitic ideals. Liam Collins was also described as very active on Iron March, and interacted and coordinated with Kryscuk on that forum. Mr. Duncan never posted

2
Case 7:20-cr-00167-M   Document 320   Filed 08/22/23   Page 2 of 13

to, or had any interaction with, Iron March. In fact, there was no evidence that he even knew Collins while the posts were being made to Iron March.

Where Mr. Duncan became a target of the investigation was when a package was shipped by a Shaun Corcoran to an address that appeared to be the same as Mr. Duncan's younger brother. This package was never opened or examined by NCIS or the postal inspector. The FBI also saw Venmo online payment transactions between Mr. Duncan and Kryscuck Mr. Duncan had previously served in the United States Marine Corps, stationed at Camp Lejeune. Collins had also been stationed at Camp Lejeune, with some crossover to Mr. Duncan's times there. Mr. Duncan had moved to Texas, and subsequently to Idaho. He was surveilled in firearms training exercises with the group, and there were electronic records of him being in conversations and group chats with other members of the group. The conversations Mr. Duncan had with members of the group were general in nature, talking about hypothetical and ideological times in the future when "an army would rise up." They were not plans for immediate danger, but rather statements about thing that could happen at some unknown point in the future. Many of the conversations and ideas exchanged would be considered racist, hateful, and deplorable by the vast majority of society. But they fall under the umbrella of protected speech and symbolic conduct protected by the First Amendment.

Kryscuk, a mentally unstable person, was found to have photographs of various power stations in Idaho, as well as a list of intersections which contained power grid equipment in Idaho. Mr. Duncan had no such photographs or lists.

The group's ideals were alleged to be fascist, Neo-Nazi views, including allegedly wanting to establish a white ethnostate, overthrow the Government, attract more people to their cause, install other members of the cause into office and high office, and create general chaos. The basis of all of these allegations is speech. It stems from conversations between the group members. Some of the

group members, including Mr. Duncan, moved to Idaho where he got a job at a defense contractor, and in their free time would do workouts and do firearm training exercises. But the vast basis of the allegations against Mr. Duncan, specifically the conspiracy charges, are rooted in speech and conversation. Often in tasteless or inflammatory comments and statements, grounded in views that would appall a large proportion of society. But speech, nonetheless.

Mr. Duncan is not treated by anyone – whether the codefendants or the Government – as being a ringleader of the group. Instead, he was a man who found people who wanted to share and debate ideologies and engage in the exchange of ideas and ideals, and carry out training drills and exercises, as he is protected in doing under the First and Second Amendments to the United States Constitution. Often, the alleged "planning" conduct of the conspiracies took the form of memes or subjectively-hyperbolic or darkly humorous images, followed by throw-away comments or jokes. Otherwise, it took the form of owning or possessing firearms or other military-style gear, as he is protected in doing under the Second Amendment to the United States Constitution.

Mr. Duncan is not charged with the transport of firearms. He is not charged with the transport of suppressors. He is not charged with delivering any weapon in interstate commerce. He was not involved in any conversation about the shipping of firearms to North Carolina. He was not involved in the manufacture of any weapon. Instead, he is charged with two counts of conspiracy, based on conversations he had with other members of the group, and possession of various firearms and similar items. The investigation was targeted at Collins and Kryscuk, and Mr. Duncan was implicated by association.

# LEGAL STANDARD

I. **MISLEADING STATEMENTS OF LAW IN AN INDICTMENT**

To pass constitutional muster, "an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy in subsequent prosecutions for the same offense." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998). "An important corollary to this requirement […] is to allow [the] court to evaluate whether [the] facts alleged could support conviction." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (*citing Russell v. United States*, 369 U.S. 749, 768-69 (1962)).

A court must dismiss an indictment where – during grand jury proceedings – a prosecutor's erroneous legal instruction to the grand jury plays a significant and impermissible role in the grand jury's decision to indict a defendant. *United States v. Bowling*, 108 F. Supp. 3d 343 (E.D.N.C. 2015) (*citing Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)); *United States v. Stevens*, 771 F.Supp.2d 556, 566–68 (D.Md.2011) (dismissing an indictment where the government "seriously misstate[d] the applicable law" to the grand jury).

