IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:20-cr-00167-M-3

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | ORDER |
| JORDAN DUNCAN, | |
| Defendant. | |

This matter comes before the court on the Defendant Jordan Duncan's ("Duncan") motions to dismiss [DE 315–318, 320]. Each motion challenges one or both of the pending conspiracy charges against him based on perceived constitutional violations and/or pleading deficiencies in the operative indictment. For the following reasons, the motions are DENIED.

## I. Background

### A. Factual Background

In 2016, Codefendant Liam Montgomery Collins ("Collins") used Iron March, an online forum frequented by neo-Nazi/white supremacy groups and sympathizers, to recruit members for "a legitimate Paramilitary/Defense force" resembling "a modern day SS." DE 149 ¶¶ 1, 6. In February 2017, Collins started communicating with Paul James Kryscuk ("Kryscuk") about the strategy to accomplish such a task. *Id.* ¶ 7. Duncan joined the crew sometime before December 2018. *Id.* ¶ 10. In July 2020, all three individuals met with Joseph Maurino ("Maurino") in Boise, Idaho to participate in firearms training and collect video footage that they would later turn into a montage displaying neo-Nazi symbols and sentiments. *Id.* ¶ 15. Kryscuk believed that their group's "final frontier [was] real life violence." *Id.* ¶ 14.

By June 2019, Collins, Kryscuk, and Duncan allegedly started working together to manufacture and sell firearms and firearm parts to themselves and paying customers. *See id.* ¶¶ 11–13. For example, Kryscuk manufactured a 9mm pistol for one individual, an assault rifle for another individual, and other firearms and/or parts for those two individuals as well as Duncan. *Id.* In addition to the group's manufacturing activity, they would also send firearms and suppressors into North Carolina. *See id.* ¶¶ 17–18, 20. They allegedly perpetrated their manufacturing and selling activities in part to murder Black Lives Matter protestors in Boise, Idaho. *See id.* ¶¶ 23, 24(J).

Around the same time, the group allegedly started targeting energy facilities in Boise, Idaho. DE 149 ¶ 29. Collins, Kryscuk, Duncan, and Maurino studied a previous attempt to destroy a power grid using assault rifles and discussed using incendiary materials to burn through power transformers. *Id.* ¶¶ 31(H), (J). By October 20, 2020, Kryscuk obtained a handwritten list identifying various components of the power grid powering the northwest United States. *Id.* ¶ 31(M). The group allegedly aimed to create general chaos in the region and cover for themselves to facilitate their assassinations and other operations. *Id.* ¶ 30.

### B. Procedural Background

On August 18, 2021, the United States charged Duncan with conspiracy to manufacture and ship firearms in violation of 18 U.S.C. § 922(a)(1)(A) (Count One, 18 U.S.C. § 371) and conspiracy to destroy an energy facility (Count Five, 18 U.S.C. § 1366(a)). DE 149. The operative indictment also charged four other individuals with various offenses. *See id.* All four codefendants have since pleaded guilty pursuant to their respective plea agreements. *See* DE 195 (Kryscuk to Count 5); DE 202 (Hermanson to Count 1); DE 283 (Maurino to Count 1); DE 353 (Collins to Count 4). Duncan is scheduled for arraignment on December 14, 2023. DE 292. Trial is set for March 4, 2024. *Id.*

2

## II. Legal Standard

A defendant may object to a defective indictment "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). "A district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial.'" *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quoting *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010)). "[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *United States v. Weaver*, 659 F.3d 353, 355 n.\* (4th Cir. 2011).

## III. Discussion

Duncan brings five claims for dismissal based on putative infirmities of law in the third superseding indictment. One claim looks to dismiss the charge for conspiracy to manufacture and ship firearms because it violates his right to keep and bear arms under the Second Amendment. *See* DE 315. He also claims the charge should be dismissed because it relies on a term that is unconstitutionally vague for purposes of the First and Fifth Amendments. *See* DE 316. He challenges the charge for conspiracy to destroy an energy facility based on improper venue, *see* DE 317, and double jeopardy, *see* DE 318. Lastly, he challenges both charges on grounds that the grand jury returned the operative indictment after receiving erroneous legal instructions. *See* DE 320. The court discusses each claim in turn.

