```
                UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NORTH CAROLINA
                     SOUTHERN DIVISION

--------------------------------------------------------

UNITED STATES OF AMERICA,

               Plaintiff,

     -vs-                        Case No. 7:20-CR-167-M-3


JORDAN DUNCAN,

               Defendant.

--------------------------------------------------------

                      MOTION HEARING
                    JANUARY 15, 2021
       THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
               UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S


On Behalf of the Government

BARBARA D. KOCHER
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601


On Behalf of the Defendant

RAYMOND C. TARLTON
Tarlton Law Firm
P.O. Box 91624
Raleigh, North Carolina 27675



                 Risa Kramer, RMR, CRR
                  Official Court Reporter
                United States District Court
                 Wilmington, North Carolina
```

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2              (Proceedings commenced at 9:57 a.m.)

 3              THE COURT:  If the clerk would please call

 4    the case.

 5              THE CLERK:  USA versus Jordan Duncan.

 6              THE COURT:  Counsel, please state your

 7    appearance for the record.

 8              MR. TARLTON:  Yeah.  Yes, Your Honor.

 9    Raymond Tarlton on behalf of Mr. Duncan.

10              MS. KOCHER:  And Barbara Kocher, sir, on

11    behalf of the United States.

12              THE COURT:  All right.  Good morning,

13    counsel.  Good morning, Mr. Duncan.

