UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:20-CR-0167-3-M

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | UNITED STATES' RESPONSE |
| ) | TO MOTION FOR RELIEF |
| JORDAN DUNCAN ) | (D.E. 401) |
| a/k/a "Soldier" ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to the defendant's motion for relief under Brady. D.E. 401. For the reasons set forth below, the Court should deny the motion on its merits; nonetheless, if Defendant would like additional time to review the material at issue here, or for other reasons reflected in other filings or statements to the Court, the Government has no objection to a modest continuance.

**FACTS AND ARGUMENT**

The Alleged Brady material

Defendant cites three items in support of his allegation of failure to timely disclose Brady material: 1) a summary of an interview of witness Zacharek (hereinafter "the witness") by the Federal Bureau of Investigation (FBI) on October 21, 2020; 2) a summary of an interview of the witness by the FBI on October 26, 2020; and 3) a transcript of the witness' testimony before the grand jury in November 2020.

1

D.E. 401, Exhibits D, E, and F. The paragraph(s) from which Defendant drew his citations are set forth in full below:

### 1) *October 21, 2020, FBI Agent's Summary of Interview of the witness*

Defendant claims two portions of the first interview are exculpatory. First, Defendant claims: "[d]uring that interview, inter alia, the witness explicitly denied knowledge of any specific plans by the group 'to carry out violence or other destructive actions against any specific persons, groups, or property.'" D.E. 401 at 2-3. The paragraph preceding and the paragraph containing the quote reads:

> On or about October 17, 2020, following the news articles of [the witness] being terminated from the Lafayette Police Department that went viral across numerous news outlets, COLLINS, PAUL, and DUNCAN reached out to [the witness] and told him to come out to Boise, ID with them. [The witness] knew that the three of them were all living in Boise after a photo was shared on Wire of them at an apartment next to or overlooking an RV park. According to [the witness], he told the other BSN members that he was planning to go break up with his girlfriend in Florida and then move back home to live a quiet life. [The witness] also notified the group that he intended on leaving BSN altogether. After informing the others of his plan, [the witness] received one or more messages/calls from COLLINS, PAUL, and DUNCAN telling him that he needed to take a few days to think about his decision and really clear his head. [The witness] felt that the messages and calls from the other members were both warnings and threats towards him. [The witness] stated that in order for him to leave BSN, he needed to ask permission. If [the witness] left BSN without asking, he claimed COLLINS and PAUL would physically harm him or possibly kill him. For the last two years, [the witness] claimed that he had been trying to distance himself and leave BSN after what he described was a radical shift in the direction and leadership under COLLINS and PAUL.
>
> **[The witness] denied knowledge of any specific plans by BSN to carry out violence or other destructive actions against any specific persons, groups, or property**. However, [the witness] was aware of several concerning conversations over Wire that COLLINS, PAUL, and other members from BSN were engaging in. There were several instances where COLLINS and PAUL discussed modern mass shooting events that targeted marginalized communities and/or places of worship like mosques

2

and synagogues. Of particular note, COLLINS and PAUL often discussed the actions of Brenton Tarrant, the shooter behind the mass murders in Christchurch, New Zealand. [The witness] also recalled COLLINS and PAUL obsessing in anger over the Black Lives Matter (BLM) leader in Boise, ID who was a Hispanic female. If any plans were in place for any violence or other criminal activity, [the witness] was neither aware nor privileged to that information. [The witness] believed that such conversations regarding plans or operations would likely be discussed behind closed doors or away from the Wire chat group for OPSEC purposes.

D.E. 401, Exhibit D at 8.

Once the surrounding context is provided, the line quoted by Defendant is clearly not exculpatory. It requires being taken out of context to conclude that this is Brady. Further cementing this is the remaining content of the interview during which the witness explains that he had moved to Florida and had only met with the group once in person, before that move, in the summer of 2017. D.E. 401, Exhibit D at 4. Even at that early time, a member of the group told him that they take the conversations "beyond the Wire app" and encourage using burner cell phones. D.E. 401, Exhibit D at 4. The witness did not obtain a burner phone and had no knowledge of who did. D.E. 401, Exhibit D at 4. In fact, other evidence provided Defendant in discovery indicates that the Wire chat was not used for actual planning because of operational security; such planning would have been done in person. The evidence in this case strongly establishes that charged co-conspirators of this group utilized greater operational security the greater the perceived illegality.

Second, Defendant asserts that the witness "stated instead during that interview that the group was engaged simply in discussions and criticism of other groups." D.E. 401 at 3. Defendant does not directly quote from the summary of the

3

interview but rather provides his own conclusion. Notably, the word "criticism" only appears once within the entire summary:

> In addition, BSN members frequently discussed on Wire other violent white supremacy and Neo-Nazi groups such as the Atomwaffen Division (AWD). [The witness] noted the conversations were not based on any sort of admiration or affiliation to groups like AWD, but rather BSN's **criticism** of other groups' downfalls and mistakes. At the direction and guidance of COLLINS and PAUL, BSN deliberately stood alone and did not form any alliances with any other groups.