II. **GRAND JURY MATERIAL GENERALLY**

Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), the Court may authorize disclosure of a grand-jury matter "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." A party seeking grand jury transcripts under Rule 6(e) must show that the sought material "is needed to avoid a possible injustice, […] that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979). Thus, a court should permit disclosure of grand jury transcripts if there is "a strong

showing of particularized need." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 419 (1983) (citing *Douglas*, 441 U.S.).

III. **GRAND JURY LEGAL INSTRUCTIONS**

During grand jury proceedings, "the prosecutor's responsibility is to advise the grand jury on the law." Department of Justice Manual, Title 9, § 11.010. Where the materials sought for disclosure are those legal instructions, some courts have held that these are not subject to grand jury secrecy and, therefore, the showing of particularized need is not required to obtain them. The ground rules "by which the grand jury conducts those proceedings are not [secret]" *United States v. Alter*, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973). *See also United States v. Facteau*, 1:15-cr-10076-ADB (D. Mass. Aug. 22, 2016) ("What a prosecutor says to the grand jurors before asking them to return an indictment does not compromise the interests sought to be protected by grand jury secrecy.").

**DISCUSSION**

I. **THE INDICTMENT SHOULD BE DISMISSED, AS THE GRAND JURY RELIED ON ERRONEOUS LEGAL INSTRUCTION.**

   A. **The Indictment charged overt acts which predated or could have predated the conspiratorial agreement, which is an error of law.**

In the Third Superseding Indictment (the Indictment), the grand jury charged two counts of conspiracy, Count One and Count Five. Both counts alleged that the respective conspiracies began in or about June 2019. However, both counts also included overt acts which predated the conspiracies. Overt acts cannot predate the formation of a conspiratorial agreement, but rather the conspiratiorial agreement must have been formed before, and continue to exist at the time that the overt acts are committed. *Harms v. United States*, 272 F.2d 478 (4th Cir. 1959) (citing other circuits); *See also United States v. Fleschner*, 98 F.3d 155, 159 (4th Cir. 1996) (stating that an overt act must be committed during the existence of the conspiracy). As such, in order for the grand jurors to have

charged these overt acts as part of the conspiracy, the only reasonable conclusion to draw is that they were either incorrectly instructed on the law of conspiracy, or indeed not instructed to a degree where they could properly charge the defendants.

The specific overt acts from Count One which either predate the conspiracy or don't specify that they occurred after formation of the conspiracy, with reference to the paragraphs in the Indictment, are:

(24) – the first paragraph of the overt acts section describes that the acts took place "between May 2019 and the present." May 2019 predates the June 2019 conspiratorial agreement detailed in paragraph (22).

The specific overt acts from Count Five which either predate the conspiracy or don't specify that they occurred after formation of the conspiracy, with reference to the paragraphs in the Indictment, are:

(31)(A) – this purported overt act refers to co-defendant COLLINS entering the marines "[i]n 2017." This event predates the conspiratorial agreement detailed in paragraph (29) by approximately two years, and therefore cannot be an overt act used to complete the conspiracy.

(31)(B) – this purported overt act refers to co-defendant KRYSCUK manufacturing firearms "[i]n or about 2017." This event predates the conspiratorial agreement detailed in paragraph (29) by approximately two years, and therefore cannot be an overt act used to complete the conspiracy.

(31)(C) – this purported overt act refers to co-defendant COLLINS allegedly recruiting Mr. DUNCAN as a member of the group "[i]n 2018." This nonspecific event predates the conspiratorial agreement detailed in paragraph (29) by approximately a year, and therefore cannot be an overt act used to complete the conspiracy.