### A. Second Amendment [DE 315]

Duncan lodges a Second Amendment challenge against 18 U.S.C. § 922(a)(1)(A), which makes it unlawful for an unlicensed individual "to engage in the business of importing,

3

manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." To culpably "engage[] in the business" of firearm manufacturing, one must manufacture firearms "as a regular course of trade or business with the principal objective of livelihood and profit," or "for criminal purposes." *See id.* §§ 921(a)(21)(A), 921(a)(23). Duncan allegedly conspired to engage in the business of manufacturing firearms with the criminal purpose of furthering a civil disorder. DE 149 ¶¶ 22–23. Thus, the statute as applied to Duncan prohibits commercially manufacturing and selling firearms for a criminal purpose. *Id.*

To analyze whether a challenged regulation violates the Second Amendment, the court must determine if "the Second Amendment's plain text covers an individual's conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). The Second Amendment states that "the right of the people to keep and bear Arms[] shall not be infringed." U.S. Const. amend. II. Its plain language "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). And its "core protection" concerns "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. In light of these principals, some courts have held that "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

Duncan argues that this court should likewise interpret the Second Amendment to confer another implied right based on its core protection. He asks this court to conclude that the plain meaning "necessarily [covers] an ability to sell, or otherwise transfer, firearms." *See* DE 315 at 8–9. It is conceivable that the right to keep and bear arms extends to the assembly and sale of firearms. *See United States v. McNulty*, No. CR 22-10037-WGY, 2023 WL 4826950, at *4 (D.

4

Mass. July 27, 2023); Hillel Y. Levin & Timothy D. Lytton, *The Contours of Gun Industry Immunity: Separation of Powers, Federalism, and the Second Amendment*, 75 Fla. L. Rev. 833, 886–888, 893 (2023). But such conduct, even if confirmed by plain meaning and commonsense, would have to be for a "lawful purpose." *Cf. Heller*, at 592, 618–620 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)). This is not that case. Duncan allegedly conspired to make and sell firearms to advance a mass shooting. His violent purpose is disqualifying. *See id.* at 618 ("Freedom, not license, is secured; the fair use, not the libellous abuse, is protected." (citation omitted)).

Moreover, "laws imposing conditions and qualifications on the commercial sale of arms," like § 922(a)(1)(A), are presumptively constitutional. *Heller*, 128 S. Ct. at 2816–17; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J. and the Chief Justice, concurring). Because § 922(a)(1)(A) imposes a condition, namely licensing, on firearms commerce, numerous courts around the country have held that it does not violate the Second Amendment. *See, e.g.*, *McNulty*, 2023 WL 4826950, at *5; *United States v. Flores*, No. CR H-20-427, 2023 WL 361868, at *5 (S.D. Tex. Jan. 23, 2023); *United States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023), *report and recommendation adopted*, No. 1:22-CR-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022). Duncan has not provided an adequate reason to depart from this weight of relevant authority.

### B. Vagueness [DE 316]

Duncan argues that the court should dismiss the charge for conspiracy to manufacture and ship firearms because it relies on 18 U.S.C. § 231(a)(2) to define the purpose of the conspiracy as manufacturing firearms to further a "civil disorder." *See* DE 316 at 6. Under the statute, "civil disorder" means "any public disturbance involving acts of violence by assemblages of three or

more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." *Id.* § 232(1). This definition, Duncan argues, is unconstitutionally vague because it lacks an intelligible standard to determine "what qualifies as a 'public disturbance'" and "when . . . an act constitute[s] an 'immediate danger.'" DE 316 at 6–7.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). But "if a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants." *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016). Duncan does not discuss § 231(a)(2)'s applicability to his alleged conduct in this case.

Section 231(a)(2), however, clearly captures his charged conduct. Duncan allegedly willfully conspired to manufacture firearms to further a civil disorder, namely shooting Black Lives Matter protestors. DE 149 ¶¶ 22–24. Under the "fulsome statutory definition" for the term "civil disorder," shooting protestors plainly constitutes a "public disturbance involving acts of violence . . . , which . . . results in damage or injury to the property or person of any other individual." *United States v. McHugh*, 583 F. Supp. 3d 1, 26 (D.D.C. 2022) (quoting 18 U.S.C. § 232(1)).