14              THE DEFENDANT:  Good morning.

15              THE COURT:  We're here on the defendant's

16    appeal of the order of detention from Magistrate Judge

17    Gates.  The Court has read the transcript of the prior

18    detention hearing and the motions -- or papers in the

19    case.  I've also seen Judge Gates's order and read the

20    pretrial services report that was included on the

21    docket.  Are there any other new written materials that

22    I should be aware of at this point?

23              MS. KOCHER:  Your Honor, I did have one very

24    small exhibit that I could add to the record at this

25    point.
```

 1          THE COURT:  All right.  And the Court has

 2    not seen the exhibits.  So if we have copies of the

 3    exhibits, that would also be helpful, but I'm assuming

 4    that this -- this is a de novo hearing.  To the extent

 5    that the parties wish to rely on information previously

 6    submitted or testimony that has previously been adduced,

 7    I'm happy to do that.  To the extent that the parties

 8    wish to put new testimony in, I'm also happy to do that.

 9    I will leave it to counsel to decide how best to put in

10    the evidence in a way that is useful to them,

11    expeditious, and they believe will be helpful to the

12    Court.

13          MS. KOCHER:  Your Honor, in the main, the

14    government would be relying on the substantial evidence

15    submitted at the hearing.  I do have a copy of each of

16    those exhibits if you would like for me to hand those up

17    at this point.

18          THE COURT:  Yes.  That would be great.

19    Thank you.

20          MS. KOCHER:  Thank you.  I do apologize.

21    They're not necessarily stapled or collated in any way.

22    If I may approach, sir.

23          THE COURT:  Thank you so much.

24          MS. KOCHER:  I would note, Your Honor, as to

25    Government's Exhibit 6 therein, what I've handed up to

1   you -- actually, if I can switch -- what I handed up to

2   you is the redacted version that's in the public record.

3   If the Court -- it's unimportant.  It's the redaction of

4   a juvenile's name, so it's not --

5               THE COURT:  That's not essential to the

6   Court.

7               MS. KOCHER:  All right.  Thank you, sir.

8               The only evidence that the government would

9   be interested in submitting today are a few additional

10  pages to what the Court now has in front of it as

11  Government's Exhibit 6, which was a series of Instagram

12  messages back and forth between this defendant,

13  Mr. Duncan, and co-defendant Paul Kryscuk.  There are a

14  few more pages that -- as events have transpired within

15  the last ten days -- that would be significant for the

16  Court's consideration.  If I may approach with a copy --

17              THE COURT:  Have those been provided to

18  defense counsel?

19              MS. KOCHER:  Yes, sir.  Actually, discovery

20  has been fully provided, but I do also have a copy for

21  him this morning.

22              THE COURT:  Okay.

23              MR. TARLTON:  Thank you, Your Honor.

24              MS. KOCHER:  I have labeled this Government

25  Exhibit 1 only because it's coming new into this

1    proceeding.

2              THE COURT:  Okay.

3              MS. KOCHER:  And if I can just point out to

4    the Court by proffer, again, I note that Government's

5    Exhibit 6 that had come in at the earlier hearing was

6    the series of Instagram records.  It was a very

7    extensive record, and the government had just put in

8    various pages for the Court's consideration.  These are

9    a few additional pages.  I would note that the page

10   numbers -- that is, the blue banner at the top -- don't

11   necessarily follow Government's Exhibit 6 from the

12   previous hearing, but they are in fact part of the same

13   disclosure.

14             I would first note to the Court the second

15   page of the current Government Exhibit 1.  The exchanges

16   are between what is noted as author JCD -- that would be

17   this defendant, Mr. Duncan -- and Slim Reaper, Slim

18   Reaper being the user identity by Mr. Kryscuk, the

19   co-conspirator and co-defendant in this case.

20             I first call your attention to the bottom

21   third of that page -- again, the blue banner at the top

22   says page 436 -- with a reference to the Hilux Hornet.

23   That is, for Your Honor's information, similar to an

24   open-bodied Hummer.  It is a Toyota vehicle on the

25   Tacoma platform.  Here in the United States, it is the

Hilux Hornet.  It is used by Special Forces, most
commonly known in the context of ISIS.  It does have a
mounted machine gun on the top of it.  Mr. Duncan posts
what appears to be a reference to the Hilux Hornet.  I
note that Mr. Kryscuk responds with some urban slang,
and I would call that to the Court's attention.  He
says:  *I just "coomed."*  That would be a statement
referencing ecstasy, Your Honor, or an orgasm.  It
becomes important for later in the point.

Turning to the next page, page 437,
Mr. Kryscuk responds:  *SF ZOG nerds don't be deserving*
*that shit.*  This is in respect to that Toyota Hilux.
The SF would be reference to Special Forces.  ZOG would
be the ZIOG occupied government, or the anti-Semitic
conspiracy theory about the United States government.
They go on.  All of this is -- conversations are
happening on August 8th.

There is a message that's unavailable right
there at the beginning of the page.  We don't know what
Kryscuk posted, but what he responded to his own post
was:  *You have no idea how much I hope this happens*.
Duncan responds:  *That's pretty much happening*, and asks
Kryscuk:  *You saw the footage of the arrest they*
*released?*

Now, on this day in history, Your Honor, on

August 8th, the judge ordered the release of the body
cam footage of the death of George Floyd.

They go on to say: *He's* -- and so the
government assumes they're discussing Mr. Floyd -- *like
demonically strung out on meth and fentanyl. Those cops
are getting acquitted*, Mr. Duncan says, *and if they
don't it's judicial activism*.

Kryscuk says: *Imagine they get sentenced
and Trump pardons them.* Mr. Duncan responds: *Ideal
scenario*, and follows with: *Combined with Trump losing
the election, then refusing the results*. Again, Kryscuk
responds: *I "coom."*

It is significant, Your Honor. I would note
that Judge Gates did not say it in these exact words
during Mr. Duncan's hearing, but in a co-defendant's
hearing -- in regard to Mr. Collins' detention hearing,
the argument was being made that there was no imminent
threat by these persons. And Judge Gates noted that the
plan and strategy are there, they're just waiting on the
trigger. The events of last week do have that trigger
mechanism in place.

I move on to what is marked as page 614 in
the blue banner. This follows -- the previous two pages
are discussions about different types of firearms. At
page 614, Kryscuk asks Duncan: *The primary question I*

1  *struggle with is do we strike now or wait until it gets*
2  *that bad?*  And again, it's some text or photo that we do
3  not have access to that they're referring to.
4  Mr. Duncan says:  *Wait until it gets bad*, and points out
5  that they aren't an army, *we don't gain anything by*
6  *blowing our load before it even matters*, to which
7  Kryscuk responds:  *An army will rise when that starts*
8  *happening.*

9          Your Honor, that would be the additional
10  evidence on behalf of the government today.

11          THE COURT:  Is there any significance to the
12  material on 615?  Or is that just included to...

13          MS. KOCHER:  I did -- I do tend to include
14  the page before and after, just so that...

15          THE COURT:  For context.

16          MS. KOCHER:  Context.

17          I do know, Your Honor, that the reference at
18  page 615 right below -- do you have a copy of the cap
19  schedule?

20          THE COURT:  Mm-hmm.

21          MS. KOCHER:  Is -- when you follow that link
22  on Instagram, that is what -- entitled something to the
23  effect of "What happens to your cell phone when you're
24  arrested."  And it lays out the law enforcement platform
25  that is used to access phones, to download phones, the

UFED software.  So the significance would be that they had an expectation and were preparing in the event of arrest and preparing their items for the ultimate download of their phones, would be the government's argument in that regard.  But that is what that references.

THE COURT:  Counsel, can you tell me what I'm looking at in Exhibits 3 and 3-2?  One is a Colorado driver's license, name of Logan Grady.  The other is a Colorado driver's license, name of James Tyler Callahan.

MS. KOCHER:  Yes, Your Honor.  Each of the defendants was found to have possession of a false identification.  The one for defendant Kryscuk was known to law enforcement before the arrest and searches because he had been using it to ship the manufactured weapons to the various places around the country.

The one in regard to Mr. Grady there, that is defendant Liam Collins.  That was found at his family home in Rhode Island.

Mr. Callahan is this defendant, Your Honor, Mr. Duncan.  Mr. Duncan's false identification was found within an official government travel passport at his apartment in Boise.

THE COURT:  And I think Judge Gates asked the question -- do we have an answer to the question of

whether or not -- actually, I think defense counsel
asked the question. Do we have an answer to the
question of whether or not they explicitly requested the
return of the official passport? I'm assuming that
that's not a U.S. state department issued passport,
that's a DOD issued passport?

MS. KOCHER: That is correct, Your Honor.
And if I can have just a moment.

(Discussion off the record between
Ms. Kocher and the agent.)

MS. KOCHER: So I don't have specific
information that Mr. Duncan was asked only --

THE COURT: Pattern and practice would have
been --

MS. KOCHER: -- by pattern and practice --
correct.

THE COURT: And Exhibit 4, whose telephone
is that?

MS. KOCHER: Your Honor, I will admit I gave
you my own copies.

THE COURT: Okay.

It's a gear list. It has "chest rig, belt,
new optic," et cetera. It looks like it's in Notes,
which -- I'm not sure if this is -- I'm assuming this is
not an iPhone, but it's the iPhone equivalent of Notes.

MS. KOCHER:  So screen shots of Wire do also have that look to it.  There are two places where that could come from.  One of the lists was recovered from -- juvenile involved at the time.

THE COURT:  Okay.

MS. KOCHER:  And my sense is that that's what you're looking at.  We do have another list that's actually even longer and greater from Mr. Duncan's Notes section of his phone.  I just don't think that that one is it.  But the one that was found in Mr. Duncan's Notes section on his phone was actually more complete.

THE COURT:  And do we know if that list was compiled before the training exercise in Idaho?

MS. KOCHER:  I'm unable to answer that question, Your Honor.  I do know overall that the chatter on Instagram, the -- from, that is -- from the messages that we've been able to see, that that training event in July seriously ratcheted up their talk and their excitement about their plan.  It was after that that Mr. Duncan switched jobs, took a pay cut, and moved to Boise.  A lot of the messages from the government's prior Exhibit 6 indicate the work that they're gonna have to undertake once Mr. Duncan gets to Boise.

So I don't know when the list would have been made, but it is consistent -- it would seem

consistent to me if it came after that, once they had

practiced, once they had that going, and once the

excitement level had ratcheted up in regard to their

strategy and plan.

THE COURT:  Exhibit 6 is...

MS. KOCHER:  Those are the Instagram --

pages from the Instagram record of messages between

Mr. Duncan and Mr. Kryscuk.

THE COURT:  So this photograph is -- the

"Don't do this," do we know who that is and who took the

photograph or where it's from?

MS. KOCHER:  We don't -- we would call that

a meme, I suspect.

THE COURT:  Okay.

MS. KOCHER:  Or that they were just sharing

that idea.  Now, there was, as you can see from another

exhibit there in front of you, that there was a list of

locations found that made reference to -- it literally

was just a list of locations, what we submitted at the

detention hearing, some of the street view shots of

those locations, and confirmed that each one of them had

something to do with either the power grid or a fuel

depot.

THE COURT:  And the "Don't step on my

hustle" meme is a fake -- somebody faking green-tipped

1  ammunition.

2  And I'm assuming that this lengthy Instagram

3  chat, the stuff that was called out as specifically

4  important to Judge Gates is the stuff you want the Court

5  to concentrate on.

6  MS. KOCHER:  Yes, sir.

7  And, Your Honor, I do have Exhibit 7, a

8  video queued up.  It's, I think, less than three minutes

9  long, if you would be interested in viewing --

10  THE COURT:  Yeah, let's go ahead and -- I'll

11  watch that.

12  MS. KOCHER:  All right.  Thank you, sir.

13  (An exhibit was played.)

14  MS. KOCHER:  This is Mr. Duncan on the

15  right, sir.

16  (The exhibit continued playing.)

17  THE COURT:  There was reference in the

18  earlier testimony to short-barreled rifles.  Do we know

19  those are short-barreled rifles as opposed to AR

20  pistols, and have those been recovered?

21  MS. KOCHER:  They are, in fact, short-barrel

22  rifles, Your Honor, and yes, they were recovered.

23  THE COURT:  Okay.  And the other question I

24  have -- sort of factual question.  Is the pallet that

25  was shipped, the one that contained the body armor, it's

 1   unclear from the testimony, but it appears that it was
 2   Collins' pallet and being shipped to Collins' address
 3   where this defendant also lived.
 4            MS. KOCHER:  That's correct, Your Honor.
 5            THE COURT:  Was it addressed to Collins?
 6            MS. KOCHER:  It was addressed to Collins.
 7            THE COURT:  Okay.  Any additional evidence,
 8   Mr. Tarlton, for the defendant?
 9            MR. TARLTON:  Your Honor, I would like to
10   present on the screen what have been admitted in Liam
11   Collins's detention hearing as exhibits -- there were 18
12   exhibits.  I think it's docket entry 62.  But my
13   understanding is it was submitted to Magistrate Judge
14   Gates in notebook form, and I have electronic copies I
15   could put on the screen, and then...
16            THE COURT:  That's fine.
17            MR. TARLTON:  Thank you, Your Honor.
18            THE COURT:  I'm sorry, Ms. Kocher.  I may
19   have cut you off.  I'd asked earlier if that was all the
20   additional evidence you have.  Do you have any
21   additional evidence?
22            MS. KOCHER:  No, Your Honor.
23            THE COURT:  Okay.  Thank you.
24            MR. TARLTON:  Your Honor, by just way of
25   background, Mr. Collins had his detention hearing after