D.E. 401, Exhibit D at 8. The witness' interview does not show that the discussions were limited to discussions or criticisms of other groups or otherwise suggest that they did not have any violent intent. In fact, the interview establishes the contrary. Just as he extracted the first quote above out of context to make the Brady argument, here too, Defendant fails to put the conclusion he draws into context. The witness last met in person with the group in 2017 and did not disavow plans by the group – only knowledge of any plans, specifically explaining that "such conversations regarding plans or operations would likely be discussed behind closed doors or away from the Wire chat group for OPSEC purposes." D.E. 401, Exhibit D at 8. The fact that the witness, not in person with the group since 2017, did not know about specific plans that may have been made well after that year is not exculpatory.

### 2) October 26, 2020, FBI Agent's Summary of Interview of [the witness]

From the second interview, Defendant claims that "[the witness] elucidates that although there were conversations regarding explosives, 'there were no conversations […] that indicated that […] anybody […] had physically acquired any

4

explosive precursors or devices.'" D.E. 401 at 3. Review of the paragraph from which that language is extracted provides much greater insight:

> With regards to explosives, [the witness] was aware of several Wire conversations involving COLLINS, DUNCAN, and PAUL HARKER (PAUL) aka Deacon, in which they discussed tannerite. According to [the witness], the conversations about tannerite pertained to the explosive compound's lack of demolition capabilities. Based on the conversations, [the witness] believed that tannerite was not what BSN was ultimately looking for. [the witness] recalled another WIRE conversation in which COLLINS ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Butcher, discussed acquiring blasting explosives. ▓▓▓▓ informed the group that while conducting urban exploration or "URBEX", he had stumbled upon some blasting explosives in an old mine he discovered.
> [the witness] was unaware whether ▓▓▓▓ took any of the explosives from the mine or what the location of the mine was. For clarification, [the witness] stated **there were no conversations on Wire that indicated that ▓▓▓▓ or anybody else had physically acquired any explosive precursors or devices.** [The witness] was aware that ▓▓▓▓ often spent time between Rhode Island and New Jersey and participated in URBEX in both locations.

D.E. 401, Exhibit E at 1-2. During this second interview, the witness again affirmed he had not met the group in person since the 2017 camping trip, although noted he did attend two WWII re-enactments with Collins once in 2017 and once in 2018. D.E. 401, Exhibit E at 2. Again, he had already explained that due to the group's operational security, he would not have been in a position to know the kind of detail. His lack of knowledge of more specific information is not Brady.

### 3) *November 2020 Grand Jury Transcript of the witness' testimony*

Finally, Defendant quotes from the transcript of the witness' testimony before the Grand Jury. According to Defendant, the witness "explained that, in relation to power grid issues, the rest of the group had discussed it and it had seemed at the time 'they just thought it was interesting,' and how they had never discussed anything

5

specific." D.E. 401 at 3. This is an extremely narrow reading and again fails to place the words in context with the surrounding statements. The witness makes it very clear that Defendant and other members were potentially interested in the information for violent purposes:

> 16 Q. Do you recall, [witness], if there was ever
> 17 talk among the group about transformers, about attacking
> 18 transformers or the power grid?
> 19 A. There was. They had done a lot of research on an
> 20 incident that happened somewhere in the American
> 21 Southwest -- I believe Arizona, but I'm not positive --
> 22 where a -- an unknown group, because they still haven't been
> 23 found, used high-powered rifles and coordinated with
> 24 flashlight signals to shoot a bunch of transformers --
> 25 electrical transformers and they brought down the power grid
>
> 1 of their local area for a certain amount of time.
> 2 So they talked about that a lot in -- in the sense
> 3 of they could have done it so much better or they talked
> 4 about pros and cons of using radio communications versus
> 5 flashlight signals and things of that nature.
> 6 Q. And did you have some work experience with a power
> 7 company at some point?
> 8 A. I did. I contracted with the New York Power
> 9 Authority, not in any sense -- not in a power generation
> 10 sense. I taught the employees first aid and CPR. But
> 11 they'd asked me about it.
> 12 **Nothing specific**; like, never asking for any
> 13 entrance codes or, like, how often the guards rotated or
> 14 anything like that, but they just -- **it seemed like at the**
> 15 **time they just thought it was interesting**. I didn't put two
> 16 and two together.
> 17 Q. Have you put something together since then?
> 18 A. It does seem like they were trying to -- to use
> 19 that experience -- my experience to gain access to some
> 20 sites. But by the time that they were big on that whole
> 21 transformer idea, I was no longer working at the New York
> 22 Power Authority.

6

D.E. 401, Exhibit F at 29-30. Here, the reference to "they just thought it was interesting" refers to their questions of the witness as to his job at the time, not the greater conversations about transformers or the power grid, as noted in the paragraph preceding the quote.

Additional argument

While the witness' referenced statements may be areas for cross-examination, none of them are exculpatory or material. As suggested above, the fact that a witness does not know everything about a crime does not make that witness' lack of knowledge exculpatory. Consider a bank teller eating her lunch in a small alcove behind the teller-counter when the bank is robbed. She can hear, but cannot see, the robbery. The fact she had some knowledge of the crime, the time it occurred, the words used by the robber, the tone of the robber's voice, the sound of the slide on a gun being racked, the response by the teller being robbed, all do not make her inability to see the robber "exculpatory" in any way. If during the prosecution of such bank robbery the teller's interview which explained her vantage point (or disadvantage point) had been omitted from discovery, such omission would hardly be found to have affected the outcome of the trial.