(31)(D) – this purported overt act refers to co-defendant COLLINS allegedly stealing military gear "[b]etween on or about November 2017 and August 2020." The beginning of these events predates the conspiratorial agreement by approximately 18 months, and therefore cannot be overt acts used to complete the conspiracy.

(31)(F) – this purported overt act refers to Mr. DUNCAN gathering a library of information "[b]etween in or about 2017 and 2018." This nonspecific event predates the conspiratorial agreement by approximately one to two years, and therefore cannot be an overt act used to complete the conspiracy.

(31)(H) – this purported overt act(s) refers to co-defendants COLLINS, KRYSCUK, MAURINO, and Mr. DUNCAN allegedly researching and discussing a previous attack on a power grid. These nonspecific events are given no timeline, and therefore cannot be used to complete the conspiracy, as there is no indication that they were events occurring after the conspiratorial agreement.

(31)(I) – this purported overt act refers to Defendant HERMANSON showing "M.W." an animated re-enactment of the attack referenced in (H). This event is not given a timeline, and therefore cannot be used to complete the conspiracy, as there is no indication that this was an event occurring after the conspiratorial agreement.

(31)(J) – this purported overt act refers to co-defendants COLLINS, KRYSCUK, MAURINO, and Mr. DUNCAN allegedly discussing using homemade thermite to destroy transformers. This event is not given a timeline, and therefore cannot be used to complete the conspiracy, as there is no indication that this was an event occurring after the conspiratorial agreement.

### B. The Indictment charges purported overt acts which are only agreements to the conspiracy itself, not separate and additional overt acts.

The general conspiracy statute indicates that conspiracy alone cannot constitute an offense, it requires an overt act separate and distinct from the conspiratorial agreement. 18 U.S.C. § 371.

Conspiracy is a continuing offense. *United States v. Kissel*, 218 U.S. 601, 607 (1910).  As such, continuing agreement or discussion of the conspiracy between alleged co-conspirators cannot constitute an overt act; they are merely continuations of the agreement to conspire.

In the Indictment, paragraph 24(J) alleges that KRYSCUK and Mr. DUNCAN "discussed" the conspiracy.  As such, this purported overt act is merely an extension of the agreement of conspiracy itself, rather than a separate and distinct overt act.

### C. The Indictment charges acts which were not outwardly or actively committed, but merely passive.

An overt act is a required element to complete a conspiracy charge under both the general conspiracy statute – 18 U.S.C. § 371 – and under the specific statute for conspiracy to destroy an energy facility, 18 U.S.C. § 1366.  An overt act "is some type of outward objective action performed by one of the members of the conspiracy which evidences that conspiracy." *United States v. Narang*, 1:16-cr-43, at *33-34 (E.D. Va. Aug. 21, 2019) (affirmed in *United States v. Narang*, No. 19-4850, 2021 WL 3484683 (4th Cir. Aug. 9, 2021)).  As such, an existing state of being is not sufficient as an overt act to complete a conspiracy charge, it must be an act taken in furtherance of the conspiracy. *See, e.g.,* 8th Cir. Model Jury Instructions, § 5.06A Conspiracy: Elements Explained (specifying that an overt act requires that a defendant "took some act" for the purpose of carrying out the agreement).

In the Indictment, paragraph 31(M) alleges that KRYSCUK "possessed" a handwritten list of places in Idaho.  As an existing state of being, entirely passive, and not in and of itself an act, being in possession is not sufficient as an overt act to complete a conspiracy.  Compiling or creating a list could be, but merely being found with a list on one's person is not any type of outward objective action performed in order to further the conspiracy.

9

### D. Conclusion

As such, the grand jury can only have charged Mr. DUNCAN with a conspiracy which had overt acts beginning before the purported start date of the conspiracy if they were incorrectly instructed on the law of conspiracy. It is the only way in which this grand jury could have returned this Indictment. Thus, the indictment should be dismissed.

## II. IN THE ALTERNATIVE, THE LEGAL INSTRUCTIONS GIVEN TO THE GRAND JURY SHOULD BE PRODUCED TO MR. DUNCAN.
### A. Grand jury legal instructions are not subject to grand jury secrecy.