To explain why the term "civil disorder" is vague on its face, Duncan first invokes a dissenting opinion to "call attention to the dangerous imprecision of the word 'disturbance'" because "[n]ew ideas more often than not create disturbances." DE 316 at 7 (quoting *United States v. Dellinger*, 472 F.2d 340, 415 (7th Cir. 1972) (Pell, J., dissenting)). Duncan also invokes a Supreme Court decision to explain that, although a statute may have clear applications to violent

6

conduct, it could also reasonably encompass nonviolent conduct. *See id.* at 7–8 (quoting *Johnson v. United States*, 576 U.S. 591, 601 (2015)). The court need not consider the extent of the term's application to speech or nonviolent conduct because the term as applied to Duncan clearly captures the nonexpressive, nonpeaceful conduct of shooting protestors in broad daylight.

Duncan lastly argues that the statute depends "on the subjective reaction of others" because determining whether an act is "in furtherance of" a civil disorder is subject to differing interpretations. *See* DE 316 at 8. "There is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation—the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh*, 583 F. Supp. 3d at 27. Duncan's observation that the term "in furtherance of" could be applied differently depending on the circumstances presents no constitutional infirmity.

### C. Improper Venue [DE 317]

Duncan argues that the court should dismiss the charge for conspiracy to destroy an energy facility because the alleged overt acts supporting the charge did not occur in the Eastern District of North Carolina or within the alleged conspiratorial timeframe. DE 317 at 7–11. Duncan also argues that some of the overt acts are not sufficiently specific to support venue. *Id.* The United States argues that the allegations contained in the third superseding indictment, if accepted as true, properly allege venue in the Eastern District of North Carolina. DE 326 at 5–6.

To warrant dismissal of the operative indictment for improper venue, Duncan must "demonstrate that the allegations therein, even if true, would not establish venue." *Engle*, 676 F.3d at 415. In general, venue is proper "in a district where the offense was committed." Fed. R. Crim. P. 18. Specifically, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Thus, "a

7

conspiracy may be prosecuted in any district in which the agreement was formed or in which an act in furtherance of the conspiracy was committed." *United States v. Gilliam*, 975 F.2d 1050, 1057 (4th Cir. 1992). Although the gravamen of a conspiracy offense is a defendant's agreement with another to effectuate a criminal act, the "act in furtherance of the conspiracy" need not be committed by the defendant himself. The commission of a conspiracy offense requires just one overt act by any one of the coconspirators. *See id.* (citing *United States v. Lewis*, 676 F.2d 508, 511 (11th Cir. 1982)); *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005) ("[E]ach co-conspirator need not take an overt act in order to be convicted of conspiracy so long as one conspirator does so.").

Duncan, along with his coconspirators, allegedly began the charged conspiracy to destroy a power grid around June 2019 in the Eastern District of North Carolina, DE 149 ¶ 29, and completed "at least one of the [described] overt acts, among others, . . . in the Eastern District of North Carolina," *id.* ¶ 31. Specifically, a coconspirator (Collins) "stole military gear" while aboard Camp LeJeune, North Carolina and "had [that gear] delivered to other members of the group" during the relevant conspiratorial timeframe. *Id.* ¶ 31(D).[1] The United States is therefore prosecuting the charged conspiracy in "[the] district in which the agreement was [allegedly] formed" and "in which an act in furtherance of the conspiracy was committed." *See Gilliam*, 975 F.2d at 1057. Venue properly lies in this district.

---

[1] Duncan argues that the dates for this allegation "are [too] vague" to allow "the Government [to] bear[] the burden to prove venue" by preponderance of the evidence. DE 317 at 8. The Government need not satisfy that evidentiary standard at this stage of the proceedings. *Engle*, 676 F.3d at 413–15 ("Submitting the venue question to the jury is an appropriate procedure for resolving a factual dispute relating to venue." (quoting *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005))).

8

### D. Double Jeopardy [DE 318]

Duncan argues that the court should dismiss the charge for conspiracy to destroy an energy facility because that conspiracy substantially overlaps with the conspiracy to manufacture and ship firearms. DE 318 at 5–9. Duncan concludes that prosecuting both charges in a single prosecution constitutes double jeopardy. *See id.* The United States disagrees because concurrently prosecuting related but statutorily distinct conspiracy offenses is well within its prerogative. *See* DE 327 at 3–5.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This constitutional guarantee "serves both the familiar function of prohibiting 'successive prosecutions for the same offense' as well as 'the imposition of cumulative punishments for the same offense in a single criminal trial.'" *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012) (quoting *United States v. Ragins*, 840 F.2d 1184, 1187 (4th Cir.1988)).