```
 1    Mr. Duncan had his, and so the discovery -- first
 2    discovery production occurred after our detention
 3    hearing.  So Mr. Collins' counsel was able to go through
 4    some of the discovery production and identify documents
 5    having bearing on the points that both I've made for
 6    Mr. Duncan as well as he was making for Mr. Collins,
 7    that there was a lack of evidence as to imminent
 8    likelihood of violence under the Brandenburg and Hess v.
 9    Indiana doctrines.  And that's, sort of, the context for
10    this.
11              Your Honor, this is a FBI investigative
12    report focusing on Mr. Collins, and it discusses the --
13    sort of, the origins of it based on a Newsweek
14    publication where, I guess, Mr. Collins was identified
15    as holding racist and, you know, right-wing ideology.  I
16    want to go down to a highlighted portion.
17              They highlighted that no imminent threat was
18    identified at the time that they initiated -- conducted
19    initial stages of this investigation, Your Honor.
20              MS. KOCHER:  Could you -- could you --
21              THE COURT:  What's our date?
22              MS. KOCHER:  -- just say which exhibit that
23    is, if you would?
24              MR. TARLTON:  Your Honor?
25              THE COURT:  This was -- so we'll mark this
```

```
 1   as Defense Exhibit 1 for purposes of this hearing.
 2              MR. TARLTON:  Yes, Your Honor.
 3              THE COURT:  And it's docket entry 62 in
 4   the...
 5              MR. TARLTON:  It's a part of docket entry
 6   62.  I think that was an exhibit list.
 7              And it looks like the date of this
 8   memorandum or investigative report was back in May of
 9   last year, Your Honor, while Mr. Collins was still in
10   the Marines.
11              Your Honor, Exhibit 2 I'm about to put on
12   the screen is what -- you've probably seen in the Iron
13   -- what's called Iron March postings by Paul Kryscuk
14   who's a co-defendant and sort of -- I believe even
15   Magistrate Judge Gates characterized either -- it was
16   either him or Collins would be seen, sort of, as the
17   leaders of any kind of group that would be -- that my
18   client was alleged to be associated with.
19              And I've highlighted portions of, sort of,
20   this ideology here, or parts of it:  that there's no way
21   that this will be accomplished on a nationwide scale
22   right off the bat; that it's not gonna happen overnight;
23   eventual goal that may take generations of war to
24   accomplish; again, qualifying things with statements of
25   "when the time comes"; not advocating anyone to go out
```

and do something stupid that will change nothing; be

patient, our time is coming; the system is killing

itself organically, it will collapse sooner than later;

when that happens, hit the streets; when the time comes;

again, characterizing it as a generational struggle.

THE COURT: This is all from 2017? It was

originally posted on Iron March?

MR. TARLTON: I believe -- yes, Your Honor.

I'll go back to the...

THE COURT: Yeah, I've read the -- I've read

the entire manifesto.

MR. TARLTON: Okay. Yes, Your Honor.

THE COURT: So to the extent that the

highlighting is just highlighting the fact that these

things are issues for the future, I understand --

MR. TARLTON: Okay. Yeah, that's absolutely

the point.

I'm gonna put on the screen, Your Honor,

Exhibit 3. And these numbers are matching up with what

was submitted by Mr. Collins's counsel. Looks like the

date of this was May 22nd of last year. Again, while

they're analyzing Mr. Collins, you know, they're

pointing out that they have not identified an imminent

threat.

Your Honor, this is Exhibit 4, FBI

memorandum, and I think it includes excerpts from Iron
March. This memorandum is dated -- or investigative
report is dated July 2nd of last year, but these are
posts from 2016 or so. And I think a point we made at
the detention hearing in front of Magistrate Judge Gates
is I don't believe there's any evidence my client even
knew Mr. Collins when these posts were being made. In
fact, I think Mr. Collins was pretty young, like 16
years old. He went into the military at a young age. I
think it was before this.

        THE COURT: Right.

        MR. TARLTON: The extent Your Honor's
already seen the Iron March, that's all that is.

        I'm putting on the screen, Your Honor,
Exhibit 5. This is October 14th of last year, getting
close to the arrest date; FBI investigative report that
they had made decisions to arrest these gentlemen.

        THE COURT: Can you scroll back up?

        MR. TARLTON: Yes, Your Honor.

        THE COURT: To the names.

        MR. TARLTON: Yes, Your Honor.

        THE COURT: Right there.

        MR. TARLTON: Yes.

        THE COURT: I'm not seeing -- he's living in
Boise by this time?