Additionally, the government did not "suppress" the material; it was provided. The Government provided the material ten business days (amounting to 17 calendar days) before trial, giving Defendant sufficient time to use the material at trial. <u>Brady</u> material needs to be disclosed to a defendant in time for its effective use at trial. <u>United States v. Smith Grading & Paving, Inc.</u>, 760 F.2d 527, 532 (4th Cir. 1985),

7

*citing* United States v. Higgs, 713 F.2d 39 (3rd Cir.1983). Smith involved undisclosed exculpatory information which came out during trial, during the cross-examination of the very first witness, but was effectively used throughout the remainder of the trial.

Since the evidence was disclosed prior to trial, and sufficiently in advance of trial for Defendant to effectively use it, there is no Brady violation, and no remedy is necessary or appropriate. Defendant does not explain how he would have used this material if he had received it earlier. He claims that his efforts at preparing for trial have been misdirected for three years but does not explain how.

Finally, even *assuming arguendo* relief under Brady should be granted, the relief proposed by Defendant is inappropriate. The witness is to set to be a testifying Government witness. He can be cross-examined on any of the above information. For reasons unknown, Defendant appears to believe that the drafter of the summary of the interview of the witness is relevant and moreover, that the summary as written by the agent would be admissible evidence. No reason or justification has been provided to support this line of thought. In any case, the Government fully expects that the witness will testify consistent with both his grand jury testimony as well as the summaries of what the agents recalled him having told them and will be available for cross-examination. The proposed jury instruction is unwarranted, inappropriate, and without any evidentiary justification. The preferred remedy for such violation is the continuance of trial (United States v. Sterling, 724 F.3d 482, 512 (4th Cir. 2013)),

8

and would be what the government would likely have suggested had contact been made by Defendant prior to the filing of the motion.

Notwithstanding the government's position that the conduct complained of here was not a Brady violation, the government affirms its significant obligations under Brady, and affirms this late disclosure was unintentional. While these are materials that are not necessarily required for disclosure earlier than they were provided under any rule of evidence (e.g., Brady, R. 16, Jencks, etc.) – they are materials that the Government would typically provide much earlier. The fact that they were not provided earlier is attributable to a change in staffing during the lengthy pendency of the case and was caught as a result of the very communication found at D.E. 401, Exhibit C.[1] There, government counsel requested of Defendant specific reference to a discovery page which may have given indication a phone belonging to the witness had been seized, as the undersigned had had trouble finding it within discovery herself. After that communication, it was realized the two reports of interview were not in discovery and they were immediately disclosed. Although the burden of disclosure rests entirely on the government, one benefit of early and regular communication between counsel is that it is helpful to each in their common goal of the pursuit of justice.

---

[1] Defendant has provided the Court two excerpts from counsels' communications in the last three weeks much in the same manner as quotes from the interviews and transcript were used. To the extent the communications could be used for anything other than confirmation the date the communications were had, there are better and more demonstrative communications that refute in part Defendant's summary statement that as a result of this late disclosure, "[a] large portion of Mr. DUNCAN's defense preparation over the last three years has been misdirected as a result of this violation." D.E. 401 at 7.

9

Just before the filing of Defendant's motion for relief under Brady, Defendant filed a motion for access to a computer so he could review discovery before trial. In that motion and in addressing the Court in a subsequent hearing on that motion, it appeared that even without considering the instant issue, a continuance was likely in the works, and the Court suggested the government put its witnesses on notice of that possibility. Again, although the government disputes the characterizations of these two interview summaries as exculpatory when they are properly considered as a whole, for several reasons on and not yet in the record, the Government has no objection to a modest continuance of trial in this matter.

## CONCLUSION

For the above-stated reasons and in accord with the applicable law, the defendant's motion for relief under Brady (D.E. 401) should be denied.

Respectfully submitted, this 26th day of February, 2024.

        MICHAEL F. EASLEY, JR.
        United States Attorney

By:   */s/ Barbara D. Kocher*
      BARBARA D. KOCHER
      GABRIEL J. DIAZ
      Assistant U.S. Attorney
      150 Fayetteville St., Suite 2100
      Raleigh, NC 27601
      Telephone: 919-856-4530
      E-mail: barb.kocher@usdoj.gov
      NC Bar: 16360
      E-mail: gabriel.diaz@usdoj.gov
      NC Bar: 49159

CERTIFICATE OF SERVICE

This is to certify that I have this 26th day of February, 2024, served a copy of the foregoing filing upon counsel for the defendant in this action by electronically filing the same with the Clerk of Court, using the CM/ECF system that will send notification of such filing to counsel for the defendant.

*/s/ Barbara D. Kocher*
BARBARA D. KOCHER
Assistant U.S. Attorney
150 Fayetteville St., Suite 2100
Raleigh, NC 27601