Grand jury secrecy serves four "distinct interests":

(1) If preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony;

(2) witnesses who appeared before the grand jury would be less likely to testify fully and frankly [absent grand jury secrecy], as they would be open to retribution as well as to inducements;

(3) risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment; and

(4) assur[ing] that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas*, 441 U.S., at 219. These interests overcome the constitutional and common law right of access to grand jury transcripts, but these interests are not furthered by withholding from public view the "'ground rules' by which the grand jury conducts its proceedings." *United States v. Pac. Gas & Elec. Co.*, No. 14-CR-00175-TEH, 2015 WL 3958111, at *12 (N.D. Cal. June 29, 2015).

By addressing each of the *Douglas* factors in turn, it follows that legal instructions to the grand jury fall outside the secrecy requirements generally associated with grand jury proceedings. Firstly,

disclosure of the grand jury legal instructions would not make public any testimony of any witnesses, far less the identity of such witnesses. Thus, the protection extended to them by grand jury secrecy remains. Secondly, by the same reasoning, their testimony would be no less likely to be full and frank, as their testimony would not be at any risk of being disclosed, should the grand jury legal instructions be provided to the defense. Thirdly, the soon-to-be indicted persons would gain no incentive to flee, nor any method by which to influence individual grand jurors, by disclosure of the instructions. Indeed, in the case of Mr. Duncan, this consideration is moot in any event, as the indictment has already been brought, and he is currently incarcerated. Finally, as with the previous factor, ridicule of those accused but then exonerated by a grand jury would not result from disclosure of these instructions; this factor is also moot in a case such as Mr. Duncan's, where the grand jury did not exonerate him.

Simply put, none of the interests served by grand jury secrecy as outlined in *Douglas* would be put at risk by disclosure of the grand jury legal instructions. As such, Mr. Duncan submits that the First, Fifth, and Sixth Amendments require production of these legal instructions provided to the grand jury upon request. *Cf. Press-Enter. Co.*, 478 U.S. at 7 (recognizing that the Sixth Amendment right to a public trial generally corresponds with the First Amendment right to access to judicial proceedings).

### B. Mr. Duncan has a particularized need for the grand jury legal instructions to be disclosed.

Mr. Duncan also submits that he has a particularized need for disclosure of the grand jury legal instructions, as required under *Sells Engineering* and *Douglas*. Under the *Douglas* balancing test, the potential injustice to Mr. DUNCAN by not being able to confirm with certainty that the grand jury were not misled as to the law outweighs the need for continued secrecy. By requesting just the

legal instructions which were issued to the grand jury, the request is structured to avoid conflicting with grand jury secrecy considerations and only to cover that material which is needed. *Douglas*, 441 U.S. at 222.

### C. Conclusion

For these reasons, the undersigned, on behalf of Mr. DUNCAN respectfully requests that this Court order the production to Mr. DUNCAN through his attorney the transcripts of the grand jury legal instructions.

Respectfully submitted, this the 22nd day of August, 2023.

TARLTON LAW PLLC

/s/ Raymond C. Tarlton
Raymond C. Tarlton
Attorney for Defendant
N.C. State Bar # 38784
ray@tarltonfirm.com

P. O. Box 91624
Raleigh, NC 27675
919-390-1278 (TEL)
919-400-4200 (FAX)

*Designation: CJA Appointed*

/s/ Joshua D. Xerri
Joshua D. Xerri
Attorney for Defendant
N.C. State Bar # 60127
jd@tarltonfirm.com

P. O. Box 91624
Raleigh, NC 27675
919-390-1278 (TEL)
919-400-4200 (FAX)

*Designation: CJA Associate*

## **CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that on the date shown below, he electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to Assistant United States Attorney Barbara D. Kocher.

    This the 22nd day of August, 2023.

/s/ Raymond C. Tarlton  
Raymond C. Tarlton