Duncan seeks to prevent the imposition of cumulative punishments. In support, he quotes *Ragins* for the proposition that "to assess whether the two conspiracies are separate, the 'totality of the circumstances' test is applied," as opposed to the *Blockburger* test. DE 318 at 5 (quoting 840 F.2d at 1188). But Duncan pulls the wrong standard. "Where the plea is against the imposition of cumulative sentences for multiple convictions obtained at a single criminal trial," *Blockburger* provides "the established test for determining whether two offenses are the same." 840 F.2d at 1188 (internal quotation marks omitted). "Where, on the other hand, the plea is against successive [conspiracy] prosecutions," the proper test is the "multi-pronged 'totality of the circumstances' test" that Duncan invokes. *Id.* (quoting *United States v. MacDougall*, 790 F.2d 1135, 1144 (4th Cir.1986)). In Duncan's own words, "[the indictment] alleges two separate counts of conspiracy," which he now challenges as multiplicitous. DE 318 at 6. The *Blockburger* test applies. *See United*

9

States v. Tedder, 801 F.2d 1437, 1446 (4th Cir. 1986) ("Where each offense requires proof of a fact not required by the other, a defendant can be punished under both statutes for a single act or transaction.").

Each conspiracy charged requires "proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Tedder*, 801 F.2d at 1446. For example, to prove a conspiracy to manufacture and ship firearms, the Government must show Duncan's intent to engage in the business of manufacturing and selling firearms. *See* 18 U.S.C. § 371. On the other hand, to prove a conspiracy to destroy an energy facility, the Government must show Duncan's intent to cause over $100,000 worth of damage to an energy facility. *See* 18 U.S.C. § 1366(a). "In creating separate conspiracy offenses, Congress exercised its constitutional prerogative to establish federal criminal law. In addition, the several conspiracy statutes are directed at distinct evils, suggesting legislative intent to punish them independently." *Tedder*, 801 F.2d at 1445–46. Prosecuting statutorily distinct conspiracy charges does not constitute repeated "jeopardy of life or limb." U.S. Const. amend. V.

### E. Erroneous Grand Jury Legal Instructions [DE 320]

Duncan asks the court to dismiss all charges against him because the grand jury, he argues, returned the third superseding indictment based on erroneous legal instructions. DE 320 at 6. To demonstrate his claim, Duncan discusses several legal deficiencies contained in the charging document. *Id.* at 6–9. For example, he takes issue with the alleged timeline of the conspiracy. *Id.* at 6–8. Both conspiracies allegedly began during or around June 2019, but certain overt acts supporting the conspiracies allegedly occurred before June 2019. DE 149 ¶¶ 22–24, 29–31. Duncan believes that this temporal misalignment demonstrates the Government's failure to instruct the grand jury that qualifying overt acts must occur after the conspiracy begins. *See* DE 320 at 6–8. Duncan also argues that overt acts like "discussion of the conspiracy" and "an existing state of

10

being" like "possession" of probative material are insufficient to qualify as overt acts as a matter of law and thus demonstrate that the grand jury was erroneously instructed. *See id.* at 8–9.

The United States argues that Duncan has not demonstrated that any error resulted in actual prejudice against him. DE 328 at 3. The law, the Government principally argues, requires at least one overt act to occur after the conspiracy begins to give rise to a prosecutable offense. *See id.* at 3 (citing *Harms v. United States*, 272 F.2d 478, 482 (4th Cir. 1959)). Thus, alleging overt acts predating the conspiratorial agreement does not render the operative indictment invalid. *Id.*

To succeed on a motion to dismiss based on an error in the grand jury proceeding, Duncan must demonstrate that the error resulted in actual prejudice. *See United States v. Brewer*, 1 F.3d 1430, 1433 (4th Cir. 1993). Actual "prejudice justifying dismissal of an indictment exists only where (1) the irregularity substantially influences the decision to indict or (2) 'there is grave doubt that the decision to indict was free from the substantial influence of such [irregularities].'" *Id.* (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). "Such an error or irregularity may be an infirmity of law in the prosecution. In other words, the defendant must demonstrate that the allegations in the indictment, even if true, would not state an offense." *United States v. Bowling*, 108 F. Supp. 3d 343, 347 (E.D.N.C. 2015) (cleaned up).