```
 1                    MR. TARLTON:  He is.  Yes, Your Honor.
 2                    THE COURT:  Okay.  That's what I was trying
 3       to figure out.
 4                    MR. TARLTON:  He had taken the job.
 5                    THE COURT:  Thank you.
 6                    MR. TARLTON:  I think this was the -- they
 7       thought that the conflict could be within the next five
 8       years.
 9                    And this, I think, reflects the
10       investigator's thoughts that they should be arrested in
11       October in light of uncertainties about the November
12       election.
13                    THE COURT:  Okay.
14                    MR. TARLTON:  Putting on Exhibit 6, the
15       interview of Michael Collins, co-defendant Liam Collins'
16       father.  And this was back in October -- so after -- or
17       late October of last year.
18                    I guess this is --
19                    THE COURT:  This is the brother?
20                    MR. TARLTON:  The brother -- right.
21                    THE COURT:  Okay.
22                    MR. TARLTON:  Your Honor, now I'm putting on
23       the screen Exhibit 7.  An individual, Maurino,
24       investigated in connection with the other defendants in
25       this case.
```

1              I'd just point out that this investigative

2   report's from October 23rd of last year.  I think

3   Maurino talks about getting a gun part for Mr. Kryscuk

4   in the case of a rainy day as basically -- he described

5   it as a breakdown in civil order in the world and denied

6   any knowledge of any plan, specific plan.

7              THE COURT:  Okay.

8              MR. TARLTON:  Putting on the screen, Your

9   Honor, Exhibit 8.  This is a report from November 2nd of

10  last year with Mr. Kryscuk's wife who had made reports

11  about him to the FBI which helped fuel this

12  investigation.

13             THE COURT:  Okay.

14             MR. TARLTON:  Again, I think she reiterates

15  the same thing, lack of a specific plan.

16             THE COURT:  Okay.

17             MR. TARLTON:  Your Honor, now I'm putting on

18  the screen Exhibit 9.  This is from November 4th of last

19  year.  I believe he's an individual that was -- might

20  have obtained a firearm from Mr. Kryscuk.  The

21  highlighted portion shows this gentleman denying any

22  specific plot.

23             Your Honor, I'm putting on the screen

24  Exhibit 10.  This is my client's former supervisor at

25  his workplace.

```
 1                    THE COURT:  Okay.

 2                    MR. TARLTON:  This is Exhibit 11.  Somebody

 3      that knew Paul -- Mr. Kryscuk.  And my understanding,

 4      Mr. Collins's counsel made the point that Mr. Kryscuk

 5      sold firearms not just to white extremists.

 6                    THE COURT:  Correct.  I saw that he was half

 7      African American.

 8                    MR. TARLTON:  Yes, Your Honor.

 9                    THE COURT:  This purchaser.

10                    MR. TARLTON:  That's right.

11                    THE COURT:  Okay.

12                    MR. TARLTON:  Showing now, Your Honor,

13      Exhibit 12.  This is a FBI investigative report from

14      September 3rd of 2020, last year.  This is a workplace

15      review that -- it's my client's middle name, Calhoun.

16      My understand- -- the takeaway is that -- again,

17      underscoring that -- no evidence that he used his

18      position of employment to further anything involving

19      these allegations.

20                    Now I'm putting on the screen, Your Honor,

21      Exhibit 13.  This is an interview of my client's

22      ex-girlfriend.

23                    THE COURT:  Okay.

24                    MR. TARLTON:  I think the takeaway is saying

25      she never thought that they were actually plotting
```

1    violence, despite being very critical of him otherwise.

2              THE COURT:  I get the gist of this.

3              MR. TARLTON:  Yes, Your Honor.

4              Presenting on the screen now Exhibit 14.

5    This is from May -- an investigative report from May 26

6    of last year; that they ruled him out of, I guess, or

7    didn't have evidence of Mr. Kryscuk being a part of a --

8    I guess, of a listed group.

9              Putting on the screen, Your Honor, Exhibit

10   15, an investigative report, FBI report from October

11   22nd of last year; I guess another person who grew up

12   with Mr. Kryscuk who was interviewed.

13             That's the count of that, Your Honor.

14             THE COURT:  All right.

15             MR. TARLTON:  Putting on the screen now,

16   Your Honor, Exhibit 16.  Looks like this is from

17   November 18th of last year, NCIS investigative report

18   for an interview of a Lieutenant Corporal Womack.

19             THE COURT:  It's probably Lance Corporal.

20             MR. TARLTON:  Oh, Lance Corporal.  Sorry.

21   Lance Corporal, Your Honor.

22             Your Honor, now I'm putting on the screen

23   Exhibit 17.  This is another interview of Paul Kryscuk's

24   wife, Melissa, back in -- October 27th of last year.

25             THE COURT:  All right.

            MR. TARLTON:  Your Honor, I'm putting on the

screen Exhibit 18, last one, an interview back on

November 13th of last year, NCIS interviewing -- looks

like First Lieutenant Pamlanye.  It's Mr. Kryscuk's

cousin.

            THE COURT:  Was there anything in particular

you want me to take from Exhibit 18?

            MR. TARLTON:  I thought that I had a

highlight in there, Your Honor, but -- going back to his

interview, he said he normally didn't take Mr. Kryscuk

seriously with -- he said hateful, racist things, knew

him well.  I think that Mr. Kryscuk had made a ghost gun

or, you know, something by that terminology but had

never actually tried to get Mister -- his cousin to move

out to Idaho with him.

            THE COURT:  So the implication that he

provides guns to folks who are not in the group as well?

            MR. TARLTON:  Exactly.  Yes, Your Honor.

            THE COURT:  Thank you.

            MR. TARLTON:  And then those -- those are

the exhibits that were presented by Mr. Collins at his

hearing, Your Honor.

            THE COURT:  All right.  They've been

previously admitted into evidence at another hearing.

I'm assuming you want them admitted in this one as well.

                    MR. TARLTON:  Yes, Your Honor.

1                    THE COURT:  All right.  They're all

2    admitted.

3                    MR. TARLTON:  Thank you.

4                    THE COURT:  Anything further, Mr. Tarlton,

5    in terms of new evidence?

6                    MR. TARLTON:  Not in terms of new evidence,

7    Your Honor.  And we would stand by also the transcripts

8    that reflects the testimony of my client's father and

9    description of the home and employment opportunities.

10                   We also admitted some exhibits at our

11   detention hearing in front of Judge Gates that showed my

12   client has employment opportunity with an individual

13   that runs an auction house.

14                   THE COURT:  That's the data entry position

15   that was described by Judge Gates in his order?

16                   MR. TARLTON:  Yes, Your Honor.

17                   THE COURT:  Ms. Kocher, the government bears

18   the burden of demonstrating by clear and convincing

19   evidence danger to the community, or by a preponderance

20   risk of flight.  I'm happy to hear from you now.

21                   MS. KOCHER:  Thank you, Your Honor.

22                   I would first begin with just a little bit

23   of reference to those 18 exhibits that were just

24   admitted.  If you review each of them closely, Your

1  Honor, each of the exhibits contains information that
2  would work against the defendant in this case as well.
3          The 2 May of 2020 exhibits that are from the
4  FBI where no imminent threat was identified, the
5  government would point out that this investigation had
6  been pending for about six weeks at that time.  The FBI
7  had been involved about two weeks at that time.  It has
8  no bearing on the current imminent threat, even more so
9  today than at the time of Mr. Duncan's original hearing.
10          As to the Kryscuk manifesto, the Defense
11  Exhibit 2, it was, as Your Honor noted, written in 2017.
12  It did appear to be a several-year plan.  Several years
13  have passed.  And in an unusual -- to my experience --
14  they kept with it.  They actually carried out and moved
15  forward in their plan.  They moved to Boise.  They were
16  on that path.  Collins had posted that he was going to
17  join the Marines, that they would be able to teach him
18  what he needed to know.  That happened.  In fact, they
19  have a "Praise Collins Day" because of the number of
20  recruits he brought into the group, Duncan among them,
21  and other military members.
22          Duncan was specifically recruited because of
23  his intel and communications specialty in the military.
24  I'm sure you're familiar with that from the record.
25          Contrary to it confirming that there's no

imminent threat because of the reference to the future
in that 2017 posting, in fact, the government would
argue that it demonstrates their commitment to it, that
it has lasted now -- we're going on four years, at
least -- and they did take active steps, even more so,
as I said, since that July training.

The video you watched, Government's Exhibit
7 -- Exhibit 7, by the way, was a compilation that was
found just like that on the electronic devices seized at
the time of the arrest.  But there were also a number of
video clips and other photographs.  This particular
video was a compilation that they had created of those
pieces.

Going to the July 20 memo that noted the
2016 posts by Collins, I've referenced those.  Those are
where Collins lays out his intention to give four years
to the cause, as it were, so that he can train.  I would
note at this point, too, that the evidence is replete
with instances where military gear was stolen, body
armor as well as less -- the PMAGs, or the polymer
magazines that were used and shipped in bulk, literally,
as well as tarps and sleeping bags and other items that
wouldn't necessarily be able to be specifically tracked
to a unit or person within the military.

The Michael Collins interview, Defense

Exhibit 6, I would note that his other son -- not Liam
Collins but the other son he's referencing -- told the
father that they had no plan for violence, that they
just wanted to live off the grid.  This is the same son
who at the age of 16 was allowed to go to Boise for that
live training.  He's actually the individual that falls
in that video, that you see fall at the one point.  That
is the younger brother -- and then flew by himself in
September to San Antonio at Mr. Duncan's request and
drove with Mr. Duncan when he moved to Boise.

            Judge Gates, you know, specifically noted in
regard to Mr. Collins' detention that all of this had
been kept, apparently, from the Collins' father.  And
that interview only punches that side of that up.

            I would note in regard to Exhibit 7 the
interview of Joseph Maurino.  Going back to Government's
Exhibit 1 from this hearing, you might find a statement
in there.  I think it's in regard to that 600-page
series where they're talking about an army.  You'll see
the phrase that they had "lost FF."  And they discuss,
yeah, but they're not gonna be able -- probably not get
up to 50 but maybe a dozen.  The timing of that is
consistent with the argument that is pointed out in that
interview that Maurino had with them.  Maurino would be
considered a founding father, potentially what is meant

by that "FF."  So that only confirms that Maurino did

have a following out, and it appears to follow that July

training.  He was present, and he is present in that

video as well.

            As to the interviews of Melissa Kryscuk

presented in Exhibits 8 and Exhibit 17, note that those

not necessarily highlighted for Your Honor here, but

Melissa Kryscuk reports the presence of bomb parts in

her home, which ultimately were found.  And although she

denies knowing any plan, that is to say Kryscuk having

told her of any plan, Exhibit 17 specifically -- I

believe it's going to be on page 61 of that exhibit --

she specifically talks about overhearing Duncan and

Collins talking in the backyard.  My -- and I don't have

those Collins exhibits with me.  My recollection is that

she's talking about the lights going out or the power

grid aspect.  And when Duncans [sic] and Collins

realized she was there within earshot, they quickly

changed the subject or stopped talking about it.

            The Vilardi [phonetic] interview, he notes

-- this is Defense Exhibit 9 -- that he did not want to

be a part of what Kryscuk was doing.  That's in that

exhibit.  I would just note for the Court that yet this

defendant, Mr. Duncan, didn't have that same clarity as

Mr. Vilardi and himself moved from San Antonio to Boise

1    with the assistance of a juvenile at that time.

2                The text in between -- and my note to myself

3    as Exhibit 9 was being reviewed, there were two portions

4    that were highlighted, and I would just draw you --

5    review that exhibit before you make your decision.  The

6    text in between those two highlighted portions -- I

7    think they had highlighted the first and the last parts

8    of a paragraph.  The information in between would be

9    relevant and is contrary to the defendant's position.

10                I would note, Your Honor, that Vilardi, that

11   interview also sets out that he used the name Pius on

12   Wire.  It is Vilardi that that meme of the masked

13   individual standing in front of the power station

14   saying, "Don't become good at taking down" -- that

15   actually came from Vilardi.

16                THE COURT:  So Vilardi posted the meme, but

17   Vilardi -- that's not a photograph that was taken from

18   Vilardi, but he posted the meme.

19                MS. KOCHER:  Correct.  They are resharing

20   this -- I can't speak to whether or not it is Vilardi.

21   But I do know that this Instagram account is resharing a

22   post that had originally come from Vilardi.

23                The government -- referring to Defense

24   Exhibit 11, the government has never maintained that the

25   sales were only to white supremacists; in fact, the

opposite.  They used and intended to use the sales of the arms both to finance their group as well as to arm their specific group.

The ex-girlfriend at Exhibit 13 noted that the group sounded "culty," that she was never allowed to touch his phone, she was never privy to any conversations he has.  Most importantly, Your Honor, the end of that interview ends with: *She believed him capable of conducting violence toward black people before he was ever arrested.*

In short, it's easy to pull a several-page interview and pull out the phrases that go to either side, as can be seen by what I'm now doing.

In regard to Exhibit 16, Lance Corporal Womack, he had obtained an AR-15 and a suppressor from this group.  He had been asked by Collins to obtain 50 pounds of Tannerite, which is an explosive material sold mostly to gun enthusiasts as a target that would explode when it's shot.  And it's used in small amounts.  There were -- the vast library of explosive information found on Mr. Duncan's hard drive -- and I have said it in the prior hearing as well -- there was information about nerve toxins and poisonous gases and IEDs and remote detonators and -- and again, "library" is an appropriate term to use.

1          There was also research and information on

2    the component of Tannerite that could be used and

3    combined -- basically, the component that was in the

4    bomb used in Oklahoma City.  Is it ammonia?

5          THE COURT:  Ammonium nitrate.

6          MS. KOCHER:  Ammonia nitrate.  Yes, sir.

7    And that was one of the topics that they did talk about,

8    that the group did talk about, was Oklahoma City.

9          Lance Corporal Womack talked about having

10   been vetted on a phone call.  Duncan was present on that

11   phone call, and our other information suggests that that

12   was a significant role that Duncan played.  In fact, he

13   had material indicating in the recruitment of others,

14   find out what their viewpoints are, what their religion

15   is, what their background is, and then explain what

16   reading material you could give them that would match

17   that most closely, to try -- I think a phrase that had

18   been shown in one of the defense exhibits -- oh.  I

19   think it's the Kryscuk manifesto, actually, where

20   Kryscuk says to start radicalizing incrementally.  This

21   is grooming that we see in human trafficking.  We see

22   grooming in many aspects.  And this -- they had their

23   own grooming mechanisms, so much so that it was written

24   down as to what written material to give whoever in this

25   regard.

1          I would note -- turning to Defense Exhibit

2     17, it is the second of the Melissa Kryscuk interview --

3     that in that interview, the task force officer who was

4     interviewing her tells her about Kryscuk surveilling the

5     Black Lives Matters, how he would pull his car up from a

6     certain viewpoint and then move it.  And her response

7     was very simple:  *That's frightening.*  And I think that

8     encapsulates, essentially, the position we find

9     ourselves in today.  It may have been a future plan.  It

10    became to where it was imminent.

11          In regard to the Pamlanye interview at

12    Defense Exhibit 18, I would only note that he explains

13    that Mr. Kryscuk told him that the significance of the

14    ghost guns was that the government won't know you have

15    them.  I would also note that Mr. Pamlanye, or Captain

16    Pamlanye, rather, described Kryscuk as having these

17    ideas that minorities needed to die, that they were not

18    human.  I would also note that Kryscuk -- in that

19    interview, Kryscuk told Pamlanye to "Get here," which

20    would be to Boise, which was their ultimate location.

21          Your Honor, this particular defendant had

22    many acts.  It's not even about free speech.  He did

23    things and he received and sent monies back and forth

24    both in support of the firearm conspiracy with which

25    he's charged as well as indicating his sincere intent

1    and involvement in the conspiracy, to the extent that it

2    was to finance the group and to arm the group for a

3    potential civil disorder.  The evidence that was

4    presented before Judge Gates, slightly enlarged here,

5    just with the note that his ideal world that would make

6    his co-conspirator "coom" is if Trump loses the election

7    and then refuses the results.  And while I'm not holding

8    these and don't attempt to hold these defendants

9    accountable for the breach of the Capitol last week,

10   this is very likely the exact trigger that these

11   defendants were waiting on, and it --

12             THE COURT:  Counsel, what's your best

13   argument for why post-arrest he now poses an imminent

14   threat of danger to the community?  Not prearrest, but

15   post-arrest now he poses an imminent threat of danger to

16   the community or risk of flight?

17             MS. KOCHER:  Because there are

18   co-conspirators who have not been arrested who are still

19   out in the community.  He has access to them.  He --

20   Mr. Duncan testified that this defendant didn't have

21   much money and they were taking care of his finances on

22   cross-exam and in argument and ultimately found by the

23   Court.  There is no truth between this defendant and his

24   father, at least not on this defendant's side.  And

25   there is no way to know what resources this defendant

has, particularly with the community -- and by
"community," his co-conspirators as well as like-minded
individuals, if you will -- would share resources even
through Go Fund Me pages.  And the likelihood that he
could garner support for flight and for ongoing action
is significant and meets that clear and convincing
burden in regard to danger and, the government asserts,
preponderance as well.

I would note the preparation of these
defendants, Your Honor, is significant and goes toward
the future dangerousness and risk of flight that you
talk about.  They have the capability, the knowledge,
the skills, and the research completed for the -- they
prethought -- everybody had a fake ID.  They prethought,
"This is what's gonna happen when our cell phones are
searched, so let's do these things to protect them."
They prethought -- the only window the government has
had are the Iron March posts, which were ultimately made
public back in 2019, which is, as you've heard today, is
what kicked off the investigation.  Their screen shots
of their Wire chats -- Wire has been completely
encrypted, but some of the things like -- it was an
exhibit in the Collins hearing.  Mr. Kryscuk had put out
the four rules for the group, which was "Snitches end in
ditches" -- right.

1          THE COURT:  Yeah.  That was before Judge

2    Gates as well.

3          MS. KOCHER:  Yes.  Thank you.  So that is a

4    screen shot of their Wire chat.  So a lot of our

5    information comes because they were keeping photos of

6    the stuff, presumably, that's more important to them or

7    that they want to have reference to as time goes on,

8    Wire being an app that deletes itself when a time is

9    set.

10          It's not come up in this hearing, and I do

11   apologize that the Duncan and Collins hearings converge

12   in my memory.  One significant event that occurred,

13   again going to their preparation and the government's

14   difficulty in getting the actual words that they were

15   using -- literally, the arrests had been planned for

16   October 20th.  My recollection is that's a Tuesday.  The

17   Friday preceding, a member of their group who was a

18   police officer in Indiana was outed.  An online petition

19   circulated on that Friday seeking his dismissal from his

20   job from the Indiana Police Department.  That hit the

21   mainstream news.  He was then called in -- that police

22   officer was then called in and dismissed from the force,

23   I believe, that Saturday.

24          Texts were recovered between Mr. Duncan and

25   that individual, which I can say that individual viewed

as a threat on him.  Mr. Duncan strongly requested the individual to come out to Boise.  He explained:  *I'm going to visit somebody in Florida.*

When that all was transpiring, we know through other interviews -- Womack, for instance -- that all the members of the group were directed to delete their Wire accounts entirely.  So even through the process of arrest and talking with someone like Womack, we would have had access to the Wire account.  It had been deleted literally within four days just prior to their arrest.

That goes again to the preparation, to their ability to hide their operational security.  That will continue on post-arrest.  We will have no ability, particularly with this defendant's knowledge of a foreign language, with his knowledge of intel and communications.  He's trained by the military for these. It is a significant risk, Your Honor.

Finally, Mr. Duncan would be a risk to those persons who have cooperated with the government, or who have at least spoken -- "cooperation" may be a big word -- but who have agreed to speak and have provided information as have even come out in this hearing today, Corporal Womack included.  And those members' safety is of large concern to the government as well.

1              THE COURT:  Mr. Tarlton.

2              MR. TARLTON:  Thank you, Your Honor.

3              Your Honor, the government now argues that

4    there is an imminent threat.  Your Honor, as to the

5    point in question -- and I think about what evidence

6    they have of after his arrest, now that they're trying

7    to say my client is an imminent threat in light of, for

8    example, what happened at the Capitol last week.  But

9    after his arrest, what evidence do they have of -- under

10   the principles of Brandenburg and Hess v. Indiana and

11   NAACP v. Claiborne that he is engaged in advocacy

12   directed towards producing imminent lawlessness or

13   violence and a likelihood of that occurring?  I would

14   submit Your Honor is well aware he's been living in a

15   veritable fish bowl with federal oversight since

16   October.

17             He was arrested in Idaho.  He's been

18   incarcerated up there.  He was ultimately transferred

19   down here.  And we finally had a detention hearing in

20   December, and here we are in January.  And they produced

21   in discovery -- they've monitored his phone calls and

22   everything else, and there's no evidence at all that

23   he's engaging in speech that is directed at anything

24   that is about to occur.

25             And so you know, Your Honor, when we take a

step back -- and I don't think you can take words or
expressive conduct from before his arrest and then --
where there was nothing imminent at the time, and then
take events months later and then bootstrap it together
to create what the law at least recognizes as the kind
of imminency that strips away speech and expressive
conduct from First Amendment protection.

THE COURT:  Counsel, I understand a lot of
these arguments are directed to the substance of the
charge and whether or not the conspiracy has advanced to
the point where you think there's sufficient imminence
for the conspiracy charge to hold.  And I'm familiar
with the law.  I'm familiar with the First Amendment
law.  But the question before the Court today is current
danger to the community and current risk of flight,
and --

MR. TARLTON:  Yes.

THE COURT:  -- it will be most helpful to
focus on that because --

MR. TARLTON:  Yes.

THE COURT:  -- that's the question I'm gonna
be answering.

MR. TARLTON:  Absolutely.

Currently, as we stand here today, there is
no evidence that since his arrest this is a man so out

of control he is continue- -- or he's allegedly
continuing to engage in directing anybody on the outside
or the inside to do anything violent; that this federal
intervention is showing -- kind of, in a sense, is
undermining the government's case as to dangerousness.
If he's the person that -- truly at his core that
counsel for the government made him out to be, we would
have seen some signs of that between now and -- between
his arrest and today.  When they're asking to detain on
dangerousness, they're asking Your Honor to engage in,
you know, engage in a process of what might happen in
the future.  And dangerousness normally is with people
that really lack volitional control.  And they are not
presenting that to Your Honor.

And then I'd say flight risk, we really
didn't hear anything from the government today on flight
risk.  My understanding at the original detention
hearing, it was sort of this idea based on he had
training in Russian when he was in the Marine Corps.
That's about -- and he's not actually from North
Carolina.  Well, the case itself has an attenuating
connection with North Carolina.  There was an isolated
sale by a co-defendant, allegedly, on Camp Lejeune.

He would be living in Pennsylvania with his
parents where he'd have a job.  He doesn't have any real

assets.  His dad talked about he's not -- he's, I think,
only 26 years old.  He's not developed a lot of
financial discipline, still owes money on a car, you
know, older car.  There's just no means to flee.
There's no bank accounts or any evidence of that
overseas.  There's no family members or close friends
overseas.  There's nothing indicating a plan to flee the
United States.

And so as to flight risk, Your Honor, they
haven't met their burden on either preponderance of the
evidence or clear and convincing.  It's just not
realistic.  And then when you look at the nature of what
he's actually charged with, one count of conspiracy, it
has a five-year statutory maximum punishment, Your
Honor.  That's just not something that he's facing here
today that he's going to abandon all of his ties in the
United States, with no money, to go on the lam in places
that don't have extradition.  That's just not realistic
over what he's facing and his actual -- the reality of
his situation.  And in light of potential defenses that
he can raise that are not just on the substantive
charges, just on the facts about his attenuation to any
gun sale or -- or, you know, a conspiracy to engage in a
civil disorder, with their own evidence shows that there
was nothing at the time imminent.  That's under the

Civil Disorders Act, that's -- imminency is effectively
an element of the Civil Disorders Act.

So he's got factual defenses.  He has
constitutional defenses.  This is a presumption of
release case under Stack v. Boyle and the Bail Reform
Act.  It's not a presumption of detention.

He -- again, no evidence of the kinds of
things you would see that would show actual propensity
and ability to flee.  He would be supervised in
Pennsylvania where there's obviously a United States
Probation Office along with his parents providing -- who
are, you know, credible, law-abiding people who will
provide oversight and eyes and ears for the Court and
probation.

And so it really does come down to
dangerousness.  And I think absolutely they lack that
sort of evidence of no volitional control that would --
and the past is prologue.  There's no criminal history
here.  There's no criminal convictions.  There's no
history of missing court, no history of convictions
showing, you know, a total lack of respect for the court
system and its court dates and hearing dates and
anything like that that we see in other detention cases.

And so under the -- Your Honor's ultimate
goal of weighing all of the factors under the Bail

Reform Act, you know, our position as we've outlined in
our memorandum is that they just have not met their
burden, Your Honor.

THE COURT:  Ms. Kocher, I'll give you the
last word.

MS. KOCHER:  Thank you, Your Honor.  I
believe at the outset I intended -- if I didn't complete
the sentence -- to incorporate the government's evidence
and arguments from the prior hearing and --

THE COURT:  That's the Court's
understanding, that both parties --

MR. TARLTON:  Yes.

THE COURT:  -- are incorporating their prior
arguments.

MS. KOCHER:  All right.  Thank you --

MR. TARLTON:  Yes, Your Honor.

MS. KOCHER:  -- Your Honor, because I do
just -- given the comment there, I just wanted to make
sure that was true.

I would respond with the statement that the
government has failed -- or that most danger is shown by
a lack of volitional control.  I don't know if that's
accurate.  I don't know if that's true.  What I do
believe and what the government's position is in this
case, it's the exact opposite.  The government's case is

that this defendant in particular is smart. His
knowledge of operational security is significant. There
is more danger presented by this defendant who has been
able to hide his activities, his belief, his -- from his
job. He's kept his top security clearance, his top
secret clearance, Your Honor, up until the day of his
arrest, despite having just filled out a new SF-86 in
January of 2020 denying any association with these types
of groups. That is the crux of the government's risk of
flight and danger as we go forward, is that it is not a
lack of volitional control; it's the opposite.

          As to the imminency, Your Honor, the
government has always argued that there is danger. And
I believe in my evidence presentation this morning, my
point about Judge Gates in the Collins hearing -- I
didn't realize it was gonna come in quite so much -- is
that the imminency is we don't know what the trigger for
these defendants is. That makes it imminent. It's not
when -- you know, they've not said that it's 2028.
They've said it's this list of ideas, all of which are
currently present. The Black Lives Matter protests were
one. That was the first thing they got excited about.
The COVID and taking out a higher rate of minorities
than whites is part of it. That's actually on -- that's
in a Collins exhibit on video during the gun exchange --

during the exchange of money for one of the guns that the government purchased from Collins. He, you know, is pleased to have COVID around to do part of their job.

We've got George Floyd and that entire thing, and that's where the Instagram thing we viewed in Government's Exhibit 1 today came forth.

The fact that this defendant has been trained, has utilized that training -- you don't hear it on the video compilation played in Government's Exhibit 7, but the other video clips from that training is the calling off of the military commands. It is definitely a military preparation that's happening on that field as they're firing those weapons. Duncan himself is shown in that possessing one of those short-barrel rifles in that video.

The government believes that it has met its burden both under preponderance for flight and clear and convincing evidence for ongoing danger and that this defendant should be retained in custody until trial.

THE COURT: I have the evidence before me. I'm gonna try and take some time to review some of it before I come to a final conclusion. I understand the arguments. I'm gonna take a 20-minute recess. We'll come back at five minutes to noon, and I'll tell you where I am at that point.

1          (Proceedings recessed at 11:35 a.m.)

2          (Proceedings recommenced at 11:52 a.m.)

3          THE COURT:  All right.  Back on the record

4   in the case of United States of America versus Jordan

5   Duncan.  This case involves an appeal pursuant to Title

6   18, United States Code, Section 3145(b) seeking an order

7   revoking the magistrate judge's order of detention.

8          I'm not gonna revoke the order of detention

9   at this time.  I think this is a very close case, and

10  it's one where I'm gonna order that the probation office

11  in Pennsylvania conduct a home inspection so that we can

12  determine what precisely the conditions might be in

13  Pennsylvania where the defendant might reside, and to

14  the extent -- and I want a report from the probation

15  office on the feasibility of electronic monitoring and

16  house arrest there.

17          This is a -- the defendant has a presumption

18  of release in this case.  It's not a presumption of

19  detention.  I understand Judge Gates's order and take

20  his findings seriously.  The Court needs additional

21  information to determine whether or not it might be able

22  to fashion conditions of release.  So I'm gonna order

23  that we have that finding made by Wednesday so that the

24  parties can receive a report and we'll have a -- we'll

25  continue this hearing until Thursday for a final

1    determination pursuant to 3145.

2              At that time, in the event that any new

3    information has come to light by either party, I will

4    consider that information at that time.  What we're

5    essentially gonna do is leave Judge Gates's order in

6    place and continue it until such time as the Court has

7    sufficient information from Pennsylvania to determine

8    whether or not conditions can be fashioned in this case.

9              Any questions from either party?

10             MS. KOCHER:  Not for the government, Your

11   Honor.

12             MR. TARLTON:  Not from the defense, Your

13   Honor.  I have given probation again the full contact

14   information for my client's father and address and

15   everything.  We'll work with them on helping them do

16   what they need to do, Your Honor.

17             THE COURT:  Okay.

18             All right, counsel.  Thank you for all the

19   hard work that's clearly gone into this case from both

20   sides.  As I said, this is one where the legal

21   presumption is strong, and this defendant's personal

22   criminal record is nonexistent.  So this is one where

23   the presumption is gonna be important.  I'll need to

24   know more.  Thank you.

25             (Proceedings concluded at 11:54 a.m.)

1                  **C E R T I F I C A T E**

2

3          I certify that the foregoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7     /s/Risa A. Kramer                    2/7/2024

8     Risa A. Kramer, RMR, CRR             Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25