Duncan is correct that overt acts cannot predate the formation of the conspiratorial agreement. *Harms*, 272 F.2d at 482. But that does not mean that the United States has failed to state a prosecutable conspiracy offense. As long as one of the alleged overt acts occurred after the formation of the conspiracy, the offense must be allowed to proceed on its merits. *See United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018) (stating that a conspiracy offense under 18 U.S.C. § 371 "has three elements: an unlawful agreement to commit an offense, the defendant's knowing and willing participation, and an overt act in furtherance of the conspiracy"); *cf. United*

11

States v. Fleschner*, 98 F.3d 155, 159–60 (4th Cir. 1996) (holding that instructing the jury that "one of the conspirators during the existence of the conspiracy knowingly committed at least one of the . . . overt acts described in the indictment" did not constitute prejudicial error). As observed above, to state a prosecutable offense, Duncan need not commit an overt act himself "so long as one conspirator does so." *Cardwell*, 433 F.3d at 391.

Each charged conspiracy relies on overt acts occurring after the formation of the illicit agreement in June 2019. *See* DE 149 ¶¶ 22, 24, 29, 31. For example, to support the conspiracy to manufacture and ship firearms, the operative indictment alleges that a coconspirator (Collins) accepted $1,500 on April 24, 2020 for a 9mm pistol and suppressor, to be manufactured by another coconspirator (Kryscuk). *Id.* ¶ 24(A). To support the conspiracy to destroy an energy facility, the operative indictment alleges that the same coconspirator (Collins) "stole military gear" while aboard Camp LeJeune and "had [that gear] delivered to other members of the group." *Id.* ¶ 31(D). Since "at least one of the . . . overt acts described in the indictment" is sufficient to give rise to a prosecutable offense, *see Fleschner*, 98 F.3d at 159, any prosecutorial misstatement or omission to the grand jury regarding the sufficiency of overt acts predating the conspiratorial timeline neither "substantially influence[d] the decision to indict" nor cast "grave doubt" as to the integrity of the grand jury's decision to indict. *See Brewer*, 1 F.3d at 1433 (citation omitted); *cf. Bowling*, 108 F. Supp. 3d at 353 (dismissing conspiracy charges because "the government's erroneous legal instruction to the grand jury . . . played a significant and impermissible role in the grand jury's decision to indict").

Duncan perceives two other legal infirmities in the operative indictment: (1) "continuing agreement or discussion of the conspiracy between alleged co-conspirators cannot constitute an overt act" and (2) "being in possession [of probative material] is not sufficient as an overt act."

12

*See* DE 320 at 9 (citing DE 149 ¶¶ 24(J), 31(M)). The definition of an overt act is expansive: "The term 'overt act' means some type of outward objective action performed by one of the members of the conspiracy which evidences that conspiracy." *United States v. O'Connor*, 158 F. Supp. 2d 697, 723 (E.D. Va. 2001). Thus, communications that evidence a conspiracy to manufacture weapons to further a civil disorder, such as discussions of "shooting protestors," can qualify as an overt act. DE 149 ¶ 24(J); *cf. United States v. Fellabaum*, 408 F.2d 220, 223–24 (7th Cir. 1969) (holding that coconspirator's instruction "to come to Chicago . . . was sufficient to support a finding of intent to travel and cause travel in interstate commerce"). So too can possessing material evidencing an intent to destroy an energy facility, such as "a handwritten list" identifying locations for "a transformer, substation, or other component of the [regional] power grid." DE 149 ¶ 31(M); *cf. United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (holding that "a conspirator's knowing receipt of criminal proceeds achieved passively through a wire transfer into an account under his control can satisfy the overt act element of conspiracy"). Even if the court accepts Duncan's argument that possessing and communicating probative material can never constitute overt acts, the operative indictment states valid conspiracy offenses as discussed above so as to preclude dismissal.

Duncan requests in the alternative that the court order the United States to disclose the "legal instructions which were issued to the grand jury" either to himself or to the court for *in camera* review. DE 320 at 10–12. Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), the Court may authorize disclosure of grand-jury matter "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." The defendant must make "a strong showing of particularized need" to obtain grand jury materials. *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 419 (1983). To this end, the

13

defendant "must show that the material [he] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [his] request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979). The operative indictment states valid conspiracy offenses, so there is no injustice to avoid through court-ordered disclosure of the grand jury legal instructions.

## IV. Conclusion

For the foregoing reasons, Duncan's motions to dismiss [DE 315–318, 320] are DENIED.

SO ORDERED this 7th day of November, 2023.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE